1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF ARIZONA

3       Bogdan Radu,                   )  4:20-cv-00246-RM
                                       )
4                    Petitioner,       )
                                       )
5       vs.                            )
                                       )  Tucson, Arizona
6       Persephone Johnson Shon,       )  July 29, 2020
                                       )
7                    Respondent.       )
        _____)

8

9         Before the Honorable Rosemary Márquez, District Judge

10         Transcript of Proceedings - Evidentiary Hearing Day 1

11    APPEARANCES:

12    For the Petitioner:

13        Ann Nicholson Haralambie Attorneys, PC
          Ann Haralambie, Esq.   (Appearing via VTC and speakerphone)
14        3661 N. Campbell Avenue, Suite 130
          Tucson, AZ 85719-1527
15        (520) 327-6287

16        McNorton Fox, PLLC
          Lisa C. McNorton, Esq.
17        4400 E. Broadway Blvd, Suite 602
          Tucson, AZ 85711

18

19    For the Respondent:

20        The Kenney Law Firm, PLC
          Shaun P. Kenny, Esq.
21        485 S. Main Avenue, Bldg. 3
          Tucson, AZ 85701
22        (520) 884-7575

23    Proceedings reported and transcript prepared by:
          A. Tracy Jamieson, RDR, CRR - Official Court Reporter
24        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
25        Tucson, Arizona 85701   (520) 205-4266

    Proceedings reported by court reporter using steno machine
    shorthand; transcript prepared with court reporting software.

1                    INDEX OF COURT PROCEEDINGS

2
                                                      PAGE
3
     Motion in Limine to Discuss Scope of the Hearing.........    3
4
     Opening Statement by Petitioner (Ms. Haralambie).........   10
5

6

7

8

9                    INDEX OF EXAMINATIONS

10

11   WITNESSES:                                          PAGE

12

13   **BOGDAN RADU**

14       Direct Examination By Ms. Haralambie..................   15

15       Cross-Examination By Mr. Kenney......................   34

16

17   **JANET JOHNSON**

18       Direct Examination By Mr. Kenney......................   48

19

20

21

22

23

24

25

```
 1              (On the record at 9:48 a.m., as follows:)

 2              THE CLERK:  In civil matter 2020-246, Bogdan Radu

 3   versus Persephone Johnson Shon, on for a hearing on the merits.

 4      Counsel, please state your appearance.

 5              MS. McNORTON:  Good morning, Your Honor --

 6              MS. HARALAMBIE:  Ann Haralambie...

 7              THE COURT:  Go ahead, Ms. Haralambie.

 8              MS. HARALAMBIE:  Ann Haralambie for the petitioner,

 9   who is also present via this app that I am also on.

10              MS. McNORTON:  Lisa McNorton, co-counsel on behalf of

11   petitioner.

12              THE COURT:  Good morning.

13              MR. KENNEY:  Good morning, Your Honor.  May it please

14   the Court, Shaun Kenney with The Kenney Law Firm, appearing on

15   behalf of the respondent, Persephone Johnson Shon, who is

16   present and seated to my left.

17              THE COURT:  Good morning.

18              Counsel, this is the time set for a hearing on the

19   petition.  Are the parties ready to proceed?

20              MS. HARALAMBIE:  Yes, Your Honor.  I believe we have a

21   motion in limine to restrict the scope of the hearing.

22              THE COURT:  I'll go ahead and hear you on the motion

23   in limine, but I may just take that under advisement, since we

24   don't have a jury.  But go ahead, Ms. Haralambie.

25              MS. HARALAMBIE:  All right.
```

1          Basically, the issue goes to whether -- the first

2     issue goes to whether or not the well-settled defense applies

3     if the petition was filed within one year of the wrongful

4     retention or the wrongful removal.  We are alleging that the

5     wrongful retention occurred in August when the children were

6     not returned.  But even if you use the date that they left,

7     which was June 10th, 2019, we filed on June 8th, 2019, so we're

8     still within the year.  And the Convention doesn't talk about

9     time zone changes or leap years or leap days that Mr. Kenney

10     refers to.  But even if you looked at that, his position is,

11     well, it's close enough to a year.

12          However, we have a list of citations for the Court.  I

13     don't need to take up the Court's time reading in the

14     citations, but if you look at the *Blondin* case, they quoted the

15     Explanatory Report to the convention, which says that the

16     framers settled on the one-year time limit, which, although

17     perhaps arbitrary, nevertheless proved to be the least bad

18     answer to the concerns.  So it's within one year.

19          Mr. Kenney also argues --

20          THE COURT:  Ms. Haralambie?  Ms. Haralambie, let me

21     let Mr. Kenney respond.  It's his motion.

22          Go ahead, Mr. Kenney.

23          MR. KENNEY:  Yes, Your Honor.  May I approach?

24          THE COURT:  Yes.

25          MR. KENNEY:  Can you see me okay, Ann?

1          Okay.

2          MS. HARALAMBIE:  No.  But that's all right, I can hear

3    you.

4          MR. KENNEY:  Oh, I see.  Okay.

5          THE CLERK:  Hold on.

6          MS. HARALAMBIE:  I see the judge.

7          THE CLERK:  There you go.

8          MS. HARALAMBIE:  There you are.

9          MR. KENNEY:  That's more important.  I want you to see

10   the Judge.

11         Your Honor, we filed our response in opposition to the

12   motion in limine last night, citing to the fact that there is a

13   difference of opinion and interpretation of the facts and

14   application of the law that they have cited to these particular

15   facts.  The facts that will be developed during the testimony

16   are such that there were one-way tickets purchased by my

17   client's father, Brian Shon, on May 28th, 2019.

18       You are going to hear, however, there are prior incidents

19   that occurred in March of 2019 that led up to why she purchased

20   the tickets.

21       She told him in March and April "our marriage is done

22   unless you get help for your mental --"  oops.  Excuse me.

23       Anyway, bottom line is this:  She told him and showed him

24   one-way tickets, May 28th, and another fight ensued.  Another

25   fight ensued again on June -- I believe it's the 4th of 2019,

```
 1    when she again said, "I am leaving, I am going back to Tucson,
 2    Arizona."  So he was on notice of her intention to vacate and
 3    leave permanently with the kids in --
 4              THE COURT:  But she didn't leave until June of...
 5              MR. KENNEY:  June 10th, Your Honor.
 6              THE COURT:  June 10th.
 7              MR. KENNEY:  June 10th, 2019.
 8              THE COURT:  So if we work with that number --
 9              MR. KENNEY:  Yes, Your Honor.  The flight was out of
10    Frankfurt, Germany, 3:30 in the afternoon on June the 10th,
11    2019, and it landed here later in the day.
12              They filed their petition on June 8th, 2020, at 10:03
13    a.m., if I am not mistaken.  I looked it up, and it showed it's
14    10:03.
15        Nevertheless, because of the nine hours difference, and
16    because of the leap year, it was 364 and a half days from when
17    she left.  So that puts it like within inches of it being the
18    365.  So we are arguing that that's close enough to the 365,
19    one-year, requirement to allow the use of the well-settled
20    defense.
21        Also, Judge, the well-settled defense --
22              THE COURT:  You're saying, wait, that she almost
23    missed it, so you should allow the defense?
24              MR. KENNEY:  I'm sorry, Your Honor?
25              THE COURT:  Are you saying that she almost missed,
```

1   that the petitioner almost missed filing the petition within

2   that time frame, so the defense should come in?

3        MR. KENNEY:  I am saying that because it was filed at

4   364 and a half days from when they left, at 3:30, on June the

5   10th, that that's close enough to a year.  I mean, the framers

6   don't say 365, it does say a year, but they are so close to

7   that one-year limit that that would justify the use of the

8   well-settled defense.

9        But, Judge, that's not the only reason we're seeking

10  its application here.  Counsel has identified -- we have

11  provided the Court a citation to the case of *Blondin v. Dubois*,

12  238 Federal 3.d 153.  The internal cite is at 164.  It's the

13  Second Circuit Court of Appeals decision, 2001.  It was

14  actually the third time the case came up to the Court of

15  Appeals.  And in that particular case, the Court stated that

16  consideration of children's or the child's settlement into his

17  or her environment is only a factor under Article 13(b)

18  analysis.

19       We are relying on what's called the 13(b) grave risk

20  analysis under the Hague Convention.

21       THE COURT:  If you're relying on the 13(b) grave risk,

22  then how does the year play into that?

23       MR. KENNEY:  You can use the well-settled defense, and

24  the exhibits that would be produced on that, to address the

25  reasonable alternatives to sending the child back to Germany.

1   Your Honor can consider well-settled defense and the elements

2   from it if you have to decide on what the reasonable

3   alternatives are to sending the children back to Germany.

4       So we're saying the well-settled defense should apply

5   because we're close enough to the year, and, alternatively,

6   even if we're not on exactly that year, the well-settled

7   defense and the elements of that are applicable and a

8   reasonable alternative analysis that the Court may have to do

9   upon conclusion of this hearing today.

10           THE COURT:  About the grave risk defense, how does the

11  one year, if I find that -- if I don't agree with your analysis

12  of the one year, then my analysis for the grave risk defense, I

13  can still consider that without considering the well settlement

14  or the one year.  Is that correct?

15           MR. KENNEY:  That is correct, Your Honor.  You could

16  still consider the evidence that would have been supplement --

17  I'm sorry -- strike that.

18           You can consider the evidence that would have been

19  submitted under the well-settled defense in reaching your

20  analysis for the reasonable alternatives, which is the next

21  step beyond our presentation of the grave risk defense under

22  13(b).

23           THE COURT:  Thank you.

24           MR. KENNEY:  Thank you.

25           MS. HARALAMBIE:  If I can just respond to that part,

 1   Your Honor.

 2              THE COURT:  Yes, please.

 3              MS. HARALAMBIE:  If you look at the *Blondin* case, at

 4   pages 168 and 165, it was talking about consideration of the

 5   children being settled as part of the grave risk analysis,

 6   quote, in the particular and unusual circumstances presented in

 7   this case.  That's at 168.

 8              At 165, it talks about how it fits in, saying that the

 9   District Court had found that, quote, wrenching the children

10   away from the safe extended family environment in which they

11   would have begun to recover from the trauma caused by their

12   father's abuse would thwart their recovery by causing a

13   recurrence of the traumatic distress disorder they suffered in

14   France, the site of their father's sustained violent abuse.

15              So there is nothing -- even if you take as absolutely

16   true all of their allegations, nothing remotely constitutes,

17   you know, sustained violent abuse or anything of the nature

18   even rising to the level of grave risk, let alone --

19              THE COURT:  Ms. Haralambie?

20              MS. HARALAMBIE:  -- well-settled would refer to that.

21              THE COURT:  Ms. Haralambie?  We're getting --

22              MS. HARALAMBIE:  Yes.

23              THE COURT:  -- beyond the scope of the motion in

24   limine.

25              So I'm going to -- I am not inclined to -- I am

1    inclined to grant it, but I am going to hear testimony with

2    regards to the settlement, well-settled, as reasonable

3    alternatives if the grave risk is established.  So let's start

4    from there.  If we get to that point.

5          Ms. Haralambie, let's begin, and let's begin with you.

6    Any presentation that you'd like to make, or argument, before

7    we begin?

8          MS. HARALAMBIE:  Yes.  Just a very brief opening, Your

9    Honor.

10         Paragraph 7 of the answer admits that, as of June 10th,

11   2019, Germany was the children's state of habitual residence,

12   and that Mr. Radu had right of custody under German law.  The

13   *Friedrich* two [phonetic] case is a Sixth Circuit case that

14   addresses pretty dispositively almost all of the issues in this

15   case.  It's the leading case in the country.  It's been

16   approved of in a number of Ninth Circuit cases, including

17   *Cuellar*, *Asvesta,* and *Gaudin.*  That involved someone who was

18   habitually resident in Germany and, under German law, had

19   rights of custody.

20         (At 10:00 a.m., Petitioner appears on the VTC screen.)

21         Now, the mother is alleging that, while he had rights of

22   custody, he wasn't exercising them.  But *Friedrich* makes it

23   clear that, under German law, it takes a German court order to

24   be held not to be exercising your rights of custody.  And it

25   said that, absent that or an act or a statement with requisite

1  formality, like testimony, or a convincing written renunciation

2  of rights, or a consistent attitude of acquiescence over a

3  significant period of time, a parent who continues to exercise

4  custody rights, even during an acrimonious separation where

5  rash words are spoken, the left-behind parent -- if the

6  left-behind parent takes actions asserting that he wants the

7  children back, that will be held not to indicate that he has

8  somehow acquiesced to the children remaining in the United

9  States indefinitely or has given up his legal rights of

10  custody.

11      On the Article 13 issue, which is where I think most of

12  this case is going to go, it's our position that even if you

13  assume the truth of all of Ms. Shon's allegations, they do not

14  rise to the level of grave risk that is contemplated in Article

15  13, and it has been construed extremely narrowly by the courts,

16  especially the federal court, that it had to apply it.  And it

17  talks about not being serious with, but has to be truly grave.

18  And even in addition, as, again, *Friedrich*, you know, points

19  out, you need to say would the grave risk be something that if

20  the children were returned to Germany or a court in their state

21  of habitual residence to determine those factors, that it would

22  be intolerable.

23      So we believe that when they put on their case on grave

24  risk, at the end of their case you can find, as a matter of

25  law, that they have not met that defense.

1       So, for that reason, we would like to reserve, to rebuttal,

2  my client's testimony regarding grave risk, because we have a

3  short time.  And I think that if, even assuming the truth of

4  her allegations, you don't find there's grave risk, I don't

5  want to waste everyone's time by having my client go into that.

6         THE COURT:  Thank you.

7         MS. HARALAMBIE:  And as a preliminary matter, we have

8  stated, both parties have stipulated that all of our exhibits,

9  1 through 10, may come in, and the respondent's exhibits, 32

10  and 38 through 41, can come in without anything further.

11         THE COURT:  So Exhibits 1 through 10, and 32, 38 to

12  41?  Through 41.

13         MS. HARALAMBIE:  Correct.

14         THE COURT:  Are admitted without objection.

15       This matter had been scheduled for two hours, from

16  9:30 to 11:30.  We had some technical difficulties, started

17  late.  I do want to give you an opportunity to present rebuttal

18  testimony, so we may need to reschedule the continuation of

19  this hearing, if need be.  But let's start and see where we go

20  timewise.  If we do reschedule, it will be for another two-hour

21  time period.

22       Mr. Kenney?

23         MR. KENNEY:  Yes, Your Honor.  I'll approach the

24  podium again.

25     Your Honor, I wanted the Court to know I did set aside my

1   court appearances today, this afternoon; so if you would like

2   us to come back this afternoon, I understand Your Honor is very

3   busy --

4          THE COURT:  It's not that I am busy.  The fact is we

5   have -- and let me put that on the record so that there is a

6   clear record.  Because of the COVID-19 pandemic, the courthouse

7   only uses a certain number of courtrooms.  These courtrooms are

8   cleaned and are used by the other judges to conduct criminal

9   proceedings of time-served cases or cases that, pursuant to the

10  CARES Act, would be a harm to the interest of justice if they

11  were continued.  So these are people that are in custody that

12  need their cases resolved.

13         This courtroom happens to be one of those -- of the

14  two courtrooms I guess that are being used for these types of

15  cases.  So I have, in order to proceed with this hearing today

16  for the two hours, have cleared other cases and used my

17  allotted time period for this case.

18      And we're required to reserve this well in advance.  So

19  we're not going to have time.  This courtroom is taken up in

20  the afternoon, and the technology and the videos are limited.

21  So we would have to reschedule it to my next time period, which

22  I believe I'll have to request permission to be able to reserve

23  the courtroom again.

24      Next Wednesday, my time periods seem to be on Wednesdays,

25  I've got hearings all day, and I've got hearings in the

1   afternoon on Tuesday, so I'll have to look into it to see if I

2   can again clear a couple of hours.  And it would just really be

3   two hours that would be cleared.  Maybe I might be able to get

4   another hour in for the rest of the hearing.

5       So I would ask -- I want the parties to know I have read

6   everything, I will re-read everything before I rule, and if --

7   and I think I've given you a guideline as to what -- where I am

8   headed.  I am interested not in the well-settled as much as in

9   the grave risk issue, and I would ask that we focus on that,

10  unless there are any other controverted issues that need to be

11  addressed, just so that we can get that cleared up.

12          MS. HARALAMBIE:  Well, they had raised whether my

13  client was exercising his rights of custody; so I think the

14  law, and especially if you read *Friedrich,* is pretty clear that

15  he was.

16          THE COURT:  So in that case, Ms. Haralambie, I would

17  probably -- I'll leave that up to you to address, if that truly

18  is an issue, then you certainly need to address that, because

19  when I re-read everything and read the cases -- and, again, if

20  it's not clear by today's hearing, then we could probably

21  address it at the next hour.

22          MS. HARALAMBIE:  Okay.  And I am going to try and be

23  very brief, Your Honor.

24          THE COURT:  Thank you.

25          MS. HARALAMBIE:  And would ask my client to answer

 1  briefly.

 2          THE COURT:  I appreciate everyone's--

 3          MR. RADU:  I will.

 4          THE COURT:  -- cooperation during these times, but I

 5  just wanted to let you know why we're -- I am not rushing

 6  because I've got other more important things, I'm just trying

 7  to allot time for this very important matter in addition to the

 8  other cases that also need to go forward.

 9      Thank you.  You may proceed, Ms. Haralambie.

10          MS. HARALAMBIE:  Thank you.  I'd like to swear in my

11  client, Bogdan Radu.

12          MR. RADU:  Yes.

13          THE COURT:  Please raise your right hand, sir.

14          THE CLERK:  Raise your right hand, please.

15          MR. RADU:  I have it raised.  I am not sure if I have

16  video feed because --

17          THE COURT:  Oh, I think he's --

18          MS. McNORTON:  It looks like you're --

19          MS. HARALAMBIE:  He looks frozen.

20          THE COURT:  That's fine.  Go ahead.

21                  **BOGDAN RADU**, WITNESS, SWORN

22                      DIRECT EXAMINATION

23  BY MS. HARALAMBIE:

24  Q.  Could you please state your name for the record.

25  A.  My name is Bogdan Radu.

1   Q.  Mr. Radu, you and Ms. Shon are the parents of two children,

2   is that correct?

3   A.  That is correct.

4   Q.  Octavian, you call "Tavi," who is six?

5   A.  That is correct.

6   Q.  And Maximilian, who you call "Max," who is four.  Correct?

7   A.  That is correct.

8   Q.  And Exhibit 1, which is in evidence, is that a photograph

9   of you and the two boys?

10  A.  That is...[lapse in audio transmission].

11  Q.  Your wife has admitted that when she left Germany with the

12  children in June of 2019, Germany was their state of habitual

13  residence.  How long had you and the family been living in

14  Germany?

15  A.  She moved to join me in the middle of March 2016...[lapse

16  in audio transmission]...a little bit earlier, around

17  December...[lapse in audio transmission].

18  Q.  Okay.  What is your job in Germany?

19  A.  [Garbled/indiscernible words]...a logistic business, and I

20  used to be a government contractor, project engineer in the

21  Army Corps of...[garbled/indiscernible words].

22  Q.  Our Exhibit 3 in evidence shows an extended proof of

23  residence in Germany, and that includes you, Ms. Shon, and the

24  two children, correct?

25  A.  That is correct.

1   Q.  And is that similar to what we would call a "green card" in

2   the United States?

3   A.  That is correct.

4   Q.  How long did the children attend kindergarten in Germany?

5   A.  [Garbled/indiscernible words]...started in August 2016.  So

6   then our youngest one started in August twenty...let's see.  I

7   would say a year before he actually left Germany.  So around

8   August 2018.  So both children were three years and one year in

9   kindergarten.

10  Q.  So I guess kindergarten starts a little earlier in Germany

11  than it does in the United States, which is usually around

12  five?

13  A.  That is correct.  About two and a half, three years, give

14  and take.

15  Q.  Now, both you and your wife indicate that she had taken the

16  children to the United States to visit her parents for two

17  months in 2017, with your consent.  She agreed to that in

18  paragraph 4 of her answer.  And then she took them again in

19  June of 2019.  What was your understanding of the circumstances

20  around that trip in 2019?

21  A.  My understanding was that she was taking the children to

22  visit her parents on a two-month type of summer vacation.

23  Q.  Did she verbally tell you any kind of return date for when

24  she expected to be back?

25  A.  Yes.  She told me she was planning to stay around two

1    months, just like the previous in twenty...[lapse in audio

2    transmission].

3    Q.  At some point you understood that she only had a one-way

4    ticket to the United States, correct?

5    A.  That is correct.

6    Q.  And did you have any understanding, one way or another,

7    whether that meant that she just hadn't purchased a return

8    ticket yet or that she was planning to never return the

9    children?

10   A.  No.  My understanding was that she would return the

11   children around the two months time frame.

12   Q.  And when she left in June of 2019, did she take all of the

13   children's toys and clothing and other belongings related to

14   the children?

15   A.  No, she did not.  Everything that you mentioned was left in

16   the apartment.

17   Q.  And did she ask you to pack them up and send them to her?

18   A.  No, she did not.

19   Q.  At some point you left the apartment that you were in, is

20   that correct?

21   A.  I'm sorry, can you repeat the question?  You were breaking

22   up a little bit.

23   Q.  Sorry.  At some point did you leave the apartment that you

24   all had been living in in June of 2019?

25   A.  The apartment, I was still residing there in June of 2019

 1   when she left.

 2   Q.  But then did you go to some different apartment later on?

 3   A.  No, I did not.

 4   Q.  Did you go to another house or something?

 5   A.  No, I did not.  That was my primary residence, even after

 6   they left.

 7   Q.  Okay.  That's not your current -- that particular apartment

 8   is not your current residence; correct?

 9   A.  [No audible response heard.]

10   Q.  Could you hear me?

11   A.  [No audible response heard.]

12            MS. HARALAMBIE:  Have we lost him?

13            THE COURT:  We've lost him, yes.

14            MS. HARALAMBIE:  I can make an offer of proof that I

15   think Mr. Kenney would agree to.

16            MR. KENNEY:  Go ahead.

17            THE WITNESS:  I'm sorry, I lost the audio.  I'm back

18   again.

19            THE COURT:  He's back.

20            MS. HARALAMBIE:  Okay.

21            THE WITNESS:  Can you repeat the last question,

22   please.

23   BY MS. HARALAMBIE:

24   Q.  Yeah, at some point the landlord told you you had to leave,

25   correct?

DIRECT EXAMINATION - RADU

1   A.  That is correct.  And I was planning to leave to see my

2   parents in November of 2019, give and take, end of

3   November...[garbled/indiscernible words].

4   Q.  And they were in -- your parents were in Romania, correct?

5   A.  That is correct.  I was planning to visit them about, give

6   and take, about two and a half months, like end of January

7   beginning of March.

8   Q.  And when you --

9   A.  [Garbled/indiscernible words].

10  Q.  Okay.  You went to visit your parents sometime after June

11  of 2019, correct?

12  A.  That is correct.  I left to visit my parents around the

13  19th of November, 2019.

14  Q.  And up until that time, had you remained in the same

15  apartment that the whole family had lived in before June?

16  A.  That is correct.  That is correct.

17  Q.  When did you first learn that your wife would not be

18  bringing the children back to Germany?

19  A.  I have learned that after middle of July 2019, around the

20  15th or the 16th of July.

21  Q.  And you had a variety of communications with her that are

22  included in, in an exhibit showing different Facebook messages?

23  Is that correct?

24  A.  That is correct.

25  Q.  I believe that's our Exhibit 4.

DIRECT EXAMINATION - RADU

1        And on July 16th, she says she wants to come back, but

2   can't if you blame her for everything.  Is that right?

3   A.  That is correct.

4   Q.  And then you ask her for her plans and you want a timeline,

5   and on July 20th, she says:  At the moment I've decided to stay

6   here.  Is that correct?

7   A.  That is correct.

8   Q.  And then on August 10th she says:  At the moment we're not

9   coming back any time soon, the kids started school.  Is that

10  right?

11  A.  That is correct.

12  Q.  So on that same day, you say:  So are you telling me that

13  you are leaving me and breaking our family?  Is that correct?

14  A.  That's correct.

15  Q.  Is that the first time you understood that it was her

16  intention to end your marriage and to keep the children with

17  her in America?

18  A.  That is correct.

19  Q.  Did you ever consent to the children changing their

20  residence to the United States?

21  A.  No, I had not.

22  Q.  Today, as you're testifying, do you consent to the children

23  remaining in the United States?

24  A.  No, I have not considered [phonetic] that.

25  Q.  Did you ever offer to sell your children to Ms. Shon or her

 1  parents?

 2  A.  No, I did not.

 3  Q.  Again, I am going to be referring to Exhibit 4 and the

 4  various Facebook messages.

 5          THE COURT:  Ms. Haralambie, one moment, please.  I am

 6  looking for Exhibit 4.

 7          MS. McNORTON:  Your Honor, I provided a bench book in

 8  the binder.

 9          THE COURT:  Thank you.  You may continue.

10          MS. HARALAMBIE:  Okay.

11  BY MS. HARALAMBIE:

12  Q.  After she told you on --

13          MS. HARALAMBIE:  And, Your Honor, Exhibit 4, you have

14  to read from the bottom of the back, up, because that's how the

15  messages are recorded.  So if you want to read them in order,

16  you have to basically read them backwards.

17          THE COURT:  Thank you.

18          MS. HARALAMBIE:  It took me a minute to figure that

19  out myself.

20  BY MS. HARALAMBIE:

21  Q.  So, after August 10th, when it was clear to you that she

22  was saying she was never going to return, did you say or write

23  things to her that you now regret?

24          MR. KENNEY:  Your Honor, before he answers, I just

25  have to lodge an objection.

1  A.  Yes, I did.

2          MR. KENNEY:  Excuse me.  I just have to level an

3  objection to the form of the question that was advanced by

4  Ms. Haralambie is leading, especially with the phrase, you

5  know, "upon it being clear to you on this date."

6          THE COURT:  Sustained.  Rephrase your question,

7  please.

8          MS. HARALAMBIE:  Okay.

9  BY MS. HARALAMBIE:

10  Q.  After the August 10th messages between you and your wife,

11  did you say or write things to her that you now regret?

12  A.  I've lost audio.  I am sorry.  Can you repeat what was

13  said?  I didn't catch...

14  Q.  After August 10th, 2019, did you say or write anything to

15  your wife that you now regret?

16  A.  There are things that I said that I regret, in retrospect,

17  you know.

18  Q.  Can you tell the Court what your emotional state was at the

19  time you wrote the things that you regret.

20  A.  I was, like, hurt, angry, was distressed, and I was feeling

21  hopeless to a certain extent.

22  Q.  One of the things or a couple of times you talk about

23  giving her various options.  Do you recall that?

24  A.  Yes, I do.

25  Q.  And among the options, you talk about wanting her to come

1  back, and then you talk about she would have to pay a certain

2  amount of money in order for you to walk away from the

3  children.  Was that a serious offer you expected she might

4  accept?

5  A.  Probably not at the time.  But my view of the situation was

6  like...[garbled/indiscernible words]...has happened financially

7  to us.  So it was...[garbled/indiscernible words]...caused a

8  lot of different things in my mind.

9  Q.  Were those offers that you included things that you were

10  intending to show that you were now okay or consenting to her

11  staying in the United States with the children?

12  A.  No, I wasn't consenting to her staying in the United States

13  with the children.

14       MS. HARALAMBIE:  Your Honor, Exhibit 5 is an affidavit

15  from Mr. Radu's German attorney, talking about his exercise of

16  rights of custody remaining with both parents even after there

17  is a separation of the parties; so that is not in issue.

18  BY MS. HARALAMBIE:

19  Q.  What efforts, after your wife left with the children, did

20  you make, I'm sorry, after August 10th, when you asked the

21  question about, "so you're saying that you're leaving me," what

22  efforts did you make after that time to assert your rights of

23  custody or your right to have the children returned to you?

24  A.  On September 15th, I reported to the Tucson PD, I have --

25       MS. HARALAMBIE:  Just a minute, Mr. Radu.

```
 1        Your Honor, that's Exhibit 7.

 2             THE COURT:  Thank you.

 3   BY MS. HARALAMBIE:

 4   Q.  I'm sorry, Mr. Radu.  What else did you do?

 5   A.  Around the 19th or 20th of December 2019, I contacted the

 6   local FBI branch in Tucson, FBI satellite office, and spoke

 7   with a...[garbled/indiscernible words]...there.  Around the

 8   same time frame, I spoke with the...[garbled/indiscernible

 9   words]...unit...[garbled/indiscernible words]...and they told

10   me that, according to their...[garbled/indiscernible words] --

11             THE COURT:  According to their what?  I'm sorry.

12   A.  [Garbled/indiscernible words]...January the

13   12...[garbled/indiscernible words].

14             THE COURT:  I am having trouble hearing.

15   A.  I filed a formal application there --

16             THE COURT:  Hold on.  Mr. Radu, we are having trouble

17   hearing.

18             MS. HARALAMBIE:  I think the last thing we heard was

19   that you contacted the FBI in Tucson.  That's the last thing I

20   could understand.

21             THE COURT:  It's breaking up.

22             Go ahead, Mr. Radu.  Let's try again.

23        [No audible response heard.]

24             THE COURT:  Are you there, sir?

25        [No audible response heard.]
```

```
 1              THE COURT:  I think we lost the connection.

 2              MS. HARALAMBIE:  Your Honor, I'd just direct you to

 3   Exhibit 8, which is the application filed on January 12th,

 4   2020, with the German federal government.  And on page 7 of

 5   document 1-5, which is page -- which is paragraph 8, on page

 6   40, in the exhibit packets, he has a statement of the various

 7   people that he contacted.

 8              THE COURT:  Thank you.

 9              MR. KENNEY:  If that was an offer of proof, we would

10   so stipulate to that information.

11              THE COURT:  Thank you.

12              MS. HARALAMBIE:  Are you back, Mr. Radu?

13              THE WITNESS:  Yes, Ms. Haralambie, I am back.

14              MS. HARALAMBIE:  Okay.

15   BY MS. HARALAMBIE:

16   Q.  You testified a little bit ago that you went to see your

17   parents in Romania, in November.  How long did you intend to

18   stay with your parents?

19   A.  It was just a temporary, short stay.  Usually the holiday

20   season, Christmas, New Year's, a little bit after New Year's,

21   maybe January.  And I was planning to actually leave around, I

22   would say, middle of March, beginning of March, but then the

23   pandemic shut the country down as well.

24   Q.  Okay.  I'll get to the COVID issues in a minute.  But when

25   you left to visit your parents, did you have any intention, one
```

DIRECT EXAMINATION - RADU

1  way or another, with respect to your German extended residency?

2  A.  Absolutely.  I've always considered Germany to be my

3  habitual residence, because I've paid taxes there for the past

4  four years.  My children were there for the past three and a

5  half years.  So there was no reason for me to, like, move

6  permanently out of the blue.  I have a storage unit where I

7  keep some of my business property and some of the other

8  properties that I have.

9  Q.  What did you do with your car?  Did you drive to Romania

10  or?

11  A.  No, I took like a shuttle...[garbled/indiscernible

12  words]...type.  Because it's a long drive, it's about like 60

13  or more kilometers.  [Garbled/indiscernible words.]

14  Q.  What did you do with your car from Germany?

15  A.  My car remained in Germany.

16         MS. HARALAMBIE:  Your Honor, Exhibit 9 shows receipts

17  from November 2019 through 2020.

18  BY MS. HARALAMBIE:

19  Q.  Mr. Radu, do you have that exhibit in front of you?

20  A.  Yes, I do.

21  Q.  Do those storage receipts pertain to your belongings from

22  your German apartment?

23  A.  That is correct.  That storage unit, it has been used to

24  move the personal effects from the previous apartment and some

25  of my business effects I have from my company.

1   Q.  And you had testified earlier that when Ms. Shon left with

2   the children she did not take all of their belongings,

3   clothing, toys, et cetera, that she left them in the apartment.

4   What did you do with those when you went to Romania?

5   A.  I packed them myself.  Basically I packed the entire

6   contents of the apartment.  It took me about two or three days,

7   because there was a lot of stuff.  And I put it in my car that

8   my...[garbled/indiscernible words]...to move them to

9   my...[garbled/indiscernible words]...storage...

10  [garbled/indiscernible words.]

11  Q.  So are those items still in the country of Germany?

12  A.  Yes, they...[garbled/indiscernible words]...a monthly

13  storage bill for those particular pieces of property

14  ...[garbled/indiscernible words.]

15  Q.  You just testified a little bit ago that you had expected

16  finally to return in March.  Before that, you had talked about

17  staying through the holidays, or maybe January.  So why would

18  you still have been there in March before the pandemic?

19  A.  My parents are not very well.  My dad has like some

20  systemic health issues, so...[garbled/indiscernible

21  words]..he's been through like several medical checkups for the

22  past six months, now he's doing some procedures.  So it was

23  almost like a support for him.  I didn't want to stay that

24  long, but...[lapse in audio transmission.]

25  Q.  So what role did the pandemic play in you not being able to

1  return to Germany as planned in March?

2  A.  [No audible response heard.]

3  Q.  Can you still hear, Mr. Radu?

4  A.  Yes...[garbled/indiscernible words]...back again...

5  [garbled/indiscernible words.]

6  Q.  You had said that --

7  A.  I can hear.

8  Q.  You had said that you planned to return in March, but then,

9  you know, the pandemic hit.  So can you very briefly tell the

10 judge what effect the pandemic has had on you returning to

11 Germany since March.

12 A.  Basically for three months you couldn't do

13 ...[garbled/indiscernible words]...total lockdown here on this

14 particular area of where I am currently.  And

15 ...[garbled/indiscernible words]...only have been lifted in the

16 last month or so.  Now because...[garbled/indiscernible

17 words]...a day.  It's been very, very challenging to plan a lot

18 of vacation,...[lapse in audio transmission]...outings, and

19 it's -- it's...[garbled/indiscernible words]...for me, it's

20 just hard for everyone, including Romanian citizens and other

21 EU citizens alike.

22 Q.  All right.  Let me -- let stop you there.  Do you have a

23 lease for a residence in Germany?

24        MS. HARALAMBIE:  I believe, Your Honor, that's

25 exhibit --

```
 1    A.  Yes, I do.

 2            MS. HARALAMBIE:  -- 10.

 3    A.  I do.

 4    Q.  And Exhibit 10 says it's effective July 15th, 2020,

 5    correct?

 6    A.  That is correct.

 7    Q.  And that's two bedrooms, enough for the whole family, is

 8    that correct?

 9    A.  That is correct.

10    Q.  In order -- today, right now, you are talking to us from

11    Romania, correct?

12    A.  That's correct.

13    Q.  In order for you to get from Romania back to Germany, do

14    you have to travel through any other countries?

15    A.  Yes, I have to go to Hungary and Austria.

16    Q.  And in going from Romania to Hungary to Austria to Germany,

17    do you have to meet all of the COVID-related requirements of

18    each of those countries?

19    A.  That is correct.  I have to provide a COVID-free status in

20    the last 72 hours, I believe, for Hungary, and

21    ...[garbled/indiscernible words]...days for Austria.  And these

22    tests, they have to be translated either in Hungarian, German

23    or English, for that matter.  And the test cannot be older than

24    72 hours.

25    Q.  And have you been attempting to get the COVID test so that
```

 1   you could leave?

 2   A.  Yes.  But in this particular area where I am, in Baia-Mare,

 3   the waiting time is anything between one and like three weeks

 4   to get a COVID test, which is non-medical related.

 5   Q.  And I assume, by saying that, you're not symptomatic.

 6   Correct?

 7   A.  No, I don't have any symptoms.

 8   Q.  So, as far as you know, if you got the test, you think you

 9   would probably test negative and be able to travel?

10   A.  Yes, I am confident of that.

11   Q.  What is your intention with respect to returning to

12   Germany?

13   A.  Basically I consider Germany to be my base of operations

14   for my business that I own.  Because most of my colleagues,

15   they originate from that particular area of Germany.  And

16   that -- it's a big crossroad of the two major highways where my

17   traffic goes on the east side, as far

18   as...[garbled/indiscernible words]...and my drivers are

19   concerned.  And it's like a certain amount for me to be on a

20   permanent basis.  And I have for four years now.

21   Q.  Are you planning to return to Germany as soon as you can

22   get the negative test within the time frame that will allow to

23   you return?

24   A.  That is correct.

25           MS. HARALAMBIE:  Your Honor, I have a few questions

1   related to ICARA, I don't know if you want me to do them now.

2   I can probably do them in five minutes.

3          THE COURT:  Go ahead.

4          MS. HARALAMBIE:  To the request for attorneys fees and

5   costs.

6          THE COURT:  Let's move on before you -- we can address

7   those at a later time.

8          MS. HARALAMBIE:  Okay.  Then that's all I have, Your

9   Honor.

10          THE COURT:  Thank you.

11          I have a question, Mister -- am I pronouncing your

12   name correctly, Radu?

13          THE WITNESS:  [No audible response heard.]

14          THE COURT:  I think we lost him again.

15          THE WITNESS:  I am back again on audio,

16   Ms. Haralambie.  I'm sorry.

17          THE COURT:  Thank you.  I just have a quick question,

18   Mr. Radu.  Are you currently employed or working?

19          THE WITNESS:  Yes, I have my own company, ma'am.  Your

20   Honor.

21          THE COURT:  Are you working?  Are you running your

22   company from Romania?

23          THE WITNESS:  Yes, I have a business office on the

24   western part of Romania, in Timisoara.  And obviously I have my

25   lease on the western end of my...[lapse in audio

```
 1    transmission]...in my residence near Kaiserslautern.

 2            THE COURT:  In where?  I'm sorry?

 3            THE WITNESS:  And I have three employees.

 4      Kaiserslautern is the major Metro area where the residence

 5    is located.

 6            THE COURT:  And that's in Romania or Germany?

 7            THE WITNESS:  [No audible response heard.]

 8            THE COURT:  I'm sorry, Ms. Haralambie, maybe you

 9    can --

10            MS. HARALAMBIE:  I see his mouth moving, but I can't

11    hear him.

12            THE COURT:  Oh.

13            MS. HARALAMBIE:  Did you turn off your microphone?

14            THE WITNESS:  No, I did not.  My microphone is on.

15            THE COURT:  Okay.  Now I can hear you.  I can hear

16    you.

17            I was asking, so explain to me your business right

18    now.  You have a business that you run, and you're currently

19    running it from Romania.  You have an office in Romania?  Is

20    that what you said?

21            THE WITNESS:  Yes, Your Honor, on the western part of

22    Romania, in Timisoara.

23            THE COURT:  And you have three employees.

24            THE WITNESS:  That is correct.

25            THE COURT:  And do you have -- and when you were in
```

1    Germany, did you have an office in Germany?

2           THE WITNESS:  At one point I was -- I was looking...

3    [garbled/indiscernible words]...circumstance

4    ...[garbled/indiscernible words]...issues of the building.  So

5    if I do not continue the lease, I will get another office in

6    the next month or so.

7           THE COURT:  Thank you.

8           Go ahead, Mr. Kenney.

9           MR. KENNEY:  Thank you, Judge.  Before I begin, may I

10   approach to --

11          THE COURT:  Yes.

12          MR. KENNEY:  -- give Your Honor a set of exhibits we

13   may be referring to as well, today?

14          THE COURT:  Thank you.

15          MR. KENNEY:  Can you hear me, Mr. Radu?  Hello?

16          THE WITNESS:  I can hear.  Yes, I can hear.

17          MR. KENNEY:  Thank you, sir.

18                       CROSS-EXAMINATION

19   BY MR. KENNEY:

20   Q.  On the issue that the Court was just inquiring about, your

21   business is called KMC Auto Travels BM SRL.  Is that correct,

22   sir?

23   A.  That is correct.  That is my company registered in Romania.

24   Q.  And that business was just established in 2020.  Is that

25   correct, sir?

1   A.  That is correct, in January of 2020.

2   Q.  And in the registration with the Romanian government, you

3   show that you have two addresses -- well, I am sorry, it

4   appears to be one address, and that's at Municipal Baia-Mare,

5   Baia-Mare.  Forgive me, I don't speak Romanian.

6   A.  That is correct.

7   Q.  That is correct.  Okay.  So, just so we're clear, your

8   business, KMC Auto Travels BM SRL, didn't start until January

9   of 2020.  Is that correct?

10  A.  It got...[garbled/indiscernible words]...2020.

11  Q.  Very good, sir.

12      And you list the business, KMC, on your lease.  Do you

13  happen to have a copy of Exhibit 10 in front of you?

14  A.  If not, I'll help you.

15  Q.  Do you see that, sir?

16  A.  [Garbled/indiscernible words.]

17  Q.  Right there?  It says KMC Auto Travels BM SRL.

18  A.  That is correct.

19  Q.  Okay.  Thank you.

20  A.  That is my company.

21  Q.  Thank you.

22      And to make sure we're clear, too, and I think you just

23  answered this for Her Honor and myself, the KMC Auto Travels

24  never had an office in Germany.  Correct?

25  A.  [No audible response heard.]

1   Q.  Sir, can you hear me?

2   A.  [No audible response heard.]

3   Q.  Mr. Radu, can you hear me?

4   A.  [No audible response heard.]

5          MR. KENNEY:  I think that's pretty much an affirmative

6   anyway, based on the facts.

7          Let's see if we can move on.

8          Can you hear me at all, sir?

9          THE COURT:  He is going to have to call back.  Give it

10  a moment.

11     (Pause.)

12         THE COURT:   Mr. Radu, are you back?

13         MS. HARALAMBIE:  Would we have a better connection if

14  he wasn't doing video as well?

15         THE CLERK:  I think if he called in on that AT&T line

16  that I provided for the last hearing, that would come in pretty

17  clear.  And I was just checking with our tech person, he might

18  be able to do both simultaneously if he mutes the audio on the

19  Jabber, the video connection, and then makes a telephone call

20  and comes in over the AT&T line for the audio.

21         THE COURT:  Tracy, you don't have to.

22     (A discussion was held off the record.)

23         THE COURT:  Let's take a 10-minute recess and allow

24  this to work out.

25     (Recess taken from 10:44 a.m. to 11:00 a.m.)

```
 1              THE COURT:  We are back on the record.
 2         You may proceed, Mr. Kenney.
 3              MR. KENNEY:  Thank you.
 4   BY MR. KENNEY:
 5   Q.  Mr. Radu, before we cut out, all I wanted to establish, and
 6   I think you answered it previously to Her Honor's questions, is
 7   that business we talked about has absolutely no offices, no
 8   employees, nothing like that, no connection to Germany.
 9   Correct?
10   A.  [Garbled/indiscernible words.]
11              THE COURT:  I did not understand that.
12   BY MR. KENNEY:
13   Q.  Could you repeat that, sir.
14   A.  My branch in Romania obviously has Romanian citizens and
15   employees, including myself as a business owner.
16   Q.  Is that a yes or a no?  Sir?
17   A.  I have set up the company in Romania, but I can operate
18   points of work anywhere under EU.
19   Q.  Let's move on, Mr. Radu.
20              MS. HARALAMBIE:  I think the audio was better on
21   Jabber.  I'm having a hard time understanding him.
22              THE WITNESS:  Is it better on Jabber?  Do you want me
23   to go back on Jabber?
24              MR. KENNEY:  That's better.
25              MS. HARALAMBIE:  Now I can understand.
```

1           THE COURT:  That's better.

2           MS. HARALAMBIE:  Now I can understand.

3           MR. KENNEY:  Whatever you were just doing just a

4     second ago, please keep doing it.

5     BY MR. KENNEY:

6     Q.  Okay.  Anyway, let's see, what I want to talk about is,

7     your only connection to Germany at this time is the storage

8     unit that you say has your personal belongings and this

9     apartment that you've never even seen.  Is that correct, sir?

10    A.  No, that is not a correct statement.  As a veteran, I have

11    access rights to the military facilities in the Kaiserslautern

12    area; full, unencumbered rights, anytime, anywhere.

13          THE COURT:  Sir, are you on a speaker phone, or could

14    you put the phone closer to you?

15          THE WITNESS:  Yes.  How about now?  Can you hear me

16    now?

17          THE COURT:  That's better.  Speak loudly and slowly,

18    please.  Go ahead.

19          THE WITNESS:  Yes, Your Honor.

20    BY MR. KENNEY:

21    Q.  Could you repeat what you just said, sir.  We can't hear

22    you out here.

23    A.  Because of the new National Defense Authorization Act, and

24    from January 2020, and because I am a veteran, I have a special

25    ID card that gives me privileges to all the military bases in

1    Germany.

2    Q.  Okay.  You have these privileges, that doesn't necessarily

3    mean you have any connection to Germany.  Correct?

4    A.  No, that is not a correct statement.  I have been living in

5    Germany since December 2016.  I don't pay taxes in Romania.  I

6    have only paid taxes in Germany for the past four or five

7    years.  I have never paid income tax in Romania.  I've never

8    earned any income in Romania.  My income has always been earned

9    from the United States and Germany.

10            THE COURT:  And is your income currently from the

11   United States and Germany, even though your office is in

12   Romania?

13            THE WITNESS:  That is correct.

14            MR. KENNEY:  Okay.

15   BY MR. KENNEY:

16   Q.  Isn't it true, sir, you've had other storage units before

17   now?

18   A.  I am sorry, can you repeat the question?  You're breaking

19   up.

20   Q.  My point is this, sir, you've had other storage units.  For

21   example, in Stockton and Tracy.  You've had a storage unit once

22   you and your wife moved from Tahoe to Germany.

23   A.  Yes, that is correct.

24   Q.  And those have been abandoned, and the property inside have

25   been sold.  Correct?

CROSS-EXAMINATION - RADU

1   A.  That, I don't know, to my knowledge, at this time.

2   Q.  You were never able to retrieve those items from the

3   Stockton or Tracy storage, were you, sir?

4   A.  No, I was not.

5   Q.  And it's also true that you had vehicles in storage in Long

6   Beach, California, too.  Correct?

7   A.  That is correct.

8   Q.  You're not alleging that California, Stockton, Tracy, or

9   Long Beach, California, were your state of habitual residence,

10  are you, sir?

11  A.  Can you repeat the question?

12  Q.  Well, that's calling for a legal conclusion, so I am going

13  to withdraw the question.

14      Let's go ahead and talk about when you got word that

15  Persephone would be leaving for Germany for good.  But before

16  we do, you brought up an interesting situation.  In March of

17  2017, Persephone left for two months and came to visit her

18  parents.  Is that correct?

19  A.  That is correct.

20  Q.  Is that a yes, sir?

21  A.  Yes.

22  Q.  And when she left, she had round trip tickets, she showed

23  you she had round trip tickets and she was leaving in March of

24  2017 and coming back two months later in May.  Correct?

25  A.  I bought -- in March 2017, I bought those plane tickets

CROSS-EXAMINATION - RADU

```
 1   myself, round trip tickets, that is correct.
 2   Q.  Very good.  Was it also on Condor Airlines?
 3   A.  Can you repeat the question?  It's breaking up again.
 4   Q.  You know what, it's not very relevant as to that.
 5       Nevertheless, you bought round trip tickets for your wife
 6   to come -- to leave Germany, come to Tucson, and return two
 7   months later.  Correct?
 8   A.  That is correct.
 9   Q.  Okay.  Yet when she showed you the receipt from Condor --
10   I'm going to show you what we've got marked as Exhibit 32 --
11   A.  Are you talking about 2017 or 2019?  You mentioned 2017.
12   Q.  Thank you for clarifying.  That's 2019 I am showing you
13   right now.  Do you see that in front of you?
14           THE CLERK:  He can't see it, he's only on the
15   telephone.
16           MR. KENNEY:  Oh, he's not got visual?
17           MS. McNORTON:  Mr. Kenney, you can refer him to the
18   exhibits, though.  He does have exhibits.
19           MR. KENNEY:  Okay.  Thank you.
20   BY MR. KENNEY:
21   Q.  Mr. Radu, do you have Defendant/Respondent's Exhibit 32 in
22   front of you, sir?
23   A.  On what page would that be?
24   Q.  That's the first page of Exhibit 32, sir.
25           MS. HARALAMBIE:  Your Honor, that exhibit is in
```

```
 1  evidence and speaks for itself, which may solve the audio
 2  problem.
 3          MR. KENNEY:  I think that's fine.  We'll move on.
 4          Nevertheless, when you were shown the itinerary, one
 5  way, on May 28, 2019, you became angry and upset at Persephone
 6  and started calling her and her family names.  True?
 7          MS. McNORTON:  Objection.  Compound question.
 8          THE COURT:  Sustained.  Rephrase your question,
 9  please.
10          MR. KENNEY:  Thank you.
11  BY MR. KENNEY:
12  Q.  How did you behave -- when you saw the itinerary that
13  showed one-way travel on May 28, 2019, how did you respond,
14  sir?
15  A.  I had asked how come I don't have a round plane ticket, I
16  believe, if I recall exactly.
17  Q.  You asked her why there was not a round trip ticket?  Is
18  that yes?
19  A.  I believe I have.  Yes.
20  Q.  What was her response?
21  A.  I don't recall.
22  Q.  In fact, sir, what she told you is, "I'm not coming back."
23  Isn't that right?  She told you that May 28, 2019.
24  A.  No, that is not --
25          MS. HARALAMBIE:  I'm going to ob....
```

```
 1              THE COURT:  What is your objection, Ms. Haralambie?
 2              MS. HARALAMBIE:  I was going to object for hearsay,
 3    except to the extent that it goes to notice.
 4              THE COURT:  Thank you.
 5              You may answer.  I believe he answered --
 6              THE WITNESS:  My understanding was always that
 7    Persephone would return after -- on or around the 10th of
 8    August.
 9    BY MR. KENNEY:
10    Q.  But there was no return ticket, was there, sir?  There was
11    no return ticket for August 10th or 11th, 2019.  True?
12    A.  Not to my knowledge.  But she told me she would purchase
13    some.
14    Q.  And she sent you by email a copy of the itinerary on June
15    4th, 2019.  Correct?
16    A.  That could have been true, but I asked for that itinerary a
17    long, long time ago.  I asked for it about at least a week or
18    two weeks before that, and I never got it.  I had to beg that
19    itinerary to be sent to me.
20    Q.  When Persephone sent you the June 4th, 2019 email with the
21    itinerary, again, you became angry.  True?
22    A.  I don't recall.
23    Q.  In fact, you started calling her and her family names.
24    Isn't that right, sir?
25    A.  I don't recall that.
```

CROSS-EXAMINATION - RADU

```
 1   Q.  Okay.  Well, I hate to press you.  The "I don't recall"
 2   means you're somewhat on the fence.  You could be a little bit
 3   yes or no.  So, as you sit here today, your testimony is, "Yes,
 4   it could have been true that's how I responded"?
 5            MS. McNORTON:  Objection.  Argumentative.
 6            THE COURT:  Sustained.
 7   BY MR. KENNEY:
 8   Q.  Then when she packed --
 9            MS. HARALAMBIE:  Your Honor, we stipulated to Exhibit
10   38, if that's what he's referring to.
11            MR. KENNEY:  Thank you, Ann.  Yes, that's the one I am
12   referring to.
13            THE COURT:  Thank you.
14   BY MR. KENNEY:
15   Q.  And then when she packed on June the 10th, 2019, you saw
16   that she packed with extra baggage.  Isn't that correct, sir?
17   A.  I helped her to kind of pack the normal weight, like she
18   would go on a two months' trip, nothing more or nothing less.
19   Q.  I'm sorry I didn't catch that.  What is the first part?
20   Say that again.
21            THE COURT:  She kind of packed the normal weight like
22   she would do for a two-month trip, nothing more, nothing less.
23            MR. KENNEY:  Thank you, Judge.
24   BY MR. KENNEY:
25   Q.  When she left in March of 2017, she only took enough bags
```

1   for a two-month trip, enough clothing and baggage for a

2   two-month trip.  Correct?

3   A.  Are you talking about 2017?

4   Q.  Yes.  I am trying to show the difference.  Because you've

5   pled in your petition about the difference with March 2017 and

6   what happened in June of 2019.  You knew she was going to be

7   gone --

8   A.  [Garbled/indiscernible words.]  I do not recall the

9   weight of her suitcases in 2017.  They could have been the same

10  suitcases and the same weight like they were in 2019.

11  Q.  My point is, my point is, sir -- are you done answering?

12  I'm trying not to step on your answer.

13      My point, sir, is that you knew, on June 10th, 2019, when

14  she packed the bags and she took extra luggage, she wasn't

15  coming back, didn't you, sir?

16          MS. McNORTON:  Objection.  Asked and answered.

17  A.  That is not a true statement.

18          MR. KENNEY:  Okay.

19          THE COURT:  Sustained.

20  BY MR. KENNEY:

21  Q.  What prompted her desire to leave were a number of

22  incidents that happened, and we don't have time unfortunately

23  to go through all of them, so I want to talk and focus on one

24  of the main incidents --

25          MS. HARALAMBIE:  Your Honor, at this point I think

1    this is going beyond the scope of direct examination and into

2    issues that were more the rebuttal under the Article 13.  I

3    don't know how -- which view you take on the narrow or the

4    broad scope of cross-examination under 611, but --

5          THE COURT:  Given our situation, are you proposing --

6    do you have other witnesses that you wish to present, anything

7    else you wish to present?

8          MS. HARALAMBIE:  No.  Only, only the -- only on the

9    attorney's fees and costs under ICARA, and our rebuttal on the

10   issues of grave risk.  If you find, after her testimony, that

11   the grave, you know, the things she's alleging rise to the

12   level of Article 13, grave risk...[garbled/indiscernible

13   words]... because otherwise he is asking questions that assume

14   facts not in evidence as well.

15         THE COURT:  Thank you.

16     Mr. Kenney, do you wish to proceed with another witness at

17   this time or move on from this?

18         MR. KENNEY:  Well, I do have two witnesses that are

19   sitting outside ready to testify, Judge.

20         And my reading of the case law is that I have to ask

21   questions of this grave risk defense to the petitioner/father,

22   petitioner --

23         THE COURT:  Well, you can certainly recall him during

24   your presentation.  And I just want to make sure that, if you

25   have other witnesses, we're going to have to end promptly at

1    11:30.

2            MR. KENNEY:  I understand, Judge.  I think the one

3    witness would take -- I could probably get her on in 10

4    minutes.

5            THE COURT:  Why don't we do that, and Mr. Radu will be

6    available for you.

7            MR. KENNEY:  I understand.  If I could, I'll, at this

8    time, then, call Dr. Janet Johnson to testify.

9            MS. McNORTON:  Your Honor, can we confirm that

10   Mr. Kenney is resting on his cross-examination?

11           MR. KENNEY:  No, I am not resting on my

12   cross-examination.

13           THE COURT:  He is not.

14      Go ahead.

15           MR. KENNEY:  I am not resting on my cross-examination.

16           THE COURT:  Go ahead and call your next witness.

17           MR. KENNEY:  Thank you.

18           MS. HARALAMBIE:  Your Honor, Ms. McNorton will be

19   dealing with the witnesses in Respondent's case.

20           THE COURT:  Thank you.

21           MS. HARALAMBIE:  We won't be objecting over each

22   other, that will all be her.

23           THE COURT:  Thank you.

24           MS. HARALAMBIE:  If you want me to mute, I don't know

25   if you're picking up any background noise --

1          THE COURT:  Yes, if you could, that would help us.

2          THE CLERK:  Step forward, please.  If you'll go ahead

3   and step up in the witness stand and remain standing, I'll

4   swear you in.  Raise your right hand, please.

5                **JANET JOHNSON**, WITNESS, SWORN

6          THE CLERK:  Go ahead and have a seat.  Pull that

7   microphone right in front you.  You can scoot a little bit

8   closer, and you can pull it towards you also.

9       State your name, and spell it, please, for the record.

10  Keep your voice up.

11         THE WITNESS:  Janet Anita Johnson.  J-a-n-e-t

12  A-n-i-t-a J-o-h-n-s-o-n.

13         MR. KENNEY:  May I inquire of the witness, Your Honor?

14         THE COURT:  Yes.

15         MR. KENNEY:  Thank you.

16                      DIRECT EXAMINATION

17  BY MR. KENNEY:

18  Q.  Dr. Johnson?

19  A.  Yes.

20  Q.  How are you related to the parties in this case?

21  A.  I am the mother of Persephone.

22  Q.  So that would make Tavi and Max, if we call them, your

23  grandchildren?

24  A.  Yes.

25  Q.  All right.  Very good.  I'm going to take you to the time

 1  period in January 15, 2015.  Do you have any recollection of an

 2  incident occurring with your son-in-law, Bogdan Radu, and your

 3  daughter, Persephone Shon?

 4  A.  Tavi was born in October, and we were up there right after

 5  birth.  A few days after his birth there was a snowstorm, and

 6  Bogdan said he wanted to put Tavi outside in the snow and take

 7  a picture and send it to his folks in Romania to show how tough

 8  his son was.

 9          MS. McNORTON:  Objection.  Speculation.  And I am

10  going to object to the relevancy --

11          THE COURT:  Overruled.  Go ahead.

12          MS. McNORTON:  Okay.

13  BY MR. KENNEY:

14  Q.  Did you stop him from doing that?

15  A.  It didn't go any further.

16  Q.  Let's talk about January 15th of 2015, which is

17  approximately two and a half years later.  Do you recall the

18  incident surrounding that?

19          THE COURT:  Hold on.  So the other -- the first

20  incident was January 15, 2015?

21          THE WITNESS:  Thirteen.

22          THE COURT:  Thirteen.  And this one you're going to

23  refer to is January --

24          THE WITNESS:  January of 2015.

25          THE COURT:  Thank you.  Go ahead.

1           MS. McNORTON:  Again, I am going to object, just for

2   the record, on the relevance of incidents from five years ago.

3           THE COURT:  Thank you.  Go ahead.  Overruled.

4   A.  We were visiting them at Tahoe.  Tavi was not feeling well,

5   had a fever of about 100.  Persephone was working.  She was

6   allowed to take him to daycare.  My husband and I picked Tavi

7   up early and brought him back to the house to care for him.

8   When Bogdan came in the door, I was very relieved to see him,

9   to get some relief from Tavi being so irritable and upset.  And

10  so I handed him to Bogdan.  Bogdan just gave me a dirty look,

11  did not ask me anything about what was going on with Tavi, how

12  the day had been, and just took him downstairs without

13  comforting him, and just showed no nurturing, no tenderness.

14  BY MR. KENNEY:

15  Q.  Okay.  All right.  You just said something about daycare,

16  what was this about daycare?

17  A.  That Bogdan refused to take care of Tavi when Persephone

18  was working --

19          MS. McNORTON:  I'll object.  Foundation.

20          THE COURT:  Sustained.

21  BY MR. KENNEY:

22  Q.  Did you actually hear Bogdan tell Persephone that she

23  needed to take care of the children?

24  A.  Yes.  They had a discussion when Tavi was not doing well,

25  and Persephone said, "I can't miss another --

DIRECT EXAMINATION - JOHNSON

1          MS. McNORTON:  Object.  Foundation.

2   A.  -- day of work and stay home."

3          THE COURT:  Go ahead.

4   BY MR. KENNEY:

5   Q.  What was it you just said?

6   A.  Bogdan said -- Persephone said she couldn't afford to miss

7   another day of work to stay home and take care of Tavi, and

8   Bogdan refused to take care of Tavi.

9   Q.  Okay.  Was Bogdan working at this time, January 15th of

10  2015?

11  A.  I am not certain.

12  Q.  All right.  Moving on.  This all occurred on your property

13  in South Lake Tahoe.  Is that correct?

14  A.  Yes.  Yes.

15  Q.  Were there any other incidents arising from that period of

16  time in January, 15th, of 2015, on?

17  A.  I just recall that Bogdan would go out the door in the

18  morning and not take part in child care in any way.

19  Q.  Okay.  And this was -- by the way, this house that you all

20  were at, was it your house in South Lake Tahoe?  Is that

21  correct?

22  A.  Yes.

23  Q.  And you were there with him for how long?

24  A.  Approximately 10 days.

25  Q.  During that 10-day period, is it your testimony that

 1  Mr. Bogdan Radu left without helping with Tavi in any way?

 2  A.  He assisted at meal time.

 3  Q.  What did he do at meal time?

 4  A.  He would give Tavi small amounts of food, one piece at a

 5  time, at the table.

 6  Q.  Now, your other grandson, Max, is born.  Correct?

 7  A.  Yes.

 8  Q.  Do you happen to recall the date that Max was born?

 9  A.  He was born on the 28th of May, in 2016.

10  Q.  Were you in Germany when Max was born?

11  A.  Yes.  We came to Germany several --

12   (Parties enter courtroom for matter starting at 11:30 a.m.)

13          THE COURT:  Hold on just a second.  I'm sorry.

14      (Discussion off the record.)

15          THE COURT:  Thank you.  You may continue.

16  A.  Yes.  We flew into Germany several days before Max was

17  born.

18  BY MR. KENNEY:

19  Q.  Max was born on May 28th.  So when you say "several,"

20  "several" could be three to me or --

21  A.  It was around the 21st of May.

22  Q.  How long were you in Germany?

23  A.  Three weeks.

24  Q.  Where did you stay?

25  A.  Initially we stayed with Persephone and Bogdan.  But a

```
 1   couple days after Max came home from the hospital, we could not

 2   tolerate the stress of staying in the household after how we

 3   saw Bogdan treat Tavi and treat Persephone.

 4   Q.  How did he treat Tavi?

 5   A.  He had, he yelled at him and he was explosive.  Tavi would

 6   be doing appropriate two-year-old activity --

 7            MS. McNORTON:  Objection.  Move to strike.

 8   Foundation.

 9            MR. KENNEY:  I'm sorry?

10            THE COURT:  Overruled.

11   BY MR. KENNEY:

12   Q.  Go ahead, ma'am.

13   A.  Okay.  For instance, I was having lunch with Tavi and with

14   Bogdan.  Tavi was seated at the table, and Bogdan insisted

15   that, at age two, Tavi sit with his legs down, his knees

16   together.  His hands, if they were not being used to feed

17   himself, had to be in his lap.  He had to look straight ahead.

18   And if Tavi moved, turned his head, put a hand on the table,

19   squirmed in the chair, each time Bogdan would explode, would

20   yell at him, and banged his hand on the table finally when Tavi

21   looked to the side.

22   Q.  Just for the record, you're indicating with your right hand

23   raised flat and --

24   A.  Yes.

25   Q.  -- slapping onto the table.
```

1    A.  To make a noise, yes.

2    Q.  Did this happened once?  Did it happen twice?  Give us an

3    idea of what you mean here.

4    A.  Bogdan was off of work that day, which is why he was with

5    Tavi at mealtime.

6         There was another instance when, before childbirth,

7    Persephone was within 48 hours of childbirth and was having

8    difficulty kneeling down and getting up and reaching Tavi in

9    the bathtub, and so she asked Bogdan to give Tavi his evening

10   bath.  And the door was shut, but we heard Bogdan

11   intermittently, repetitively yelling at Tavi throughout the

12   bath, bath time.

13        Bogdan also exploded at Persephone when she took a sippy

14   cup with milk in it, and the milk had turned sour evidently,

15   and Bogdan exploded all over her about being a terrible mother.

16   Well, I felt it was completely inappropriate.

17   Q.  You witnessed, you saw this.

18   A.  Absolutely.  Yes.

19   Q.  Did you confront your son-in-law and say, "Bogdan, that's

20   not how you talk to the mother of your kids"?

21   A.  I was afraid of him.  I didn't want him exploding at me.

22   Q.  Why were you afraid?

23   A.  Because he was explosive.  I did not want to get into an

24   argument with him.  I don't deal well with confrontation.

25   Q.  Okay.  So these incidents you're talking about with the

1   bath, with Tavi, and the sour milk and everything, this all

2   occurred during your visit on May 21st through, I think you

3   said, June --

4   A.   11th.

5   Q.   -- of 2016.  Is that correct?

6   A.   Yes.

7   Q.   And this had reached a point -- what did you do when this

8   had gotten to a point you just couldn't take it anymore?

9   A.   We talked to the landlord and arranged to move into a

10  separate apartment.  And so we were with Persephone and the

11  children during the day.  I would cook dinner, and when dinner

12  was over we would leave and go back to the separate apartment.

13  Q.   The landlord you spoke to, was that Inge Frick and Roland

14  Frick?

15  A.   It was Inge that I spoke with.

16  Q.   So you end up getting into your own apartment.  Is your own

17  apartment close to where their apartment was?

18  A.   Yes.  It was just down the stairs.

19  Q.   Did you hear what was going on in their apartment?

20  A.   No.

21  Q.   By "theirs," I mean the Radu-Johnson apartment.

22  A.   No.

23  Q.   Any other incidents that you recall from your visit on May

24  21st through June 11th, 2016?

25  A.   Not off hand, no.

 1   Q.  The way that Mr. Bogdan Radu interacted with his son Tavi,

 2   is that appropriate behavior for a parent?

 3            MS. McNORTON:  Object.  Foundation.

 4            THE COURT:  Sustained.

 5   BY MR. KENNEY:

 6   Q.  You're a grandparent.  You have kids.  True?

 7   A.  Yes.

 8   Q.  By the way, how many kids do you have?

 9   A.  I have two daughters and five grandsons.

10   Q.  All right.  Do any of the parents behave the same way that

11   Bogdan Radu does?

12   A.  No.

13   Q.  And when you saw what you saw, is this something that

14   struck you as normal, or abnormal, or what?

15            MS. McNORTON:  Objection.  She is not qualified as an

16   expert on parenting.

17            THE COURT:  Sustained.

18            MR. KENNEY:  But she is a parent, so she would fit

19   under what's the skilled layperson exception, too.

20            THE COURT:  I don't need her expertise at this time

21   with regards to the -- you can move on, please.

22            MR. KENNEY:  Okay.

23   BY MR. KENNEY:

24   Q.  So, my concern, what I am asking about, do you think that,

25   with what you've seen with Mr. Radu, that there is some risk of

 1   harm to Tavi?

 2          MS. McNORTON:  Objection on qualification.

 3          THE COURT:  Sustained.  You can rephrase your

 4   question.

 5   BY MR. KENNEY:

 6   Q.  Is there risk that perhaps Tavi would be harmed if he was

 7   left alone with Mr. Bogdan Radu?

 8          MS. McNORTON:  Again, Your Honor, same objection.  She

 9   is not qualified.  Foundation.

10          THE COURT:  Ms. Shon, did you feel -- were you worried

11   about Mr. -- were you ever worried about Mr. Radu harming the

12   children?

13          THE WITNESS:  Yes.

14          THE COURT:  Physically harming the children?

15          THE WITNESS:  Yes.  And I felt he was psychologically

16   abusive and harming Tavi at that time.

17          THE COURT:  And that's just your personal opinion,

18   correct?

19          THE WITNESS:  Correct.

20          THE COURT:  Thank you.

21   BY MR. KENNEY:

22   Q.  By the way, what are you a doctor of?

23   A.  Neurology.  I am board certified by the Board of Neurology

24   and Psychiatry.

25   Q.  So you have a psychiatric background?

```
 1    A.  I have rotated through psychiatry, but I don't -- never

 2    practiced psychiatry.  I am basically a neurologist.

 3              THE COURT:  Did you ever examine Mr. Radu?

 4              THE WITNESS:  No.

 5              THE COURT:  Thank you.

 6    BY MR. KENNEY:

 7    Q.  Did Mr. Radu present to you as somebody that has PTSD or

 8    anger management issues?

 9              MS. McNORTON:  Objection again on foundation, based

10    upon the very limited interactions she has testified she has

11    had with Mr. Radu.

12              THE COURT:  She just indicated she never examined him

13    or conducted an examination.  Sustained.

14    BY MR. KENNEY:

15    Q.  Is there any other incidents that you had personal

16    observations of since May 21 through June 11th, 2016?

17    A.  No.

18    Q.  Anything else that you may have learned about this case you

19    would have learned through Persephone, is that correct?

20    A.  Yes.

21    Q.  And it's based upon conversations you had with Persephone?

22    A.  Yes.

23    Q.  Ma'am, I am going to show you some pictures from an

24    exhibit.  Are these pictures -- can you see this?  Are these

25    photos of your husband and the children involved in this case?
```

1          MS. McNORTON:  Your Honor, we object to this exhibit.

2     It's cumulative.  It's very extensive.  We have no objection to

3     one or two photos, but it's my understanding that there are a

4     significant number, and they're cumulative.

5          THE COURT:  How many photos are in this packet?

6          MR. KENNEY:  In this packet, Judge, there are 16

7     total, but they're of the family.  What I can do is pull out

8     those that are of her and the child.

9          THE COURT:  Well, I can review those photos.  It is

10    now 11:35.  We are going to have to resume at a later date and

11    time.  Let me find a date.

12         MS. HARALAMBIE:  I am now unmuted, Your Honor, just so

13    I can address calendar issues.

14         THE COURT:  Thank you.

15         Are counsel available on Tuesday, August 4th, at 1:00

16    o'clock?

17         MS. McNORTON:  I can make myself available.

18         MR. KENNEY:  You're okay?

19         THE COURT:  Otherwise it's going to have to be moved

20    for a couple of weeks.  Does that date work for you

21    Ms. Haralambie?

22         MS. HARALAMBIE:  I may have to end early.  I have a

23    telemedicine appointment at 3:00 my time, 12:00 your time.  I

24    should be done with that.  But, if not, Ms. McNorton is doing

25    all of the in-person witnesses.

1          THE COURT:  Thank you.

2      So we will begin on Tuesday, August 4th, at...

3      Let's start at 1:30 on Tuesday, August 4th.  That will give

4  our tech people time, about 1:00 o'clock, to get everything set

5  up.

6      So we will recess until August 4th, at 1:30.  And if there

7  is nothing further at this time, you are excused.

8                  (Off the record at 11:36 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, A. TRACY JAMIESON, do hereby certify that I am

4    duly appointed and qualified to act as an Official Court

5    Reporter for the United States District Court for the District

6    of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true and accurate transcript of the proceedings

9    contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11         I FURTHER STATE that I had no control over the

12   quality of the audio transmission or the parties' ability to

13   speak clearly into their microphones.

14         Signed in Tucson, Arizona, on the 1st day of October,

15   2020.

16

17

18
                              s/A. Tracy Jamieson
19                            A. Tracy Jamieson, RDR, CRR

20

21

22

23

24

25