1                 IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ARIZONA

3     Bogdan Radu,                ) 4:20-cv-00246-RM
                                  )
4                 Petitioner,     )
                                  )
5     vs.                         )
                                  ) Tucson, Arizona
6     Persephone Johnson Shon,    ) August 26, 2020
                                  )
7                 Respondent.     )
      _____)

8

9        Before the Honorable Rosemary Márquez, District Judge

10        Transcript of Proceedings - Evidentiary Hearing Day 2

11    APPEARANCES:

12    For the Petitioner:

13        Ann Nicholson Haralambie Attorneys, PC
          Ann Haralambie, Esq.  (Appearing via VTC and speakerphone)
14        3661 N. Campbell Avenue, Suite 130
          Tucson, AZ 85719-1527
15        (520) 327-6287

16        McNorton Fox, PLLC
          Lisa C. McNorton, Esq.
17        4400 E. Broadway Blvd, Suite 602
          Tucson, AZ 85711
18

19    For the Respondent:

20        The Kenney Law Firm, PLC
          Shaun P. Kenny, Esq.
21        485 S. Main Avenue, Bldg. 3
          Tucson, AZ 85701
          (520) 884-7575
22

23    Proceedings reported and transcript prepared by:
          A. Tracy Jamieson, RDR, CRR - Official Court Reporter
24        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
          Tucson, Arizona 85701   (520) 205-4266
25    Proceedings reported by court reporter using steno machine
      shorthand; transcript prepared with court reporting software.

1                          INDEX OF EXAMINATIONS

2    WITNESSES:                                                    PAGE

3

4    **JANET JOHNSON**

5         Direct Examination By Mr. Kenney.....................   6

6         Cross-Examination By Ms. McNORTON....................  13

7         Redirect Examination By Mr. Kenney...................  17

8

9    **INGEBORG (INGE) FRICK-WILDEN**

10        Direct Examination By Mr. Kenney.....................  20

11        Cross-Examination By Ms. McNORTON....................  44

12

13   **SHERRI MIKELS-ROMERO**

14        Direct Examination By Mr. Kenney.....................  52

15        Cross-Examination By Ms. McNORTON....................  69

16

17   **PERSEPHONE JOHNSON SHON**

18        Cross-Examination By Ms. McNORTON.................... 147

19

20   **BOGDAN RADU**

21        Rebuttal Examination By Ms. Haralambie............... 160

22

23

24

25

 1              (On the record at 1:08 p.m., as follows:)

 2          THE CLERK:  In civil matter 2020-246, Bogdan Radu

 3   versus Persephone Johnson Shon, on for further hearing,

 4   evidentiary hearing.  Counsel, please state your appearance.

 5          MS. HARALAMBIE:  Ann Haralambie for the petitioner,

 6   Bogdan Radu, who is present, I guess, telephonically.  We can't

 7   see him.

 8          MS. McNORTON:  Good afternoon, Your Honor.  Lisa

 9   McNorton on behalf of the petitioner, Bogdan Radu.

10          THE COURT:  Good afternoon.

11          MR. KENNEY:  May it please the Court, Shaun Kenney

12   with The Kenney Law Firm, appearing on behalf of respondent,

13   Persephone Johnson Shon, who is present, seated to my left.

14          THE COURT:  Good afternoon.

15          This is the continuation of the hearing.  Are the

16   parties ready to proceed?

17          MR. KENNEY:  We are, Your Honor.

18          MS. McNORTON:  Yes, Your Honor.

19          MS. HARALAMBIE:  Yes, Your Honor.  And we do have one

20   preliminary -- well, two preliminary matters.  There is a

21   stipulation to the admission of Petitioner's Exhibits 11 and

22   12.

23          THE COURT:  Exhibits 11 and 12 will be admitted by

24   stipulation.

25          MS. HARALAMBIE:  I am not sure whether the Court has

1    ruled on the motion in limine.  Mr. Kenney has filed some

2    additional exhibits that your ruling on the motion in limine

3    would be relevant to, whether or not they are relevant also as

4    to whether at least one of the proposed witnesses, who I think

5    is a pastor, would be relevant.  I believe they go to the

6    well-settled issue, the well-settled defense, which does not

7    arise if the Hague petition is filed within a year of the

8    wrongful retention --

9            THE COURT:  I think I --

10           MS. HARALAMBIE:  -- which was the subject of the

11   motion.

12           THE COURT:  Thank you.  I believe I had ruled on the

13   motion in limine.  And I did go back to look at the record just

14   to make sure that I didn't need to issue an order, but I did

15   rule that the petition was filed within the time limits and

16   that the -- but I was going to entertain evidence as to the

17   substantial harm issue, not the well-established.

18           Is that what the parties recall?  Or was I not --

19           MR. KENNEY:  My recollection is, Your Honor, that you

20   were reserving judgment on the well-settled defense, waiting to

21   hear further evidence.  It has come to my attention, by the

22   way, when I spoke with my client, she actually left the marital

23   residence on June 9th, on Sunday, 2019.  Even though the flight

24   departed on June 10th, 2019, she left the marital residence.

25   And the filing was done here on June 8th, 2020.  When we

1   counted the days between it, it's actually 366 days, if you

2   count the fact that she actually left Merzalben and the marital

3   residence on June 9th, 2019.  So it is actually beyond the one

4   year.  Because of the leap year here, if you count the days,

5   it's 366 days of filing, from when she departed.

6           MS. HARALAMBIE:  Well, our position is, you don't --

7   the cases that I cited the last time indicate very clearly that

8   the one-year period runs from the date of wrongful retention or

9   wrongful removal, and that wrongful retention is when the

10  petitioning party had reason to know that the children were

11  going to be removed for a permanent stay, which the various --

12  I don't know if they're Facebook Messenger or text messages.

13  Whatever they were between the parties made it very clear that

14  my client was expecting the children to return on or about

15  August 10th, and that, when they did not, he became very

16  concerned and started sending some pretty aggressive emails and

17  contacting police and the Hague Central Authority in Germany.

18      So the time didn't even begin to run until August, not when

19  it was, you know, Ms. Shon's unilateral intention that she

20  didn't think she was going to return.  Plus, she left most of

21  her belongings and most of the children's belongings in their

22  home in Germany.

23          THE COURT:  Thank you.

24      So it is the ruling of the Court that the motion in

25  limine is granted to the well-established, now settled in its

```
 1    new environment section of the statute.  But I will -- and
 2    because I do find that the petition was filed within the
 3    one-year time limit, again, I will entertain any information
 4    that you might have regarding the harm issue section of that
 5    statute.
 6            MR. KENNEY:  Your Honor, I understand Your Honor's --
 7    your ruling and order on this.  My client will be testifying
 8    that what he says is not correct.  On May 28th, when she got
 9    the airline tickets, they were one-way, and they got into a
10    fight about that, that he knew she was leaving.  She will
11    testify she told --
12            THE COURT:  Well, I will listen to -- I'll listen to
13    her testimony with leave to -- and you can address that issue
14    after her testimony.  Thank you.
15            MR. KENNEY:  Thank you.  At this time I call back to
16    the stand Dr. Janet Johnson.
17            THE COURT:  Thank you.
18            MR. KENNEY:  I think we had left off with
19    Dr. Johnson's testimony.
20            THE COURT:  Yes.
21              JANET JOHNSON, WITNESS, PREVIOUSLY SWORN
22            THE COURT:  Please come forward, ma'am.
23            And, ma'am, you are still under oath.
24                         DIRECT EXAMINATION
25    BY MR. KENNEY:
```

 1   Q.  Ma'am, I've just handed you Respondent's Exhibit 38, but

 2   before we talk about that exhibit, did you receive some emails

 3   from Mr. Bogdan Radu during the fall of 2019?

 4   A.  Yes.

 5   Q.  What were the sum and substance of those emails?

 6   A.  He asked for money in return to giving up the children and

 7   letting Persephone go free.

 8           MS. McNORTON:  Objection.  Document speaks for itself.

 9           MR. KENNEY:  I'm sorry?

10           MS. McNORTON:  The document speaks for itself.

11           THE COURT:  Overruled.

12   BY MR. KENNEY:

13   Q.  If you could, tell us what was your email address, or what

14   is your email address?

15   A.  jjohn5900@aol.com.

16   Q.  Okay.  How much money was Mr. Bogdan Radu seeking to

17   release his interest in the children?

18   A.  Initially, a quarter of a million dollars.  And then

19   another subsequent email increased it to approximately 440,000,

20   plus some interest in a partnership.

21   Q.  Very good.  Ma'am, if you could, take a look now at what's

22   been marked as Exhibit 38.  I ask you to turn to Thursday,

23   October 24th, 2019.  They are in chronological order.

24   A.  October 24?

25   Q.  Yes, 2019, at approximately 9:57 a.m.  You'll see at the

1    top caption:  Update on Final Numbers.

2        Do you see that?

3    A.  Yes.

4    Q.  Okay.  Is that the email you're referencing where he

5    increased his demand from a quarter million to 400,000?

6    A.  Yes.

7            MR. KENNEY:  Your Honor, I don't know if 38's been

8    admitted yet, but I will move to admit 38.

9            THE COURT:  Any objection?

10           MS. McNORTON:  Your Honor, my objection to 38 is these

11   emails are to Persephone, they're not to Ms. Johnson.

12           THE WITNESS:  What I'm reading, it says:  Persephone,

13   Brian and --

14           THE COURT:  Hold on, ma'am.

15       What was that, Mr. Kenney?

16           MR. KENNEY:  I am sorry, Your Honor.  Were you

17   addressing that to me?

18           THE COURT:  Yes.  So the objection is that they're to

19   Persephone, not to --

20           MR. KENNEY:  The first one -- if I may, Your Honor.

21           THE COURT:  Yes.

22           MR. KENNEY:  The first one she is looking at is

23   probably Saturday, August 31st, 2019.

24           MS. McNORTON:  Correct.

25           MR. KENNEY:  First page.  So the collection you see

1   there is to Persephone and to Dr. Johnson and Mr. Brian Shon,

2   Dr. Brian Shon.

3           MS. McNORTON:  Your Honor, many of these are just to

4   Persephone.

5           MR. KENNEY:  I'm sorry?

6           MS. McNORTON:  Many of the ones that are in my packet

7   are only to Ms. Shon.  They don't reference Ms. Johnson in

8   them.  So I just want clarification that Ms. Johnson is only

9   going to be asked about emails that were specifically addressed

10  to her.

11          THE COURT:  Is there any objection to the introduction

12  of Exhibit 38?  It's all the -- I assume they're all the

13  collection of emails from to Ms. Johnson as well as to

14  Persephone, is that correct?

15          MR. KENNEY:  That is correct, Your Honor.

16          The first set, running through September, are to

17  Persephone Shon.  And then he starts adding Persephone's

18  parents once he has, quote, "final numbers," which begins

19  around October 24th, 2019.  The remainder, from October 24,

20  2019 on, is also addressed to this witness and her husband.

21          THE COURT:  Okay.  And so at this point you'll be

22  asking her about the emails that she read that were directed to

23  her.

24          MR. KENNEY:  That is correct.  But I am also going to

25  ask if she recalls seeing the emails previously that were sent

DIRECT EXAMINATION - JOHNSON                    10

1    to Persephone as well.

2              THE COURT:  And is Persephone going to take the stand

3    and set the foundation for these emails that she received?

4              MR. KENNEY:  She is, Your Honor.

5              THE COURT:  Any objection to the questioning now so

6    that we don't have to take a break and let the petitioner

7    testify?

8              MS. McNORTON:  No objection, subject to the

9    qualification and foundation.

10             THE COURT:  Thank you.

11             Go ahead.

12   BY MR. KENNEY:

13   Q.  Ma'am, after October 24 -- well, all right.  First of all,

14   when you received that particular email which we have

15   discussed, Thursday, October 24, 2019, at 9:57 a.m., what was

16   your reaction?

17   A.  I was horrified, absolutely horrified.

18   Q.  Why were you horrified?

19   A.  He didn't ask us about his children at all.  He was just

20   looking at a price.

21   Q.  Okay.  After October 24, 2019, did you receive some

22   additional emails where you were listed on as well?  For

23   example, Tuesday, October 29, 2019, at 7:21 a.m., October 30,

24   2019, 4:24 p.m.?

25   A.  Yes.

1  Q.  And did these emails address follow-up to his update on

2  final numbers?

3  A.  Yes.

4  Q.  Did they deal with what to do with things like the

5  household goods?

6  A.  Yes.

7  Q.  Do you recall receiving those emails?

8  A.  Yes.

9  Q.  All right.  Finally, I want you to look at the very back

10  page on Exhibit 38.  Do you recall getting an email on

11  Thursday, April 30, 2020, at 9:46 a.m.?

12  A.  Yes.

13  Q.  The very last page of 38.

14  A.  Yes.

15  Q.  And the sum and substance of that email -- what was the sum

16  and substance of that last email you received from Mr. Bogdan

17  Radu?

18  A.  He wanted to confirm that we were residing in Tucson,

19  Arizona, and that the children were with us.

20  Q.  And he just asked for a yes-or-no answer, is that correct?

21  A.  Yes.

22  Q.  Okay.  Now, ma'am, by the way, I don't know if we talked

23  about this before, how is your relationship with the grand

24  kids, Tavi and Maximilian?

25  A.  Wonderful.

 1   Q.  You guys have a close relationship?

 2   A.  They're great kids.

 3   Q.  By the way, do they still reside with you at your house?

 4   A.  Yes.

 5   Q.  You and your husband, Brian Shon?

 6   A.  Yes.

 7   Q.  And do they -- by the way, do they have their own rooms and

 8   everything?

 9          MS. McNORTON:  Objection.  Relevance, Your Honor.

10          THE COURT:  Overruled.

11          You may answer.

12   A.  Tavi is in his own room and Max is with Persephone.

13   BY MR. KENNEY:

14   Q.  He still sleeps with Persephone?

15   A.  Yes.

16   Q.  How old is Max?

17   A.  Four.

18   Q.  Very good.  Ma'am, my notes don't reflect that we discussed

19   this, but I do recall -- and forgive me.  When you were there

20   in Germany with Persephone during the birth of Max, do you

21   recall an instant, or instance, with Bogdan Radu bathing Tavi?

22   A.  Yes, I do.

23   Q.  And what happened?

24   A.  He, he just lost it.  The door was shut, but we heard him

25   yelling and screaming at Tavi and the water splashing, and we

 1   just couldn't understand.

 2   Q.  Did you go inside to the bathroom to figure out what's

 3   going on to help him out?

 4   A.  No.

 5   Q.  How come?

 6   A.  I was very intimidated by that man.  Very intimidated.

 7           MR. KENNEY:  Your Honor, that's all the questions I

 8   have of this witness at this time.

 9           THE COURT:  Thank you.

10           MS. McNORTON:  May I proceed, Your Honor?

11           THE COURT:  Yes.

12                       CROSS-EXAMINATION

13   BY MS. McNORTON:

14   Q.  Ms. Johnson -- Dr. Johnson.  I apologize.  You are a

15   medical doctor, correct?

16   A.  Yes.

17   Q.  You testified about an alleged incident in 2013 regarding

18   Tavi.  Where did that occur?

19   A.  It occurred at South Lake Tahoe.

20   Q.  And you testified that was when Bogdan wanted to take

21   photos of Tavi in the snow, is that correct?

22   A.  Yes.

23   Q.  You testified to another alleged incident on January 15th,

24   2015, where you allege Bogdan came home, Tavi was upstairs, and

25   he took Tavi downstairs.  Do you recall that testimony?

CROSS-EXAMINATION - JOHNSON

1   A.   Yes.

2   Q.   Where did that occur?

3   A.   At Tahoe.

4   Q.   And you alleged another incident involving Mr. Radu where

5   you're saying Tavi was in a chair being a typical two-year-old

6   and he was telling Tavi to sit still.  Where did that occur?

7   A.   Can you repeat that?

8   Q.   Where did that allege incident occur?

9   A.   In Germany.

10  Q.   How long have these two parties been married for?

11  A.   Eight years and some months.

12  Q.   Out of those eight-plus years, how many times have you

13  personally observed Mr. Radu with his children?

14  A.   Dozens.  They were living in our home at Lake Tahoe.

15  Q.   How long did they stay with you in Lake Tahoe?

16  A.   Over three years.

17  Q.   They lived with you consistently for three years.

18  A.   We went to Lake Tahoe, to our home there.  We reside in

19  Tucson, but we went to Lake Tahoe because it was our second

20  home, and they were living there.

21  Q.   So when you say "dozens," are you talking 12, 24?  Let's

22  have some idea of how many times.  Your personal observation,

23  please.

24  A.   Are you talking about individual days?  More than 30.

25  Q.   Okay.  More than 30.  Okay.

1       Now, based upon questioning by the Court, you testified

2   that you believe the children are at risk of harm.  Do you

3   recall that?

4   A.  Yes.

5   Q.  You're a mandatory reporter, aren't you?

6   A.  Yes.

7   Q.  Did you report the alleged incidents in Tahoe in 2013?

8   A.  No, I did not.

9   Q.  Did you report the alleged incidents in 2015 that occurred

10  in Tahoe?

11  A.  No.

12  Q.  When you were in Germany, was Mr. Radu working for the U.S.

13  military?

14  A.  I don't know.

15  Q.  Did you -- you don't know where Mr. Radu was working --

16  A.  No.

17  Q.  -- when you were visiting him in Germany?

18      Did you contact any authorities in Germany to indicate you

19  had concerns, such as law enforcement?

20  A.  No.

21  Q.  Have you had any personal interaction with Mr. Radu since

22  June of 2016?

23  A.  Outside of receiving emails, you're talking about --

24  Q.  Personal.

25  A.  No.

1   Q.  Your daughter and the children came to visit you in the

2   summer of 2018, didn't they?

3   A.  I don't remember the date.

4   Q.  Prior to their visit last year, when was the last time you

5   saw your daughter and grandchildren?

6   A.  Persephone came to Tucson when -- with the boys -- when Max

7   was 10 months old.

8   Q.  And they then returned to Germany.

9   A.  Yes.

10  Q.  You were asked about email exhibits that you testified you

11  believed Mr. Radu was offering money in exchange for the

12  children.

13  A.  Correct.

14  Q.  Let me reference the October 24, 2019 email.  Doesn't he in

15  fact say:  If divorce option is chosen, we need to move forward

16  with figures.

17      If you'd like, take a look to refresh your recollection of

18  that.

19  A.  That's what this says.

20  Q.  Okay.  There are no threats against the children in this

21  correspondence, are there?

22  A.  Are you asking me a question?

23  Q.  Is he making threats of harm towards the children in this

24  document?

25  A.  Not this document, no.

1          MS. McNORTON:  Nothing further, Your Honor.

2          THE COURT:  Thank you.

3          Any redirect?

4          MR. KENNEY:  Just briefly, Your Honor.

5                      REDIRECT EXAMINATION

6  BY MR. KENNEY:

7  Q.  Ma'am, the question is, why didn't you call the police with

8  the incidents that you've testified to?

9  A.  I was very afraid he would take it out on Persephone and

10 things would get worse.

11 Q.  Also, you were just asked the question, there was no

12 threats in any of the emails that's referenced.

13 A.  Correct.

14 Q.  Are there any expressions of care or concern for the kids?

15 A.  No, there was not.

16 Q.  Thank you.

17     Did you ever receive any emails with expressions of care

18 and concern for the children?

19 A.  We did not.

20          MR. KENNEY:  That's all I have, Your Honor.

21          THE COURT:  Thank you.  May the witness step down?

22          MR. KENNEY:  Yes, Your Honor.

23          THE COURT:  Thank you.  And may she be excused?

24          MR. KENNEY:  I'll ask her to wait outside, if there's

25 any last-minute things that need to be addressed.

1              THE COURT:  Thank you.

2              MS. McNORTON:  Your Honor, I would make a request that

3     as Mr. Kenney appears to want to reopen the issue on the motion

4     in limine, that before we get to any other witnesses, we hear

5     testimony from Ms. Shon so we can then determine whether or not

6     the majority of the remaining witnesses and exhibits are even

7     relevant.

8              MR. KENNEY:  From what I heard -- and, I'm sorry, I'm

9     really having trouble hearing because of the mask --

10             THE COURT:  Yes.  Overruled.

11             MR. KENNEY:  Judge, at this time I do have a witness

12    that was instructed to call at 1:30 Tucson time from Germany.

13    Her name is Frau Ingeborg Frick-Wilden.  We did have a little

14    issue on the prefix number to call in, and I've just texted her

15    to tell her the prefix number, so I expect her to call in any

16    minute.  In the interim, though, I do have another witness we

17    could call and very quickly put them on and off.

18             THE COURT:  Sure.

19        (Sound of phone call coming in over the speakerphone.)

20             THE COURT:  There's our caller.

21             MR. KENNEY:  It is the witness.

22             MS. FRICK-WILDEN:  Yes, hello?

23             MR. KENNEY:  That would be Inge Frick.

24             Okay.  (Addressing other witness:)  Doctor, I'm sorry.

25    I have to ask you to step outside.

 1             MS. FRICK-WILDEN:  Hello?

 2             THE COURT:  Yes, ma'am.

 3             MS. FRICK-WILDEN:  Yes, it's me, Frick speaking, from

 4     Germany.

 5             THE COURT:  Thank you.  Go ahead.

 6             MR. KENNEY:  [German words spoken.]  Can you hear me?

 7             MS. FRICK-WILDEN:  Are you talking to me?

 8             MR. KENNEY:  Yes, ma'am.  This is Shaun Kenney.  Can

 9     you hear me?

10             MS. FRICK-WILDEN:  Yes.  Yes.  Yes, I can understand

11     you good.

12             THE COURT:  Ma'am, we're going to place you under

13     oath.  You've been called to testify.  Please raise your right

14     hand.

15             MS. FRICK-WILDEN:  I don't understand.  What shall I

16     do?

17             THE COURT:  Ma'am, you've been asked to testify, so

18     you will be placed under oath to tell the truth.

19     Please raise --

20             MS. FRICK-WILDEN:  Yes, I will only tell the truth,

21     that correctly [phonetic spelling].

22             THE COURT:  Please raise your right hand.

23             MS. FRICK-WILDEN:  Pardon?

24             THE COURT:  Go ahead.

25             THE CLERK:  Ma'am, if you'll raise your right hand, I

 1  am going to swear you in to testify.

 2          MS. FRICK-WILDEN:  Yes.  Okay.  Thank you.

 3          THE CLERK:  Do you solemnly swear or affirm that you

 4  shall truthfully answer all questions that will be asked of you

 5  in the matter now before the Court, so help you God?

 6          MS. FRICK-WILDEN:  Yes.  If you are talking a little

 7  bit more slowly, then I, I understand much better.  But it's

 8  okay, I know what you mean.  Thank you.

 9          THE COURT:  Would you like her to repeat the oath

10  slower?

11          MS. FRICK-WILDEN:  To repeat, yes, if I can trust --

12  if it's okay, yes.

13          THE COURT:  Thank you.

14          THE CLERK:  Do you solemnly swear or affirm that you

15  shall truthfully answer all questions that will be asked of you

16  in the matter now before the Court, so help you God?

17          MS. FRICK-WILDEN:  Yes.

18          **INGEBORG (INGE) FRICK-WILDEN**, WITNESS, SWORN

19          THE CLERK:  Thank you.

20                          DIRECT EXAMINATION

21  BY MR. KENNEY:

22  Q.  Would you please state your --

23          MR. KENNEY:  May I inquire of the witness, Your

24  Honor?  I'm sorry.  I forgot to ask.

25          THE COURT:  Go ahead.

 1              MR. KENNEY:   Thank you.

 2   BY MR. KENNEY:

 3   Q.   Would you please state your name for the record.

 4        Madam?

 5   A.   Yes.

 6   Q.   Wie ist dein, your, Name?

 7   A.   My name is Ingeborg Frick-Wilden.

 8   Q.   Very good, ma'am.

 9        And where do you reside, ma'am?

10   A.   Pardon?

11   Q.   Where do you live?

12   A.   Sorry.   I am living in Merzalben, in Germany.   The post

13   code is 66978.   That's Alben.   And the street is Höhstraße

14   Number 12.

15   Q.   Very good.   Thank you.

16        Are you the owner of the property there at Höhstraße Zwölf,

17   at 66978 Merzalben?

18   A.   Yes, I am the owner of this.   And I am the owner of the

19   house, Höhstraße Vierzehn, where Mr. Radu was living.   That was

20   the house number, Höhstraße Vierzehn.

21   Q.   Danke.

22              MR. KENNEY:   Forgive me, Madam Court Reporter, my

23   German is not very good.

24   BY MR. KENNEY:

25   Q.   Ma'am, how do you know Persephone Shon and Bogdan Radu in

1    this case?

2    A.   Mmm.  Mmm.  Just a second.  What -- you told me what was

3    the problem with them.

4    Q.   But how do you know them?  Are they tenants of yours?

5    A.   Ah.  They live here -- sorry.  They lived here since 2016

6    in our apartment.

7    Q.   Very good.  Do they have children?

8    A.   No, we have no children.

9    Q.   No, but do they?  Bogdan Radu and --

10   A.   Do they have children?  Sorry.  They have children.  Tavi,

11   when they came to Germany, Tavi was already there.  And Max,

12   Maximilian, was born in Germany when they were living here in

13   our apartment.

14   Q.   Very good.  Ma'am, did you ever have occasion as the

15   apartment owner to hear any disputes by and between Mr. Bogdan

16   Radu and Persephone Shon?

17            MS. McNORTON:  Objection.  Leading.

18            THE COURT:  Overruled.

19   A.   Yes, I hear them.  I hear them often.  Mr. Radu was often

20   yelling in the apartment with the family.

21   BY MR. KENNEY:

22   Q.   Okay.  Now, when he was yelling, was there any -- is there

23   anything you recall, a specific date of an incident or specific

24   instance that stands in your mind?

25   A.   When they -- when Mr. Radu was yelling with the family, I

1   only could hear him yelling.  And Persephone, I could not hear

2   her, it was only him.  The situation was terrible for him when

3   I have hear him always yelling in the apartment with the

4   family.

5   Q.  How often did this happen, where you heard yelling in the

6   apartment by Mr. Radu?

7   A.  I don't know.  He was, he was starting to get different

8   person.  And I think when the kids is doing something or she is

9   doing something, what was not okay, and then he was yelling.

10  And I know when he was yelling in English, then he was yelling

11  to his wife.  And when I hear him speaking rumänisch, and then

12  I know he was yelling to the kids because, with the kids, he

13  always -- when I mixed with him or hear him, he was only

14  speaking rumänisch with the kids.

15          MS. McNORTON:  Objection.  I move to strike on

16  speculation.

17          MR. KENNEY:  I could ask if she speaks Romanian.

18          MS. McNORTON:  She testified that he was yelling in

19  response to what she alleged he was yelling about.  She was

20  speculating.

21          THE COURT:  Overruled.

22  BY MR. KENNEY:

23  Q.  Frau Frick --

24  A.  Pardon?

25  Q.  The objection was overruled.

 1          Moving on to the next set of questions.

 2          Now, Frau Frick-Wilden?

 3   A.   Yes.  Yes.

 4   Q.   Do you recall when Persephone Shon left?

 5   A.   Yes.  She left at the beginning of June.

 6   Q.   June of which year, ma'am?

 7   A.   June of the last year, of 2019.

 8   Q.   Very good.  And how is it that you recall --

 9   A.   And, and if I can tell this:  Before she left, they had

10   about three months not even a car.  And she know.  And we told

11   him to move out because he did not pay the rent or only the

12   half of rent.  So she know all of the situation that they --

13   that they have to move out.  And I think it was also to go back

14   to the States, because she could not stay anymore in Merzalben

15   because we canceled the contract for the apartment.

16          MS. McNORTON:  Objection.  Move to strike.

17   Speculation.  Lack of foundation.

18          THE COURT:  Hold on.  What part was the -- could you

19   stand and speak into the microphone.

20          MS. McNORTON:  I'm sorry, Your Honor.

21          THE COURT:  What is the objection to specifically?

22          MS. McNORTON:  Your Honor, speculation with respect to

23   why she is claiming she believes Ms. Shon was moving out.

24          THE COURT:  Sustained as to that part.

25          Go on.  What was the second objection?

 1          MS. McNORTON:  Your Honor, I'm sorry, it just escaped

 2   me.

 3          THE COURT:  Okay.  I think that that --

 4          MS. McNORTON:  Lack of foundation, again, with respect

 5   to the reasoning and intents of these parties.

 6          THE COURT:  Overruled as to that part.

 7          Sustained as to the -- why she believes they moved

 8   on -- moved out.

 9          You may continue.

10          MR. KENNEY:  Thank you.

11   BY MR. KENNEY:

12   Q.  Ma'am, how is it that you recall the last time that you saw

13   Persephone Shon?

14   A.  When I had seen her the last time.

15   Q.  When was the last time, though?  What I'm saying is, is

16   there something specific you recall, the meeting with her, the

17   last time you saw Persephone Shon?

18   A.  Yes.  In end of May, I have seen her all the time outside.

19   Q.  Okay.  At the time, at the end of May, did she tell you

20   that she was leaving?

21   A.  No.  At this time, a little bit end of May, before she was

22   going, I had problems with my husband.  He was very sick.  So I

23   was very busy with my husband, so I did not know exactly the

24   date when she was leaving because on this time I was -- I had

25   to take care of my husband.

```
 1   Q.  Very good.

 2       Your husband, is that Hans Frick?

 3   A.  Hans Roland Frick, yes.

 4   Q.  Very good.

 5       Is he also co-owner of the property there?

 6   A.  He knows everything, all the problems.  He knows about

 7   this.  And when I can tell this, he took -- he knows that I

 8   have to do something tonight, to talk about Mr. Radu, and he

 9   told me --

10          MS. McNORTON:  Objection.

11          THE COURT:  Sustained.

12          Ma'am?  Ma'am?  Ma'am?

13          THE WITNESS:  Yes.  I'm sorry.

14          THE COURT:  Go ahead.

15   BY MR. KENNEY:

16   Q.  I think my question was a little bit different.

17   A.  Oh.  Okay.  Yes.

18   Q.  I was asking if your husband -- you and your husband are --

19   A.  Yes, my husband know also all the situation about them.

20   Q.  But is he co-owner of the property as well?  As you -- you

21   are co-owner with your husband of the property at Höhstraße

22   Zwölf and also the subject address here where Bogdan Radu and

23   Persephone Shon resided?

24   A.  Yes.

25   Q.  Okay.  That answers that.
```

1       Now, ma'am, when is it that Mr. Bogdan Radu moved?

2   A.  Mr. Bogdan moved out at the 19th of November.  19 of

3   November, last year.

4   Q.  Of 2019, is that correct?

5   A.  20 -- 19 of November, yes.  Last year.

6   Q.  Did you send an email to Persephone Shon on July 6th, 2020,

7   at about 5:30 in the morning, Tucson time, in German?

8   A.  Yes.

9   Q.  What was the sum and substance of that email, ma'am?

10          MS. McNORTON:  Object, Your Honor.  Foundation.

11  Hearsay.

12          MR. KENNEY:  No.  She is the declarant.

13          THE COURT:  Overruled.

14          You may answer.

15  A.  She wants to know -- she wants to know exactly the date

16  when he was moving out, and I sent her the papers.

17  BY MR. KENNEY:

18  Q.  I'm sorry, what was that, ma'am, that last part?  You just

19  said you supplied a paper?

20  A.  Yes.  I sent her the document when Radu was moving out, and

21  I sent her the document that I have the paper where I was going

22  to this office to tell them that he is not living here anymore

23  in Germany.

24  Q.  And the office that you were telling them, was that the

25  Verbandsgemeinde --

DIRECT EXAMINATION - FRICK-WILDEN                    28

 1  A.  Gemeinde, yes.  It was the government office for our
 2  village.
 3  Q.  Did you notify them that Mr. Bogdan Radu had vacated the
 4  apartment on or about November 19th or -- I'm sorry -- November
 5  21, 2019?
 6  A.  He was moving out at the 19th of November, and then I
 7  was -- two days later or three days later, I was calling them
 8  that he is not living anymore.  And they did not get any
 9  information from him that he is moving out, so they did not
10  know anything.  So I have to -- told them, and they put him out
11  of the system because he was not living here anymore.
12  Q.  Very good.
13      Ma'am, do you happen to have the email and the letter from
14  the government municipality in front of you?  Do you happen to
15  have that information?
16  A.  Yes, I have in front of me, correctly.
17  Q.  Could you please describe for us the email that you wrote
18  to Persephone Shon, the date and time?
19  A.  Ah.  When was this?  I'm sorry.  When did I... Sorry.
20  When did I write her?
21          MS. McNORTON:  If I may, Your Honor, could I ask
22  Mr. Kenney what exhibit he is referencing?  I didn't hear an
23  exhibit number.
24          MR. KENNEY:  I'm sorry?
25          MS. McNORTON:  I didn't hear an exhibit number

1    referenced, so I don't know which exhibit he's referring to.

2              MR. KENNEY:  31.

3              THE COURT:  Thank you.  31?

4              MR. KENNEY:  Yes, Your Honor.

5    A.  My husband, my husband sent her these papers, I remember.

6              MS. McNORTON:  Your Honor, I am going to object to any

7    questions about an email.  Exhibit 31 is not an email.

8              MR. KENNEY:  Actually, the first page --

9    A.  It was on the 6th of July.  My husband, my husband sent a

10   message to Persephone.

11             MS. McNORTON:  I apologize, Your Honor.

12             THE COURT:  Ma'am?  Ma'am?

13             THE WITNESS:  Yes.

14             THE COURT:  Hold on just a second.

15             MS. McNORTON:  Just for clarification, Your Honor,

16   when the exhibits came through to me and they were printed,

17   they were in reverse order.  So I apologize.  I do have that

18   exhibit.  It's the last page, and it's Mr. Kenney's first page.

19             THE COURT:  Thank you.

20   BY MR. KENNEY:

21   Q.  Again, ma'am, it was Monday, July 6th, 5:30 a.m.?

22   A.  Yes.

23   Q.  Of 2020.

24   A.  My husband sent this fax, yes, to Persephone.

25   Q.  Very good.

1      And it's in German, and it starts -- go ahead and read the

2  first line to us.

3            MR. KENNEY:  Forgive me, Madam Court Reporter.

4  BY MR. KENNEY:

5  Q.  Go ahead and read the first line.  Do you have it in front

6  of you?

7  A.  Which one did I -- the one my husband sent to Persephone?

8  Q.  Yes, the email that you sent on Monday, July 6th, 2020, at

9  5:30 in the morning.

10  A.  6th of Monday, of July?  Yes, I have it here.

11  Q.  Go ahead and read just the first line for us.

12            MS. McNORTON:  I'm going to object on the grounds of

13  hearsay.

14            THE COURT:  Hold on just a second.  I am trying to

15  find -- you're talking about Exhibit 31.

16            MR. KENNEY:  That is correct, Judge.  An email that

17  she sent.  I'm just trying to lay foundation that what we've

18  got here in 31 is the same email that she sent.

19            THE COURT:  I think she already testified that it was

20  the same email.

21            MS. McNORTON:  Correct, Your Honor.  But it's based on

22  hearsay.

23            THE COURT:  She didn't send it, her husband sent it,

24  is that what the hearsay problem is?

25            MS. McNORTON:  That's the initial problem, Your Honor.

1   It's also based on alleged statements made and comments made by

2   Mr. Radu and based upon statements here that were made by the

3   husband.  So it's compounded hearsay.

4            THE COURT:  Go ahead, Mr. Kenney.

5   BY MR. KENNEY:

6   Q.  Ma'am, did you write this email, the July 6th, 2020 email?

7   A.  No, my husband write the email to Persephone.  You mean the

8   document from the Verbandsgemeinde?

9   Q.  No, ma'am.  The email, the specific email.

10  A.  The email, my husband, my husband sent it to Persephone,

11  not me.

12  Q.  Is the information that's imparted in the email correct

13  based upon the letter you later received from

14  Verbandsgemeinde -- from the government?

15  A.  Genau, yes.

16           MS. McNORTON:  Your Honor, I again repeat the

17  objection.  It's hearsay.  And the letter reflected, attached

18  to the email, again, is also hearsay.

19           THE COURT:  Mr. Kennedy [sic], so this email, what

20  does this have to do with Ms. -- I'm going to butcher your

21  name, I'm sorry, ma'am.  Frick-Wilden?

22           THE WITNESS:  [Indiscernible/garbled word(s)].

23           THE COURT:  This is apparently an email sent from the

24  husband, is that correct?

25           MR. KENNEY:  Yes.

1          THE COURT:  From the husband's email?

2          MR. KENNEY:  Yes, Your Honor.  You'll see that the

3    email is signed or is best regards from Merzalben.  And it's

4    actually, at the bottom, Ingeborg Frick.  So it says her name,

5    she wrote.  And this information was information actually to

6    the government, she provided to the municipality, about the

7    move-out date.

8          THE COURT:  So she -- your --

9          Ms. Frick-Wilden, did you write this email?

10         THE WITNESS:  No, no.  The government, the government

11   office write it to me because I want actually to know on the

12   paper to send it for Persephone, I want to have.  But they told

13   me that I -- I called them on the -- in November, when he was

14   moving out, that they are closing him out of the system, that

15   he is not living here anymore.  A landlord like me, we have to

16   do this when people are moving out, we have to take care that

17   they're also getting out of the German government office, you

18   know.

19         THE COURT:  Okay.  So then they responded to you, to

20   this email?

21         THE WITNESS:  They send it to me, yes, correct, that

22   this information I give to Persephone, that she has exactly the

23   date when her husband not living here anymore.  It was

24   important for her.

25         THE COURT:  And so are these the documents that you

1  received and sent to --

2          THE WITNESS:  I received the documents from them, and

3  I -- in the email, I make -- my husband sent to Persephone.

4          THE COURT:  I'm sorry.  And your husband sent it to

5  Persephone?  Or did you --

6          THE WITNESS:  Persephone, correctly.  Because

7  she want -- she want to know that she can tell you her husband

8  is not living anymore in Germany, you know.

9          MS. McNORTON:  Objection.  Calls for a legal

10  conclusion.

11         THE COURT:  Ma'am, who sent the email to Persephone?

12         THE WITNESS:  The email to Persephone, my husband.

13         THE COURT:  And then the document that's attached, is

14  that the document you received from the government?

15         THE WITNESS:  Yes.  I received and -- but -- and if he

16  had to send to email, not to post it, was the only way.

17         THE COURT:  Thank you.

18         You may continue, Mr. Kenney.

19  BY MR. KENNEY:

20  Q.  Just so we are clear, the document you received from the

21  government obviously is in German.  At the very top of it,

22  could you describe it for the Court, please.

23  A.  Correctly, it was in German.  And what?

24  Q.  The document, how does it read at the very top?

25  A.  The German -- the document was only in German.

1   Q.  But at the very top of the document, on the letter or

2   whatever you received from the government, could you describe

3   the top for us.

4   A.  The address was going to me.

5   Q.  But at the very top line, is it from the government --

6   A.  The very top, it was Verbandsgemeinde, Rodalben, Am Rathaus

7   in Rodalben.

8   Q.  Very good.

9       And that is the municipality of Rodalben, is that correct,

10  in English?

11  A.  Correctly.  The prefix -- the post code is 66976, and the

12  village is Rodalben.

13  Q.  Very good.

14  A.  And the letter -- the letter is from 7th of July 2020.

15  Q.  And it's a --

16          MS. McNORTON:  Your Honor, if I may --

17          THE COURT:  Yes.

18          MR. KENNEY:  Excuse me.  I was trying to lay

19  foundation.

20          THE COURT:  Hold on.

21          Yes, what is your objection?

22          MS. McNORTON:  I'm sorry.  I didn't know if we already

23  addressed this exhibit, so if Mr. Kenney is addressing it right

24  now, I will...

25          THE COURT:  Thank you.

1            Go ahead.

2            MR. KENNEY:  I'm trying to lay foundation.

3   BY MR. KENNEY:

4   Q.  The letter is addressed to whom?  Who is it addressed to,

5   ma'am?

6   A.  The address is to me.  Because I asked for this document

7   and then they sent it to me.  Because I also was there at the

8   19th of November and getting out of the list.  So they send it

9   also to me because we are the landlord, so they can send this

10  to us.

11  Q.  Thank you, ma'am.

12  A.  You know?

13  Q.  Who signed the letter?  Who is the letter signed by?

14  A.  The letter is signed, a woman, her name is Ernst,

15  E-r-n-s-t.  It is a woman.  She is working for this German

16  government.

17  Q.  And it's pronounced Monika Ernst, is that correct?

18  A.  Genau.  You can see it upstairs, Frau Monika Ernst.  She

19  was writing the letter.

20  Q.  And this is the letter you say you received on or about

21  July 7th, 2020, is that correct?

22  A.  Correct.  7/7/20.  And then straightaway, I sent this

23  letter to Persephone.

24  Q.  Okay.  The documents that you have before you, are they in

25  both German and in English.  Do you see English translations?

1    A.  Yes, I have in German and a translation in English,

2    correct.

3    Q.  Okay.  Is the English translation of the letter from Monika

4    Ernst, does that appear to be correct?

5    A.  Yes, I was reading this, if everything correct was the

6    letter told.  I translation in the German, and I was looking in

7    English, and everything is correct.

8              MR. KENNEY:  Your Honor, I move for admission of

9    Respondent's Exhibit 31.

10             THE COURT:  Any objection?

11             MS. McNORTON:  Yes, Your Honor.  It's hearsay.

12             THE COURT:  The...

13             Overruled.  It will be admitted.

14   BY MR. KENNEY:

15   Q.  Ma'am, I just need to ask you --

16   A.  And, and if I can say --

17             THE COURT:  No, ma'am, you need to wait for a

18   question.  Ma'am, you need to wait for a question.

19             THE WITNESS:  Okay.

20   BY MR. KENNEY:

21   Q.  Okay.  Ma'am, I want to talk with you now about those

22   incidents involving Mr. Bogdan Radu.

23       Am I to understand there was more than one incident where

24   you heard Mr. Bogdan Radu yelling in Romanian and yelling in

25   English?

1    A.  No, I hear him, I hear him more often yelling.  Because I

2    had to do something in this house, we had also another

3    apartment downstairs, and when I had do something, I hear him

4    more at them yelling.  And sometimes it was so terrible, and I

5    was thinking to tell him to stop this, but then I was scared

6    that he attack me.  But I did not like this situation because,

7    to hear them so yelling with the family, that was for me also

8    very terrible.

9    Q.  So you're saying that you were afraid of Mr. Bogdan Radu?

10             MS. McNORTON:  Objection.  Leading.

11             THE COURT:  Overruled.

12   A.  I was very afraid of him.

13   BY MR. KENNEY:

14   Q.  Excuse me, ma'am.  Wait.  There's an objection.

15             THE COURT:  Overruled.

16             Go ahead.

17   BY MR. KENNEY:

18   Q.  I'm sorry.  You started to answer.  Go ahead.

19   A.  Yes, I was very afraid about him because he was unfriendly

20   to me, very much.  Because we told him to move out, and he had

21   to pay the open rent, and he did not like me anymore.

22   Q.  Okay.  Was there ever an incident at or near that time in

23   November that you recall that specifically stands out with you

24   and Mr. Bogdan Radu?

25   A.  Can you ask me, tell me this again?

1   Q.  I'm asking, is there anything that stands out in your mind
2   about an incident at or near the time he moved out in November
3   of 2019?
4   A.  Before, you mean?
5   Q.  Yes, before he moved out.
6   A.  Before he moved out.  Yes.  One time I was outside, I was
7   always looking that he is not coming in my line, because I was
8   so scared about him.  And one time -- always I was looking to
9   the left, to the right, that I am not crossing his line --
10              THE COURT:  Ma'am?  Ms. Frick?  Ms. Frick-Wilden?
11              THE WITNESS:  Yeah.
12              THE COURT:  Hold on one second.
13              MS. McNORTON:  Foundation.
14              MR. KENNEY:  I'm sorry?
15              MS. McNORTON:  Could we establish some foundation for
16   when this occurred?
17              MR. KENNEY:  Thank you, Judge.
18   BY MR. KENNEY:
19   Q.  Can you tell us what this incident occurred?
20              THE COURT:  What is the relevance of this incident?
21              MR. KENNEY:  It goes to establish his behavior and
22   demeanor.  It supports her testimony about her being
23   intimidated by him.
24              THE COURT:  But this was in November of 2019.
25              MR. KENNEY:  Yes.

1          THE COURT:  After the children were gone and Ms. Shon

2    was already in the United States; correct?

3          MR. KENNEY:  That is correct, Your Honor.

4          THE COURT:  Move on from that.  I don't see any

5    relevance at this time.

6          MS. McNORTON:  Thank you, Your Honor.

7    BY MR. KENNEY:

8    Q.  Can you tell us about -- did you ever watch the children,

9    either Tavi or Max?

10   A.  Oh, yes.  I took care of the kids very often.  Sometimes of

11   both, but most the time of Tavi.  When Persephone was out or

12   she had to do something, she was working or shopping, and then

13   I took care of Tavi very often.

14         MS. McNORTON:  Objection.  Relevancy.  The entire line

15   of questioning here goes to grave risk of harm to the children.

16         MR. KENNEY:  That's exactly where I'm going.

17         THE COURT:  Overruled.

18         You may answer.

19   BY MR. KENNEY:

20   Q.  All right.  Ma'am, those incidents when you were watching

21   Tavi, was Mr. Bogdan Radu home?

22   A.  Pardon?

23   Q.  Was Mr. Bogdan Radu home when you would watch Tavi?

24   A.  Ah.  That is a good, that is a good, a good question.

25   Sometimes I had no time, or it was not so easy, and I asked

1    Persephone why is Mr. Bogdan, "Why is your husband not taking
2    care of the kids, because he is non-stop home?"  And then she
3    told me she is not feeling good because he is getting so
4    quickly nervous with the kids, and she does not like that the
5    kids are staying with him when she is not home.
6    Q.  Okay.  So there would be times you would be watching Tavi
7    and then Mr. Radu would be home, is that correct?
8    A.  He was home, yes, and I watching Tavi; and she was gone to
9    do something, and she had Max, and she took Max to other
10   friends.
11   Q.  All right.
12   A.  And that is because --
13           THE COURT:  Ms. Frick?
14   A.  -- she was --
15           THE COURT:  Ms. Frick-Wilden, one moment.
16           MS. McNORTON:  Your Honor, I move to strike.  This is
17   not relevant to the issue.
18           MR. KENNEY:  She's about to testify to what happens
19   when she would watch Tavi.
20           THE COURT:  You may continue.  Let's get to the
21   relevant points, Mr. Kenney.
22           MR. KENNEY:  Yes.
23   BY MR. KENNEY:
24   Q.  When it would come time to take Tavi back home, back to his
25   apartment --

1   A.  Yes.

2   Q.  -- did you ever experience or see anything from Tavi that

3   would indicate that there was some issue with Tavi and his

4   father?

5           MS. McNORTON:  Objection.  Foundation.  Speculation.

6           THE COURT:  Overruled.

7           Go ahead.

8           THE WITNESS:  Can I start?

9           THE COURT:  Yes.

10  A.  Yes.  When I had to bring Tavi home on time, always I know

11  a time when I have to bring him home, and we were going home,

12  and Tavi had seen that the car from Mama was not there, he did

13  not like to go home when Mama was not there.

14  Q.  Did he express to you that he did not want to go and see

15  his father or be with his father?

16          MS. McNORTON:  Objection.  Calls for hearsay.

17          THE COURT:  Overruled.

18          Go ahead.  Go ahead, Ms. Frick.

19  BY MR. KENNEY:

20  Q.  Go ahead.

21  A.  Pardon?  I'm so nervous now, because I am thinking for all

22  this time I had with them.

23          THE COURT:  Ms. Frick-Wilden, the question was --

24          Go ahead.

25  BY MR. KENNEY:

1  Q.  Did Tavi say anything to you at that time about his father?

2  Did he say anything specifically?

3  A.  Mmm, no.  He -- when something has to be talking about his

4  father, he has closed his mouth.  He only wonder if Mama was

5  here when he is going back home.

6  Q.  Okay.

7  A.  And when I bring him home and sometimes Mama was not there,

8  and Mr. Radu opened the door and Tavi was quickly inside, he

9  was completely different.  With me, he was so happy and so good

10  and so friendly.  And when I bring him home, and then you could

11  see him, he was getting so quiet then.

12  Q.  Okay.  Is there any other expression that you could recall

13  seeing on him, like perhaps any other emotion that he was

14  expressing?  Like crying or anything like that?

15          MS. McNORTON:  Objection.  Leading.

16          THE COURT:  Sustained.

17          MR. KENNEY:  Okay.

18  A.  No.  You mean Tavi or Mr. Radu?

19  BY MR. KENNEY:

20  Q.  Ma'am, there was an objection.  It was sustained.

21      Anything else about those instances when you would watch

22  Tavi or Max that stands out in your mind?

23  A.  No.  When I have the kids, and then they were, they were

24  very happy with me.

25  Q.  Very good.  Last set of questions.

```
 1        Did you ever call the polizei, the police, there in
 2   Germany, when you would hear Mr. Bogdan Radu yelling at the
 3   children or at Ms. Persephone Shon?
 4   A.  One time I was there, oh, I remember very good, and I think
 5   with Mr. Radu was something completely different.  He was
 6   yelling.  The situation, I was getting crazy, and I was
 7   thinking to call the police, but then I was thinking I make
 8   more terrible when the police is coming.  And then I was
 9   waiting next to the apartment until I could hear that the
10   situation in the apartment was getting better.
11   Q.  Is your testimony to this Court that you did not call the
12   police?  Is that your testimony?
13   A.  I did not call the police, no, because I was thinking then
14   Mr. Radu is maybe attack me, and I already was scared about
15   him.  And then I was thinking --
16             MS. McNORTON:  Objection.  Move to strike.
17             THE COURT:  Sustained.
18   A.  -- that my situation was getting more worse when I do this.
19             THE COURT:  Ms. Frick?  Ms. Frick-Wilden?
20             MR. KENNEY:  Frau?  Frau?  There is an objection
21   that's been sustained.
22             THE COURT:  Thank you.
23             MR. KENNEY:  What was the objection?  I didn't hear
24   it.
25             MS. McNORTON:  Speculation.
```

1          MR. KENNEY:  Speculation.  Okay.

2     BY MR. KENNEY:

3     Q.  All right.  Mrs. Frick-Wilden, is there anything further --

4     A.  Oh, just "Frick" is okay.  Thank you.

5     Q.  Okay.  Frau Frick, is there anything else about the

6     relationship between Persephone, the children, and Bogdan Radu

7     that I have not asked you about that you think is important for

8     this Court to consider?

9          MS. McNORTON:  Object to the form of the question.

10    A.  Yes, very, very important is --

11         MR. KENNEY:  Just a minute.  Frau Frick, hold on.

12         THE WITNESS:  Yeah.

13         THE COURT:  Sustained.

14         MR. KENNEY:  Okay.  That's all the questions I have at

15    this time, Judge.

16         THE COURT:  Thank you.

17                         CROSS-EXAMINATION

18    BY MS. McNORTON:

19    Q.  Good afternoon.  This is Lisa McNorton.  I am working with

20    Mr. Radu, and I just have a few questions for you.

21         Now, you testify --

22    A.  Yes.  Your voice is very -- okay, can you talk a little bit

23    louder, please.

24    Q.  Absolutely.  Is this any better?

25    A.  It's a little bit better, yes.  I am older, my ears are

1   not -- the English is a little bit more different.  But I try

2   to understand, yes.  What can I -- please tell me or ask me.

3   Q.  Thank you.

4       Now, you testified that you heard Mr. Radu yelling on

5   occasions, is that correct?

6   A.  Yes.  Yes.  Yelling in the apartment, yes, at the family.

7   Q.  If you could just, please, to the extent you are able to,

8   limit your answers to "yes" or "no," so we can move along, that

9   would be great.

10      Were you ever personally present in the apartment during

11  any of these alleged incidents?

12  A.  I did not understand this question.

13  Q.  Were you in the apartment with Mr. Radu when you heard this

14  alleged yelling?

15  A.  Now I understood.  No, I was not in the apartment.  I was

16  outside.

17  Q.  Thank you.

18      Are you fluent in Romanian?

19  A.  I was never in Romania, no.

20  Q.  But didn't you testify that you heard Mr. Radu yelling in

21  Romanian?

22  A.  Yes.  That is, I know the rumänisch, because when we were

23  together or we have been outside, he was only speaking

24  rumänisch with the kids.

25  Q.  But let me ask you a question again.  Are you fluent -- do

1   you speak Romanian?

2   A.  I do not understand rumänisch, no.

3   Q.  Okay.  Thank you.

4       Now, how long did they live with you?  Did they live at

5   your apartment for about three years?

6   A.  They, they moved in middle of 2016.

7   Q.  Okay.  And it's your testimony you heard yelling but you

8   never called the police.

9   A.  It was, it was -- I never called the police, no.

10  Q.  The last time you saw Ms. Shon, you were not personally

11  present to hear any discussions between her and Mr. Radu

12  regarding when she would be returning to Germany, were you?

13  A.  No.

14  Q.  Now, I am going to ask you a question about this document

15  that Mr. Kenney asked you about.

16  A.  Yes.

17  Q.  After Mr. Radu left your apartment on November 19th, you

18  don't know where he went.  You don't know where he was living,

19  did you?

20  A.  No.  He only -- if I can tell this:  He only, he only sent

21  me SMS that he is gone.  And then he said the car is there and

22  some paperwork he forgot in the home, and somebody will come,

23  will come soon to get, and I have to give them the documents,

24  and they will take the car.  And then that was the last time.

25  I hear from him sometimes, SMS, because I was writing him that

1    he has to take the car, the car cannot stay any longer here.

2    And then he sent me, this year, two or three times, SMS, and he

3    told me, "Don't touch my car."

4              MS. McNORTON:  Your Honor, I move to strike this

5    testimony.

6              THE COURT:  Ma'am?  Ma'am?

7              MS. McNORTON:  Nonresponsive.

8              THE COURT:  Try to only answer the questions that are

9    asked.

10             THE WITNESS:  Ah.  Sorry.

11             THE COURT:  Thank you.

12             The last part will be stricken.

13             MS. McNORTON:  Thank you.

14   BY MS. McNORTON:

15   Q.  You, in fact, have no idea whether or not Mr. Radu was

16   still living in Germany after he left your apartment, is that

17   correct?

18   A.  I do not know anything about German, yes.

19   Q.  Thank you.

20       You testified with respect --

21   A.  But can I --

22             THE COURT:  No.  Please listen to the question, ma'am.

23             THE WITNESS:  I would like to say one thing.

24             THE COURT:  Ma'am?  Ms. Frick?  Ms. Frick?

25             THE WITNESS:  Yes.

```
 1              THE COURT:  You need to listen to the question.

 2              THE WITNESS:  Yes.  It was something for the question.

 3              THE COURT:  Yes.  Just wait for the next question.

 4         Go ahead.

 5  BY MS. McNORTON:

 6  Q.  I'm going to move on and ask you a little bit about Tavi.

 7         When Tavi went inside to see his father, you said he ran

 8  right in and he was quiet.  Was that your testimony?

 9  A.  Correctly.  He was completely quiet, and, yeah.

10  Q.  Did you go inside the house with him?

11  A.  I was sometimes also with him in the apartment, yes.

12  Q.  When you dropped him off, are you saying you walked into

13  the apartment with Tavi when Mr. Radu was there?

14  A.  Oh, sorry.  When I bring him -- I did not understand.  When

15  I bring him home, when I took care and I bring him home,

16  Mr. Radu was only staying on the entrance door.  And then he --

17  as Tavi was running in and he was -- Mr. Radu was closing

18  straightaway the entrance door.  He said thanks, and he closed

19  the entrance door.

20  Q.  So you have no idea what Tavi's demeanor was when he was

21  with his father alone.

22  A.  No, I don't know.

23  Q.  And you were never so concerned about the children to call

24  law enforcement, isn't that true?

25  A.  Well, normal, the kids have been, mostly Mother was
```

1   there --

2          MS. McNORTON:  Nothing further, Your Honor.  This is

3   nonresponsive.

4          THE WITNESS:  Maybe I understood not your question.

5   Sorry.  My English is not so perfect, you know.

6          THE COURT:  Hold on, ma'am.

7   BY MS. McNORTON:

8   Q.  I am just confirming, at no time did you ever call the

9   police with respect to this family.

10  A.  No, I never called the police.  No.

11         MS. McNORTON:  Nothing further, Your Honor.

12         THE COURT:  Thank you.

13         MR. KENNEY:  Briefly on redirect.

14                    REDIRECT EXAMINATION

15  BY MR. KENNEY:

16  Q.  Frau Frick, can you hear me okay?  This is Shaun Kenney.

17      You were asked the question that you have never been to

18  Romania and you don't speak Romanian.

19  A.  No.

20  Q.  Did you have tenants, people that lived there, that were

21  from Romania?

22  A.  Yes, we had people, they have been sometimes here for a

23  couple of days from Romania, yes.

24  Q.  And were there other Romanians that were living actually in

25  the other apartment building at the same time when Bogdan and

```
 1   Persephone moved in in 2016?

 2            MS. McNORTON:  Objection.  Relevancy.

 3            THE COURT:  Overruled.

 4            Go ahead.

 5   A.  No, not in -- sometimes we had somebody, but at the time,

 6   2016, when they moved in, Mr. Radu was okay, you know.  He

 7   changed.  He changed his --

 8            THE COURT:  Ma'am?  Ma'am?

 9            THE WITNESS:  -- everything demeanor.

10            THE COURT:  Ma'am?

11            You can go ahead.

12   BY MR. KENNEY:

13   Q.  Ma'am, you just -- we're limited on what you can answer

14   with the redirect.

15       You were about to finish the question regarding you don't

16   know where Mr. Bogdan Radu lived in Germany.  You started to

17   say something there.  What is it?

18   A.  Yes, I started to say something.

19       I was calling this government, what you have, the paper.  I

20   was calling a couple of weeks, many weeks later, and I ask if

21   they have -- because we have to get some rent, and I want to

22   know the address.  And then I ask him --

23            MS. McNORTON:  Objection.

24   A.  -- do you know where he is living?

25            THE COURT:  Sustained.
```

1       Ma'am?

2              MR. KENNEY:  Frau Frick?

3  A.  And they did not get any papers.  They did not know.

4              MR. KENNEY:  Frau Frick, hold on.

5              There was an objection.  Was it sustained, Your Honor?

6              THE COURT:  Yes.

7              MR. KENNEY:  And the objection was of hearsay, is that

8  correct?

9              THE COURT:  And she just answered she does not know.

10             MR. KENNEY:  Okay.

11             Frau Frick, thank you very much for your time today.

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.  Ma'am, you may hang up.  Thank

14  you.

15             THE WITNESS:  Yes.  So I am finished now?

16             THE COURT:  Yes, ma'am.

17             THE WITNESS:  Okay.  Thank you.

18             MR. KENNEY:  Thank you.  Haben sie gute Nacht.

19             At this time I call to the stand Sherri Mikels-Romero.

20             THE COURT:  We can go another half hour before we

21  take another break.

22             MS. McNORTON:  Your Honor, we were scheduled for two

23  hours.  We wanted to make sure we would get done today.

24             THE COURT:  We will get done today.

25             MR. KENNEY:  We will get done today?

```
 1              THE COURT:  Yes.
 2              MR. KENNEY:  I do have -- once she testifies, then
 3    the well-settled defense witness is prepared to come and
 4    testify.
 5              THE COURT:  I missed that last part.
 6              We're off the record.
 7         (Discussion off the record.)
 8              THE CLERK:  Step forward, please.
 9              THE COURT:  Please come forward.
10              THE CLERK:  If you'll step up in the witness stand
11    and remain standing, I'll swear you in.  Raise your right hand.
12              SHERRI MIKELS-ROMERO, WITNESS, SWORN
13              MR. KENNEY:  May I inquire of the witness, Your Honor?
14              THE COURT:  Yes.
15              THE CLERK:  Please state your full name and spell your
16    first and last name for the record.
17              THE WITNESS:  Sherri Mikels Romero.  First name
18    S-h-e-r-r-i.  Last name M-i-k-e-l-s hyphen R-o-m-e-r-o.
19              MR. KENNEY:  Thank you.
20              THE COURT:  Thank you.
21              You may proceed.
22                            DIRECT EXAMINATION
23    BY MR. KENNEY:
24    Q.  Ma'am, would you tell us, what is it you do for a living?
25    A.  I'm a psychotherapist.
```

 1   Q.  How long have you been a psychotherapist?

 2   A.  For 23 years at the master's level.

 3   Q.  Do you reside here in the Tucson metropolitan area?

 4   A.  Yes.

 5   Q.  Have you been practicing for the entire 23 years in the

 6   Tucson metropolitan area?

 7   A.  Yes.

 8   Q.  Do you have -- by the way, I notice your name carries the

 9   signia "PLLC"?

10   A.  Yes.

11   Q.  You're a professionally licensed limited liability company?

12   A.  Yes.

13   Q.  And you did say that you were a master's level?

14   A.  Yes.

15   Q.  All right.  By the way, where did you go to college, and

16   then any post-college specialty training?  Where did you go to

17   college?

18           MS. McNORTON:  Objection, Your Honor.  This witness

19   has not been classified as any kind of expert and has not

20   rendered any kind of expert opinions in this matter.

21           MR. KENNEY:  I'm sorry?  I can't hear.

22           THE COURT:  That's okay.

23           MS. McNORTON:  This witness has not been listed as any

24   kind of expert witness and has not rendered any kind of expert

25   opinion in this case.

1          MR. KENNEY:  Actually, Judge, I did provide them a

2     copy of the letter, as well as her CV.  That was attached.  And

3     it's Exhibit 35, and it was sent to them.  And I did let them

4     know that she would be testifying.

5          MS. McNORTON:  Your Honor, again, she's not been

6     classified as an expert, therefore, her qualifications, I don't

7     believe, are necessarily relevant besides the fact we know

8     she's a licensed clinical social worker.  I don't think her

9     educational background is relevant to her statements that may

10    have been made for purposes of treatment by Ms. Shon.  She's

11    certainly not here to render an opinion on anybody.

12          THE COURT:  She treated --

13          What was her role?  Did she treat the children or

14    Ms. Shon?  Who was she treating?

15          MS. McNORTON:  Ms. Shon, Your Honor.

16          MR. KENNEY:  She saw Ms. Shon.  But it's my

17    understanding, since the July 6th letter, she actually has met

18    with Tavi, and I think we can establish the foundation on the

19    number of times she's met with him.

20          MS. McNORTON:  And I'd object to any line of

21    questioning on that, Your Honor.  We have not been provided any

22    disclosure with respect to that.

23          MR. KENNEY:  We have no report from her regarding her

24    conferences with Tavi.

25          THE COURT:  You may continue.  Go ahead, Mr. Kenney.

 1          Overruled.

 2     BY MR. KENNEY:

 3     Q.   Ma'am, quickly we need to run through your background, your

 4     education and your experience.  So could you tell us, where did

 5     you go to college?

 6     A.   I have a master's degree in social work from Arizona State

 7     University.  I have a certification as a Certified Advanced

 8     Child Youth and Family Social Worker, from National Association

 9     of Social Workers.  And another certification, I'm a certified

10     EMDR therapist, from the EMDR International Association.

11     Q.   I am really having a hard time hearing.  I'm so sorry.

12     It's very difficult for me to hear.  I don't know if I'm losing

13     my hearing.

14          But am I to understand you have certifications in the areas

15     with which you will be testifying to today?

16     A.   Yes.

17     Q.   Are these certifications issued by the State of Arizona?

18     A.   No.

19     Q.   Are they issued nationally?

20     A.   Yes.

21     Q.   So you're a nationally certified therapist and also when it

22     comes to working with children?

23     A.   Yes.

24     Q.   Tell us, what is the certification requirement when -- with

25     respect to what you're testifying to that would be applicable

1   in this case?

2   A.  Well, my work with children, youth and families is

3   something that is important in working with children and with

4   children and their families together, and that has a certain

5   amount of hours per year of extra training in working with

6   children and families.

7       The EMDR certification is for a particular type of therapy

8   which I have been using with Persephone Shon.

9   Q.  EMDR is eye movement desensitization?

10  A.  Eye movement desensitization and reprocessing, yes.

11  Q.  I understand.

12      And is it your testimony you've been using that form of

13  therapy with Persephone Shon?

14  A.  Yes.

15  Q.  Now, let's talk for a little bit.

16      When did you first meet Persephone Shon?

17  A.  September 2019.

18  Q.  Why was it that Persephone Shon came to you?

19  A.  She stated that she wanted to get stronger, have more solid

20  coping skills, increase her self-confidence and assertiveness.

21  Q.  All right.  Anything else?  Did she discuss anything else

22  with you about what had happened recently?

23  A.  Yes.  She talked about a history of trauma with her husband

24  in regards to domestic violence, and that she wanted to

25  understand and be able to cope with the symptoms that she was

1  having as a result of that.

2  Q.  And while you were there and you -- how many times --

3  strike that.

4      How many times have you actually met with Persephone Shon

5  since September 2019?

6  A.  Approximately 40 times.

7  Q.  And how often do you see Persephone Shon?

8  A.  Approximately weekly.

9  Q.  I'm sorry, ma'am?

10 A.  Almost weekly.

11 Q.  Almost weekly?  Okay.

12     Am I to understand that you utilized the EMDR therapy as

13 part of your therapy with her when it came to addressing these

14 specific issues that she told you she needed --

15 A.  Yes.

16 Q.  Why don't you go ahead and tell us now, how was it -- when

17 she came, did you notice any specific symptoms that indicated

18 to you that would support what she was seeking assistance on?

19 A.  Yes, she has, and had, symptoms to meet the criteria for a

20 diagnosis of posttraumatic stress disorder.  And the things

21 that she described to me and related from her history of her

22 marital relationship with her husband explained the trauma and

23 the effects and impact of the trauma on her.

24 Q.  Did you see any symptoms of that, though, any objective

25 symptoms?

1   A.  Yes.  She dissociated periodically when talking about some

2   of the specific details of the domestic violence.  She had

3   anxiety, which I could see from her expression, some trembling

4   of her hands, and expression of going blank or staring off.

5   Those were the obvious ones.

6   Q.  You said she was dissociated.  What is dissociated?

7   A.  It's when a person is not present with the environment.  At

8   that moment, their brain takes a break, or trails off into

9   different thoughts, or goes blank altogether.

10  Q.  Very good.

11       Was there anything about her speech patterns that would

12  indicate to you that perhaps she had been the subject of

13  domestic violence or --

14          MS. McNORTON:  Objection.

15  BY MR. KENNEY:

16  Q.  -- PTSD?

17          MS. McNORTON:  Leading.

18          THE COURT:  Sustained.

19  BY MR. KENNEY:

20  Q.  Anything in addition to being disassociated [sic] and

21  staring off that you saw?

22  A.  She had blocked speech throughout periodically.  That means

23  that the speech pauses for long pauses, which can be because

24  there is some level of dissociation, or that there is an

25  intrusive thought which is distracting the person from their

 1   speech.

 2   Q.   During the course of your treatment with her, have you been

 3   able to assist her in addressing these various issues that she

 4   came to see you about in September of 2019?

 5   A.   Yes.

 6   Q.   Has she gotten better?

 7   A.   Yes, she has gotten better at setting boundaries with

 8   people in terms of letting people know how she feels, being

 9   more assertive in what she needs or is wanting from another

10   person or situation.  These are things that she is still

11   working on, but she has made some progress with that.

12        And she is better able, though still pretty distressed, in

13   talking about some of the trauma that she's been through.

14   Q.   Now, ma'am, the symptoms of PTSD, is there anything in

15   particular about the diagnoses or symptoms of PTSD in this case

16   that stands out?

17   A.   Yes.  She has reported intrusive thoughts, which I have

18   noted in her sessions.  She has talked about doing something,

19   whether it's at work or a task at home, and having intrusive

20   thoughts of some of the traumatic events.  She has had some

21   hypervigilance, which I have noticed.  That is an exaggerated

22   startle response.  For example, if she was waiting in the

23   waiting room and I walked out into the waiting room, she would

24   jump or look very startled, and yet she was not engaged in

25   anything that I was interrupting.  That's just an example of

 1  her exaggerated startle response.

 2  Q.  Okay.  The exaggerated startle response, is that something

 3  that's on the -- what is it you use to do analysis for PTSD?

 4  A.  The criteria according to the Diagnostic and Statistical

 5  Manual, yes.

 6  Q.  Are we talking about the 5-D?

 7  A.  DSM-V, yes.

 8  Q.  DSM-V?

 9  A.  Yes.

10  Q.  Ma'am, I've heard the phrase "PTSD checklist of the

11  inversion."  What is the PTSD checklist of the inversion?

12  A.  It is for symptoms such as the ones that that I have

13  mentioned, as well as distressing thoughts, moods and behaviors

14  that fit with the PTSD symptoms.

15  Q.  And I've also heard of the SL -- SCL-45 symptom checklist.

16  What is that?

17  A.  It's a symptoms checklist which assesses mental status and

18  other impacts from trauma and adverse experiences, including

19  physical symptoms, thought patterns and emotional states.

20  Q.  And during your discussions over the last 40 sessions with

21  Persephone Shon, did you utilize either the PTSD checklist of

22  the inversion or the SCL-45 symptom checklist?

23  A.  Yes.

24  Q.  What was the result of your analysis and therapy of

25  Persephone Shon?

DIRECT EXAMINATION - MIKELS-ROMERO

1   A.  It was a significantly high score on the PTSD checklist,

2   and several related to mood and thoughts on the symptoms

3   checklist, not so much with the somatic issues.

4   Q.  Ma'am, I am going to hand you what's marked here previously

5   as Exhibit 35 and ask, did you prepare a report in this case,

6   and, if so, is that your report?

7   A.  Yes, I did; and it is.

8   Q.  What's the date of your report?

9   A.  In July -- I don't have my glasses on.  Can I get my

10  glasses?

11           MR. KENNEY:  With the Court's permission.

12           THE COURT:  Yes.

13  A.  July the 6th of 2020.

14  Q.  Very good.

15      This letter is addressed to me.  Did I call you and ask you

16  to prepare this report?

17  A.  Persephone told me that it would be something that could be

18  helpful to clarify some things about her treatment.

19  Q.  And also attached to your report of July the 6th, 2020, is

20  that your itemized bill statement there, third page in?

21  A.  Yes.

22  Q.  Does that detail all the sessions you had with Persephone

23  Shon?

24  A.  It does.  It does not show the insurance interruptions, in

25  terms of charges and payments made by the insurance, but it

1    does show Persephone's own co-payments or payments for whatever

2    services, including those not covered by insurance.

3    Q.  Are you the custodian of records for the itemized billing

4    in this case for your firm?

5    A.  Yes.

6    Q.  Is this something that's normally generated by your firm?

7    A.  Yes.

8    Q.  In looking at this, when was it you started treating in

9    September of 2019?

10   A.  I apologize.  I am looking.  I believe it was the very end

11   of September.  September the 29th or September the 30th.

12   Q.  Very good.

13       Now, also attached to this document is there a copy of your

14   current résumé, CV?

15   A.  Yes.

16          MR. KENNEY:  All right.  Your Honor, I move for

17   admission of Exhibit 35 in this case.

18          THE COURT:  Any objection?

19          MS. McNORTON:  I do, Your Honor.  First of all, this

20   is not a regular business document.  It was clearly testified

21   to that this was dependent on participation of litigation.  If

22   it was to be considered a business record, it's a summary

23   exhibit, but we have not been provided a true and complete copy

24   of the entire file, and it's based on hearsay.

25          THE COURT:  This goes to show the number of visits

 1    that she has had, is that correct?

 2              MR. KENNEY:  That does, yes, Your Honor.

 3              THE COURT:  Okay.  Exhibit 35 is admitted --

 4              MR. KENNEY:  Thank you.

 5              THE COURT:  -- for that limited purpose.

 6              MS. McNORTON:  If I may, Your Honor, it also includes

 7    a summary letter that was prepared for litigation.  That's the

 8    exhibit that I am specifically objecting to.

 9              MR. KENNEY:  I am not --

10              THE COURT:  The report?  Her report?

11              MS. McNORTON:  Yes, Your Honor.

12              THE COURT:  Overruled.

13    BY MR. KENNEY:

14    Q.  Is it Mikels-Romero?

15    A.  Yes.

16    Q.  Is that your last name?  Okay.

17         Since July 6, 2020, what has happened?  What has

18    transpired?

19    A.  I have continued to see Persephone.  In addition to

20    addressing the trauma and her assertiveness skills, I have

21    addressed the anxiety that she has been having around these

22    issues coming up with the court dates and the developments, and

23    what she is having to cope with related to her entire case.

24    She has had significant anxiety, and we have spent time

25    focusing on how to cope with that, including how to cope with

DIRECT EXAMINATION - MIKELS-ROMERO                    64

1   the anxiety that she might have in her own testimony.

2   Q.  Before I begin the next line of questioning, have you

3   worked with children before?

4   A.  Yes.

5   Q.  And have you worked with children the same age as her

6   children?

7   A.  Yes.

8   Q.  And did you work with her children?

9   A.  Yes.  I have seen Tavi four times.

10  Q.  You've seen Tavi four times?

11  A.  Yes.

12  Q.  And this is since July the 6th of 2020?

13  A.  Yes, it was actually since July the 9th.  I saw Tavi on

14  July the 9th, and three more times since then.

15  Q.  What has been the purpose of your meetings with Tavi?

16  A.  For him to be able to talk about his feelings and assess

17  his level of coping or any stress that he is experiencing, and

18  how he can be able to talk about his feelings, express them

19  appropriately, and cope.

20  Q.  And does he come to you presenting with any of the symptoms

21  of PTSD in children?

22  A.  He has had some dissociative episodes, very brief; but I

23  haven't seen other symptoms, so I would not give him that

24  diagnosis.

25  Q.  And during the course of your sessions with Octavian,

1    "Tavi," I guess, is his name, Tavi Radu, have you learned

2    anything in particular about what -- either his relationship

3    with his father or with his mother or anything like that?

4    A.  He has talked almost -- well, three sessions of the four,

5    he talked quite a bit about his father being mean, angry,

6    yelling, saying bad words and calling him bad names.

7        In one session, he said that his father had hit him.  When

8    I asked where he hit him, he dissociated.  And then he flinched

9    twice, which is significant to a sensory kind of experience

10   when talking about something that has been traumatic or

11   frightening.

12       And then he talked, in a fourth session, about how he

13   believed that his dad was mostly being mean with his words, but

14   that he had also hurt him on his body.  And he said that he

15   yelled and said mean words and mean things, such as "stupid,"

16   and that he also yelled at the younger brother, but that Tavi

17   felt like he was getting more anger from his father and more of

18   the bad names, bad words.

19   Q.  So, if I understood what you just said, you're saying Tavi

20   was indicating he was getting more of the bad words and bad

21   behavior from his father than his brother Max?

22   A.  Yes.

23   Q.  Okay.  All right.  How old is Tavi?

24   A.  He is six.

25   Q.  Okay.  Very good.

1      You didn't prepare a report, though, of your meetings with

2  Tavi.

3  A.  I did not.

4  Q.  How come?

5  A.  I wasn't asked for a report.  I did, of course, have chart

6  notes.

7  Q.  Now, why is it that it took three sessions before Tavi

8  would share any information with you?

9          MS. McNORTON:  Objection.  Speculation.

10          MR. KENNEY:  Actually --

11          THE COURT:  Hold on.

12          Can you rephrase your question.

13          MR. KENNEY:  I can.

14  BY MR. KENNEY:

15  Q.  Is there a procedure when you're talking with children that

16  you have to follow to make sure you are getting information

17  from them on a voluntary basis?

18  A.  Yes.  Tavi did talk about his father's behaviors and his

19  feelings about those in each of the four sessions; however, he

20  talked more about some parts of the behaviors of his father

21  than he did all of them all together.

22      I have -- I ask open-ended questions, such as, "What scares

23  you?"

24      We do a feelings check-in at the beginning of every session

25  with drawing faces on the board and saying one time when you

1    felt that way.  And in each session, when he would talk about

2    "scared," he would say when his dad talks mean and says bad

3    words and "calls me mean names" and "when he yells at my mom."

4        Then he would talk about how he would feel sad when his dad

5    would hurt him.  And when he would stop with that, I would say,

6    "How did he hurt you?"  He would say, "On my body," and "he

7    would hurt my feelings."  Then I asked him what his dad would

8    do that was mean and that was nice.  He would say, well, he

9    would do the same things when he was mean.  But he would say

10   when he was nice he would play with him, and then he would say

11   "but mostly he was mean."

12       So I asked him to identify some other things about his dad

13   that were positive things.  You know, I asked him, "What are

14   some of the good things that you think about when you think of

15   your dad?"  And he was able to identify a couple of things, but

16   he would clarify that that wasn't usually how it would happen.

17       And on two occasions he told me that he was very confused

18   because he said he thought it was weird that somebody, and then

19   he clarified that his "dad," could be so nice and play with

20   him, and then he would be so mean and call him names and use

21   bad words.

22   Q.  Okay.  But the protocol you followed in this case is what

23   you've been certified and trained to do when you come to the

24   therapy with children, is that correct?

25   A.  Yes.

1   Q.  And you said that you always ask open-ended questions,

2   correct?

3   A.  Yes.

4   Q.  Why is it that you ask open-ended questions?

5   A.  Because I don't want to be leading by giving the child the

6   idea that I am looking for a specific answers, and I want them

7   to be able to explain without me deciding what they're going to

8   talk about, to be able to have them talk freely.

9   Q.  I've heard the phrase "planting an answer."  Have you heard

10  of that phrase?

11  A.  Yes.

12  Q.  Is that something that you avoid when you're speaking with

13  children?

14  A.  Yes.

15  Q.  And is that something that your training in this area has

16  taught you to avoid?

17              MS. McNORTON:  Objection.  Leading.

18              THE COURT:  Overruled.

19              You may answer.

20  A.  Yes, it is.

21       If I may add, I was a Child Protective Services

22  investigator and ongoing case manager as one of my employment

23  methods, and I also learned from that how to talk with children

24  in ways to avoid muddying investigations or assessments.

25  BY MR. KENNEY:

1   Q.  You worked with DCS and CPS?

2   A.  I worked for the Pascua Yaqui Tribe in their child

3   protective services department.

4   Q.  What time period was that, ma'am?

5   A.  That was 1999 to 2000.

6   Q.  Very good.

7       While you were there, you learned these techniques and the

8   protocol that we've discussed, is that correct?

9   A.  Yes.

10          MR. KENNEY:  Your Honor, that's all the questions I

11  have of this witness at this time.

12          THE COURT:  Thank you.

13                      CROSS-EXAMINATION

14  BY MS. McNORTON:

15  Q.  Good afternoon.  So you have been -- let's start with

16  Ms. Shon.  You have been providing counseling service for her,

17  correct?

18  A.  Yes.

19  Q.  And you have never met Mr. Radu?

20  A.  No, I have not.

21  Q.  You've never spoken to Mr. Radu.

22  A.  I have not.

23  Q.  And you testified earlier that you have chart notes.

24  A.  Yes.

25  Q.  You did not provide copies of any of those notes along with

 1  your summary letter and your billing records, is that correct?

 2  A.  That's right.

 3  Q.  And you claim that Ms. Shon presents with symptoms of PTSD?

 4  A.  Yes.

 5  Q.  You are a master's level?

 6  A.  Yes.

 7  Q.  Did you refer Ms. Shon out for independent psychological

 8  testing by a psychologist in this case?

 9  A.  I did not.

10  Q.  To your knowledge, has she ever undergone any complete

11  psychological evaluation?

12  A.  Not to my knowledge.

13  Q.  Now, other than Ms. Shon's statements to you, what other

14  independent basis do you have upon which you have prepared what

15  would be your conclusion?  For example, did you receive any

16  police reports?

17  A.  No.

18  Q.  Did you receive any Department of Child Safety notes?

19  A.  No.

20  Q.  Any orders of protection?

21  A.  No.

22  Q.  So your opinion is based solely upon Ms. Shon's statements

23  and how she presented to you during your limited sessions with

24  her.

25  A.  That's my observations, and her statements.

 1  Q.  And as a therapist versus an independent evaluator, you

 2  pretty much rely on the statements made to you by your client,

 3  isn't that true?

 4  A.  Largely, yes.

 5  Q.  You don't engage in any independent fact taking.

 6  A.  No actual testing, no.

 7  Q.  And you said it's your opinion that based upon Ms. Shon's

 8  reports, that Mr. Radu might benefit from participating in some

 9  parenting education and domestic violence treatment?

10  A.  Yes.

11  Q.  Did you engage in any kind of parenting time or legal

12  decision-making evaluation in this case?

13  A.  No.

14  Q.  Isn't it inappropriate to make recommendations and provide

15  opinions with respect to individuals you have not met?

16  A.  I would agree with that.

17  Q.  Thank you.

18      Do you know when Ms. Shon moved to Tucson?

19  A.  I believe it was July of 2019.

20  Q.  Now, when you were talking with Ms. Shon, did you engage in

21  her past family trauma?

22  A.  Yes.

23  Q.  Did she inform you that she did, in fact, have trauma

24  associated with her family?

25  A.  Yes.

 1   Q.  That is not reflected in your letter, though, is it?

 2   A.  No, it is not.

 3   Q.  You focused this letter solely upon Mr. Radu, based upon

 4   the request of your client, for trial purposes, correct?

 5   A.  No.

 6   Q.  So why did you not mention anything regarding the family?

 7   A.  When I assess for trauma, it is from the person's life.

 8   The issue that we were addressing to help her cope most with

 9   was this case that she is having with her husband, and that was

10   the presenting intrusive thoughts and flashbacks, so we focused

11   on that first.

12   Q.  So a decision was made to focus on Mr. Radu.

13   A.  On the trauma from the relationship with Mr. Radu.

14   Q.  Now, you said that you have met with Tavi.

15   A.  Yes.

16   Q.  Did you obtain Mr. Radu's consent to meet -- to treat his

17   child?

18   A.  No.

19   Q.  Did Ms. Shon provide you any orders awarding her sole legal

20   decision-making?

21   A.  No.

22   Q.  So is it your practice as a therapist to treat children of

23   a married couple without notifying the other parent?

24   A.  I did not have a way of notifying the other parent, and my

25   client stated that she did not know of his whereabouts.

1    Q.  Did you ask for an email?

2    A.  I don't have a business email.

3    Q.  You were aware that she was in litigation because you

4    testified she was preparing for the litigation, correct?

5    A.  Yes.

6    Q.  So you were aware that legal counsel was involved.

7    A.  Yes.

8    Q.  Did you not impress upon Ms. Shon how important it was to

9    get consent from the father before treating his child?

10   A.  I have a parent fill out a proof of guardianship paper, and

11   if the parent does not give me a copy of custodial court

12   orders, one parent's consent is -- when there's not a divorce

13   or custody determination, one parent's consent is usually

14   enough for treatment.

15       I do like to notify the other parents, but I did not have a

16   way of getting in touch with Mr. Radu.

17   Q.  Isn't it more appropriate you didn't take any efforts to

18   try and find a way to get a hold of Mr. Radu?

19   A.  It is appropriate.

20   Q.  But, again, you did not engage in any reasonable efforts to

21   reach out to him.

22   A.  I asked for his contact information, and it was not

23   available.

24   Q.  Who said it wasn't available?

25   A.  My client said that she did not know where he was.

1  Q.  Did she say he -- what about a phone number?

2  A.  There was not a phone number provided to me.

3  Q.  Okay.  Thank you.

4      Now, you said that Tavi made some statements to you about

5  Dad yelling and the like.  You're a mandated reporter, aren't

6  you?

7  A.  Yes.

8  Q.  And you used to work for DCS, so you know your obligations

9  regarding reporting.

10  A.  Yes.

11  Q.  Have you filed a report in this case?

12  A.  No, I have not.

13  Q.  There's no orders that prohibit contact between Mr. Radu

14  and his children, are there?

15  A.  No.

16        MS. McNORTON:  I don't believe I have anything --

17  BY MS. McNORTON:

18  Q.  Do you know the last time that Tavi saw his dad?

19  A.  I believe it was before he and his mother and his brother

20  left Germany, which was June or July of 2019.

21  Q.  Would it be fair to say that Tavi had been in the sole care

22  of his mother for about 15 months when you -- well, more than

23  that, by the time you finally met with Tavi?

24  A.  Twelve months.  Well, if they moved in July, then 12

25  months.

1   Q.  Okay.  Do you know the last time Tavi spoke to his father?

2   A.  I do not.

3   Q.  Did you conduct any kind of evaluation to determine the

4   impact that the lack of contact with his father may have had on

5   him?  For example, did you conduct an evaluation determining

6   whether there's any kind of coaching, alienation or any other

7   factors that could have been involved in this case?

8   A.  I did.

9   Q.  You conducted an independent evaluation?

10  A.  It was not any formal evaluation.  In my interactions with

11  him, I explored from the very beginning if anyone had talked to

12  him about what he should say to people, to me, to any other

13  grown-ups.  I asked him if -- I ask him if his mom or if his

14  dad had ever told him what he should say or not say to anybody.

15  I asked him how -- what his feelings were when he would talk

16  about the things that he was reporting from his father's

17  behaviors.  I asked him two questions about, "Well, why do you

18  think that happened?" to see what his perceptions were.  Those

19  were the kinds of interactions I had with him in that way.

20  Q.  All right.  Have you conducted formal parenting time or

21  legal decision-making evaluations?

22  A.  Not by a psychologist or with testing.  I have conducted

23  assessments and made recommendations to the Court about custody

24  and parenting time.

25  Q.  Are you on the Superior Court approved list to conduct

1  parenting time and legal decision making evaluations?

2  A.  No.  I have been requested by judges to make

3  recommendations and put something in writing and testified to

4  those recommendations.

5  Q.  And if you were to conduct an evaluation, would you be

6  prescribing to the APA guidelines?

7  A.  If I was doing something formally, yes.

8  Q.  If you were to provide an opinion under those guidelines,

9  isn't it appropriate, again, that you don't make an opinion

10  without speaking to a person?

11  A.  Yes.

12  Q.  And with respect to what you've said about Tavi, again, you

13  did not speak to Mr. Radu to determine whether or not what his

14  son was representing was true and accurate, did you?

15  A.  I did not speak to Mr. Radu.

16          MS. McNORTON:  Nothing further, Your Honor.

17          THE COURT:  Thank you.

18          Any redirect?

19          MR. KENNEY:  Yes.

20                    REDIRECT EXAMINATION

21  BY MR. KENNEY:

22  Q.  You were just asked a question a moment ago there, isn't it

23  true Tavi has been in the sole custody of Persephone for the

24  last 15 months.  You were just asked that question, is that

25  correct?

1   A.  Yes.

2   Q.  Isn't it true, in fact, he's six years old and about to

3   turn seven in October?

4   A.  Yes.

5   Q.  Isn't, in fact, true that Tavi has been in the sole custody

6   of Persephone since he was born?

7           MS. McNORTON:  Objection.  Lack of foundation.

8           THE COURT:  Sustained.

9   BY MR. KENNEY:

10  Q.  By the way, you were just asked about requested by judges

11  to do parent evaluations.  Are these the state court judges

12  here locally in Pima County?

13  A.  Yes, in the Juvenile Court and in the Superior Court.

14  Q.  How often are you requested by judges to do parent evals

15  for the family court services?

16  A.  Approximately four different times a year with different

17  families.

18  Q.  Very good.

19      To your knowledge, when you follow up on those, do you know

20  if the judges have followed your recommendations?

21  A.  Yes.  And they have.

22          MS. McNORTON:  Objection.  Foundation.

23          THE COURT:  Relevance.  Sustained as to relevance.

24          MR. KENNEY:  I have no further questions.

25          THE COURT:  Thank you.

1              May the witness be excused?

2              MR. KENNEY:  Yes, Your Honor.

3              THE COURT:  Ma'am, you are excused.

4              We're going to take a 15-minute recess.  10-minute

5    recess.

6         (Recess taken from 2:53 p.m. to 3:22 p.m.)

7              THE COURT:  Thank you.  You may call your next

8    witness.

9              MR. KENNEY:  Your Honor, at this time I call to the

10   stand the respondent, Persephone Johnson Shon.

11             THE COURT:  Please come forward, ma'am, and be sworn.

12             THE CLERK:  Go ahead and step up in the witness stand,

13   and if you'll remain standing, I'll swear you in.  Raise your

14   right hand.

15             **PERSEPHONE JOHNSON SHON**, WITNESS, SWORN

16             THE CLERK:  Please state your full name.  Spell your

17   first and last name for the record.

18             THE WITNESS:  Persephone Johnson Shon.  Persephone is

19   spelled P-e-r-s-e-p-h-o-n-e.  My last name is spelled Shon,

20   S-h-o-n.

21             MR. KENNEY:  May I inquire of the witness, Your Honor?

22             THE COURT:  Yes.

23             MR. KENNEY:  Thank you.

24                          DIRECT EXAMINATION

25   BY MR. KENNEY:

1    Q.   Persephone, are you married to Mr. Bogdan Radu?

2    A.   Yes.

3    Q.   You have two children?

4    A.   Yes.

5    Q.   How old are they?

6    A.   They are six and four.

7    Q.   What are their names?

8    A.   Octavian Shon Radu, but we call him "Tavi" for short.  And

9    Maximilian Shon Radu, and we call him "Max" for short.

10   Q.   When was Tavi worn?

11   A.   Tavi was born October 20th, 2016.

12   Q.   2016?

13   A.   I'm sorry.  2013.  Sorry.

14   Q.   Thank you.

15        Have you ever testified in court before?

16   A.   No.

17   Q.   Are you a little nervous today?

18   A.   Yes.

19   Q.   And Max, when was Max born?

20   A.   Max was born on May 28th of 2016.

21   Q.   Where was Tavi born?

22   A.   Tavi was born in South Lake Tahoe, California.

23   Q.   Where was Max born?

24   A.   Max was born in Landstuhl, Germany.

25   Q.   I'm going to take you through that period of time starting

```
 1   after Tavi was born.  I understand you had a difficult delivery
 2   with Tavi.
 3              MS. McNORTON:  Objection.  Relevancy.
 4              THE COURT:  Overruled.
 5   BY MR. KENNEY:
 6   Q.  I understand you had a difficult delivery, is that correct?
 7   A.  Yes, I had -- yes.
 8   Q.  Your parents -- when you gave birth to Tavi, where were you
 9   living at that time?
10   A.  We were living in their house in South Lake Tahoe.
11   Q.  I am going to take you to that period of time shortly after
12   Tavi was born.  Were you employed at that period of time?
13              MS. McNORTON:  Again, Your Honor, my objection is
14   relevancy to the limited legal issues at hand for this Court.
15              THE COURT:  Overruled.
16   A.  No, I was not.
17   BY MR. KENNEY:
18   Q.  How about in November of 2014, were you working at that
19   time?
20   A.  Yes.
21   Q.  Where were you working at?
22   A.  I was working at Heavenly Mountain Resorts.
23   Q.  Was Bogdan working also?
24   A.  No, he was not.
25   Q.  So who was watching the children when you were at work?
```

DIRECT EXAMINATION - SHON

1    A.  I had to get daycare for Tavi because Bogdan refused to

2    watch him.

3    Q.  What do you mean he refused?  When did he refuse to watch

4    his own son?

5    A.  He refused to watch his own son all the time.  He told me

6    it was my job, I was the mother, it was my job, and it was my

7    responsibility, and he didn't have to do it.

8    Q.  When did he tell you that about Tavi?

9    A.  He told me that all the time.

10   Q.  No, but I mean --

11          MS. McNORTON:  Objection.  Relevancy.

12          THE COURT:  Overruled.

13   BY MR. KENNEY:

14   Q.  Specifically what was the start?  Was there --

15   A.  Oh, it was -- I mean, it was after Tavi was born.

16   Q.  Which was what?

17   A.  Tavi was born in October 20th of 2013.

18   Q.  But when was it he told you specifically "you're taking

19   care of Tavi"?

20   A.  Oh, he told me that, I mean, within the first month.  I

21   mean, I would say, you know, in October, the end of October,

22   you know.  If I needed a break, you know, he would say no.  He

23   would say, no, I was his mother, Tavi needed me, and it was my

24   job.

25   Q.  Did he ever take care of Tavi by either dressing, bathing,

1    feeding him or anything like that?

2    A.  No.

3    Q.  So who did?  Who took care of Tavi after he was born?

4    A.  I did.  I did everything.

5    Q.  Did he ever offer to say, "Hey, Persephone, why don't you

6    take the night off, I'll take care of Tavi," or anything?

7    A.  No.  No.  I was the one who got up in the middle of the

8    night to take care of all the feedings.  And I did all the

9    bathing and all the feedings and the clothing.  And the only

10   thing that he did help with a little bit were diapers, diaper

11   changing.

12   Q.  He did diapers for who?

13   A.  For Tavi.

14   Q.  How long did he do diapers for Tavi?

15   A.  He did that off and on when -- probably for the first year.

16   And maybe after the first year, it got less and less.

17   Q.  All right.  I'm going to move up to a period of time.

18       When did you leave South Lake Tahoe?

19   A.  I left South Lake Tahoe with Tavi in March of 2016.

20   Q.  Prior to leaving for South Lake Tahoe, was Bogdan still

21   living with you?

22   A.  No.

23   Q.  When did he leave South Lake Tahoe?

24   A.  He left South Lake Tahoe in December of 2015.

25   Q.  Why?  Why did he leave and where did he go?

1    A.  He went to Germany.  He got a job.  He got a contractor job

2    that had a contract with the U.S. State Department.

3    Q.  It's been years since I've been to South Lake Tahoe.  Is

4    that in California or Nevada?

5    A.  That's in California.

6    Q.  And there is a Lake Tahoe, northern Lake Tahoe, that's in

7    Nevada, is that correct?

8    A.  Yes, that is correct.

9    Q.  Where did you work when you were living in South Lake

10   Tahoe, during the period of time from 2015 through when you

11   left for Germany?

12   A.  I was working -- I had the same job working at Heavenly.  I

13   was the lift operations administrative assistant.

14   Q.  So when you would go to work as the Heavenly lift

15   operations administrator, who was watching Tavi?

16   A.  I had to find -- well, at the beginning, when I first

17   started, which was in October of 2015, it's a seasonal job,

18   Bogdan refused to watch Tavi.  And I was -- and so I found a

19   babysitter to watch Tavi.  Her name was Cassidy Simpson, and

20   she came to the house to watch Tavi, and Bogdan was in the

21   house the whole time that she was there.  And she was able to

22   watch him, Tavi, for the first two weeks, and then she got

23   called to go back to work at Heavenly.  She worked at Heavenly

24   also in a different position.

25        So then there was no one else available, and so Bogdan did

DIRECT EXAMINATION - SHON

1   have to watch Tavi at that point.  And that was really the

2   first time that he really watched Tavi by himself without me in

3   the vicinity, within like the house.

4   Q.  Okay.  Now I have to lay foundation.

5       What time period are we talking about here?

6   A.  This is -- so I started working October 2015.  This

7   probably was in November, probably mid-November, of 2015.

8   Q.  Very good.  So Bogdan's watching Tavi, Mr. Radu is watching

9   Tavi, starting about the middle of November; am I correct?

10  A.  I believe so.

11  Q.  Then what happened?  What happened with Mr. Radu, your

12  husband?

13  A.  Then he said he had -- he got a job in Germany.

14  Q.  Was he employed during that time period, from 2014 through

15  2015, before he left for Germany?

16  A.  No, I don't think so.

17  Q.  So he gets a job in Germany, and that was when?

18  A.  The job was going to start in, I believe in mid-December.

19  Q.  I'm sorry?

20  A.  The job was going to start in December of 2015.  I just

21  don't remember when in December.  But he left, he left mid

22  -December.

23  Q.  So if I am understanding what you are saying, is your

24  husband was unemployed for about a year, year and a half,

25  started watching Tavi in the middle of November and then

1   suddenly gets a job in Germany in the middle of December.

2   A.  Yes.

3   Q.  Do you think the fact that he -- did you ever discuss with

4   him the fact that he had to watch Tavi gave him the energy and

5   impetus to get a job?

6           MS. McNORTON:  I'm sorry, could I --

7           THE COURT:  Sustained.

8   BY MR. KENNEY:

9   Q.  All right.  He gets a job in December of 2015 in Germany.

10  Let's take it from there.  Okay?

11      You leave Heavenly at what time?  When do you go from

12  working at Heavenly to Germany?

13  A.  Oh.  You mean when I moved to Germany?

14  Q.  Yes.

15  A.  Oh, I moved to Germany in March, like around March 10th of

16  2016.

17  Q.  During that period of time, from when Mr. Radu left in

18  December 15th or middle of December 2015, to when you left in

19  March of 2016, were you the only one taking care of Tavi?

20  A.  I was, except for there was -- he was at a daycare when I

21  was at work.

22  Q.  I'm sorry, ma'am, I didn't hear you.

23  A.  He was at the daycare when I was at work.

24  Q.  So you moved to Germany, and Tavi at this point is

25  approximately three years of age, close to three?

1  A.  No.  When we moved to Germany, he was closer to two and a

2  half.

3  Q.  Did he start schooling in Germany about that time period?

4  A.  It took a few months.  We got there in March, and he didn't

5  start until May.

6  Q.  And what was he enrolled in, in Germany?

7  A.  He went to the German preschool.  They call it

8  kindergarten.

9  Q.  At some point when you're in Germany in 2016, am I to

10  understand that you gave birth to Max, your son?

11  A.  Yes.

12  Q.  Specifically where in Germany was Max born?

13  A.  Max was born at St. Johannis hospital, and that's a German

14  hospital in Landstuhl.

15  Q.  Were you living in Merzalben during this period of time

16  when Max was born?

17  A.  Yes.

18  Q.  Were you living at the apartment that we heard from your

19  landlord from today?

20  A.  Yes.

21  Q.  And who was your landlord?

22  A.  My landlord was Inge Frick and Hans Frick.

23  Q.  Inge and Hans Frick?

24  A.  Mmm-hmm.

25  Q.  Is that a "yes," ma'am?

1    A.   Yes.

2    Q.   Thank you.

3         At some point do your parents come to stay with you when

4    you're living in Merzalben, Germany?

5    A.   Yes, they do.

6    Q.   And when was that?

7    A.   They came, they came in about mid-May through like, through

8    like June 11th, to help with -- yeah, to help with Tavi and me

9    and Max.

10   Q.   Did they stay with you in your apartment for the entire

11   time they were with -- in Germany?

12   A.   No, they didn't.

13   Q.   Why not?

14   A.   Because they were really stressed out.  They were really

15   stressed out.  My mom had said it was a toxic atmosphere --

16            MS. McNORTON:   Objection.  Calls for hearsay.

17            THE COURT:   Sustained.

18   A.   Bogdan was, Bogdan was really stressed out and angry, and

19   he yelled a lot.  And we lived in a three-bedroom, two-bath

20   apartment, and so my parents were sleeping in the room that

21   Bogdan usually slept in, and so Bogdan was on the couch.  And

22   so they also thought it would be better, you know, if they

23   moved to a different apartment so that Bogdan could get his

24   room back, and then they could get a break from all the stress

25   that was in our house.

1    Q.  All right.  Well, where did they move to, is what I am

2    asking.

3    A.  Oh.  They moved to an apartment that was in the same

4    building.  We lived on the third floor, and they moved to an

5    apartment that was on the first floor.

6    Q.  And during this period of time, how long did they stay on

7    the apartment on the first floor?

8    A.  I would say it's about a week and a half.

9    Q.  So you said that they came in the middle of May or the end

10   of May of 2016 and stayed until June 11th, 2016, is that

11   correct?

12   A.  Yes, that's correct.

13   Q.  So they were in Germany for roughly, what, three, four

14   weeks?

15   A.  Yes.

16   Q.  So they lived with you for half that time and then had

17   their own apartment down on the first floor for the other half

18   of the time?

19   A.  Yes.

20   Q.  Okay.  All right.  So during that time that they were --

21   well, when did you come home from the hospital after delivering

22   Max?

23   A.  I came home three days after delivery.

24   Q.  Max was born May 28th, 2016, so that means you would have

25   been home by June 2nd, 2016, is that correct?

1  A.  That is correct.

2  Q.  Did anything happen during that period of time, on June

3  2nd, 2016, that you have personal knowledge about, that you

4  saw?

5  A.  Yes.

6  Q.  What happened?

7            MS. McNORTON:  Object to the form of the question.

8            MR. KENNEY:  I'm sorry?

9            MS. McNORTON:  Object to the form of the question.

10  Foundation.  Personal knowledge of what?

11            THE COURT:  Overruled.

12            You may answer.

13  A.  I was getting some milk for Tavi from the refrigerator, and

14  it was in a sippy cup and it had been saved and I gave it to

15  him.  And we found out later that the milk had soured, and I

16  didn't know that.  Bogdan slammed his hand on the table, and he

17  started yelling and screaming at me and threatening me.  And he

18  told me I was trying to poison my son, which I would never do

19  that.  And I remember that my mom was there when that happened

20  also, and it was just, I just, it was horrible.

21      And then another thing that happened afterwards is that

22  Bogdan would get really mad and angry and almost explosive when

23  he -- and would tell me that when he couldn't get -- he

24  couldn't sleep at night, and so he told me it was my job to

25  keep Max quiet during the night.  And Max was a newborn, he

1    needs to eat every two to three hours.  It's the same as how it

2    was with Tavi as it was with Max.  I have to get up and feed

3    him, and I'd have to try to get sleep in between.  And I ended

4    up staying up most of the night to try to anticipate when Max

5    needed to feed so that Max wouldn't cry and I could keep him

6    quiet, because I was scared.  I wasn't sure what -- I was

7    scared.  I felt threatened.

8        And then another thing that happened is that Bogdan refused

9    to change Max's diapers.  He would not touch Max -- strike

10   that.  He would not change any of Max's diapers.  And Max is

11   feeding every two to three hours, which means he has a diaper

12   every two to three hours.  So I was changing all of his

13   diapers.  Bogdan just kept saying it was my job, it was my

14   responsibility.

15   BY MR. KENNEY:

16   Q.  This time period that you're talking about would have been

17   around the end of June of 2016, is that correct?

18   A.  Yeah.  I mean, all -- yeah, these would -- these were in

19   June, yeah, June of 2016.

20   Q.  Again, how old would Tavi have been about this point?

21   A.  Tavi is -- he's almost -- well, he's still two and a half.

22   I mean, he's more than two and a half, but not three yet.

23   Q.  All right.  So he's a toddler.

24   A.  He's a toddler, yes.

25   Q.  What we call a toddler.  Is that correct?

1          Okay.  Very good.

2          I'm going to move ahead to October 31st, 2016.  Do you

3     recall October 31st, 2016?

4     A.  Yes.  That is Halloween.

5               MS. McNORTON:  Objection.

6               MR. KENNEY:  I'm trying to lay foundation.

7     BY MR. KENNEY:

8     Q.  Can you tell us about Halloween 2016?  What happened --

9               THE COURT:  Wait.  Ms. McNorton, what was your

10    objection?

11              MS. McNORTON:  He's leading, Your Honor.

12              THE COURT:  What was that?

13              MS. McNORTON:  He's leading.

14              THE COURT:  Overruled.

15              Go ahead.

16    BY MR. KENNEY:

17    Q.  Tell us about Halloween 2016.

18    A.  Halloween, we took -- I wore Max in the carrier.  He was a

19    pirate, and we took Tavi, and we went to Ramstein Air Force

20    Base, because in Germany they don't celebrate -- they don't do

21    trick-or-treating, it's not a German holiday.

22         So we went on the air force base and we were

23    trick-or-treating.  And it was fun until we discovered that

24    Tavi had lost one of his gloves.  The weather was cold at that

25    time, and so we had jackets on over our costumes.  And so we

1    found out that one of his gloves was missing, and Bogdan got

2    really mad.  He got really mad, and he was yelling at Tavi

3    about it.  Tavi is only three at this time.  And then he also

4    got mad at me because he told me it was my responsibility to

5    keep track of everything, it was my responsibility, you know,

6    to know where both of Tavi's gloves are.  And he just wouldn't

7    let it go.  The whole night he was fixated and obsessed over

8    this glove that was missing, and I really didn't have any

9    control over it.

10   Q.  Okay.  Did he threaten you in any way physically at that

11   time, in October of 2016?

12   A.  Yes.

13   Q.  In what way?

14   A.  I mean, he was constantly threatening me.  He was giving

15   me -- you know, he was threatening me about the kind of person

16   that I am.  He was constantly yelling and screaming at me about

17   how the house was messy and how I was a bad example for our

18   children.  He was always putting me down or telling me things,

19   you know, calling me names.  Like he would call me "bitch."

20   Excuse the language.  He would say profanities to me and

21   criticize who I am, criticize where I'm from, tell me I'm too

22   slow, tell me I'm not a good mother, tell me I'm not a good

23   parent.  He would blame me for basically everything that

24   happened that he didn't like.  It scared me.  It scared me all

25   the time.

1   Q.  Did he ever -- we're in October of 2016 now.  Okay?

2   A.  Okay.

3   Q.  Did you see him become physical as against Tavi?  Did he

4   become physical in any way, or hit or beat or strike him in any

5   way?

6   A.  I don't recall.

7   Q.  During October 2016?

8           MS. McNORTON:  Asked and answered.

9           THE COURT:  Sustained.

10  BY MR. KENNEY:

11  Q.  I guess the question is, when did you see or start

12  witnessing that the behaviors of Tavi -- or Bogdan towards Tavi

13  changed?

14          MS. McNORTON:  Objection.  Assumes facts not in

15  evidence.

16          THE COURT:  Sustained.

17          MR. KENNEY:  I don't recall her testifying...

18          THE COURT:  I'm sorry.  What was that, sir?

19          MR. KENNEY:  I don't recall her testifying.  Was the

20  objection it's been testified to?  I'm really having a hard

21  time --

22          THE COURT:  She has not testified that he was hit or

23  beaten in any way.  So your question was improper as to that,

24  the way it was asked.

25  BY MR. KENNEY:

1    Q.  Beyond October 2016, okay, it's almost Christmastime.

2    Christmas 2016, where did you all go?

3    A.  We went to Romania.

4    Q.  Why did you go to Romania?

5    A.  Because we -- they were the closest family, and we could

6    drive there, and we went to go see Bogdan's family.

7    Q.  Did anything happen en route to Romania?

8    A.  Yes.  We had car problems.

9              MS. McNORTON:  Objection.  Relevancy to car problems.

10             THE COURT:  What was that?

11             MS. McNORTON:  Relevancy to this line of questioning.

12    The issue here is grave risk of harm to the children if they

13    are returned to Germany.

14             MR. KENNEY:  I'm sorry.

15             MS. McNORTON:  And it appears we're getting into what

16    would be more appropriate for a custody case, as opposed to

17    that limited issue of grave risk of harm to the children in

18    Germany and whether the children should be returned to Germany

19    for Germany to decide the custody.  We are not here on a

20    custody case.

21             THE COURT:  I assume that that's where we were

22    getting, Mr. Kennedy [sic], with regards to the Christmas 2016.

23    You can be more specific on your question.

24    BY MR. KENNEY:

25    Q.  Did anything happen in Romania, as affects the children,

1    which is the subject of this case, anything in Romania during

2    Christmas 2016?

3    A.   No.

4    Q.   Anything involving the children en route to Romania or

5    coming back from Romania?

6    A.   Just that we had major car problems and the car had to be

7    towed on our way to Romania.  And we had -- that was really

8    difficult, trying to get a tow truck in Hungry, because we

9    spoke English.  And then on the way back --

10              THE COURT:  Ma'am, wait for your question.

11   BY MR. KENNEY:

12   Q.   Was there an altercation between you and Bogdan Radu about

13   the car breaking down en route to Romania, and did it happen in

14   front of the children?

15   A.   Yes.  I told him he bought a dud.

16   Q.   I'm sorry?

17   A.   I told him he had bought a dud.  That the car he bought

18   before we left was a dud.  And the children were there with us

19   the whole time.

20   Q.   Was there a fight between you and Mr. Radu?

21   A.   No, I don't think so.

22   Q.   Moving on from Christmas 2016, January 2017.

23        Let's talk about -- was Bogdan working after -- I'm sorry,

24   strike that.

25        When did Bogdan start working in Germany again?

1    A.  Well, he had a job when he moved to Germany in 2015.  And

2    then his job -- his contract ended in September of 2017.  So

3    after September 2017 was when he stopped working and didn't

4    have a job all the way up to when we left.

5    Q.  After September 2017, were you working?

6    A.  Well, I was working as a full-time mom.

7    Q.  All right.  And did you -- were you doing anything other

8    than -- and not to denigrate being a full-time mom.  That's

9    probably the most important job in the world.  But were you

10   also doing anything in addition to being a full-time mom?

11   A.  Yes, I was a volunteer for Mom2Mom KMC, which is a

12   military -- a U.S. -- it's a breastfeeding support group, and I

13   was the finance director, so I was on a board.

14   Q.  When you would have to attend to the matters involving

15   Mom2Mom KMC, who would watch the kids?

16   A.  I would.  I would take them with me.

17   Q.  You wouldn't leave them with Bogdan?

18   A.  No.

19   Q.  Why not?

20   A.  Because I didn't trust him.  I didn't -- you know, he --

21   when he would rage and get angry and mean and mad, it would

22   seem to happen all the time.  And it got worse and worse and

23   worse like the longer we were there.  He couldn't control

24   himself.  He couldn't turn it off.  He couldn't turn it on.  He

25   was like Dr. Jekyll and Mr. Hyde.  One minute he was

1   Dr. Jekyll, and he seemed like a regular person, going about

2   doing regular things, and then instantly it would just change,

3   and he would be Mr. Hyde, and he would become this monster and

4   really ugly.  And he would range and yell and scream.  And he

5   would do it in front of the children, and he would do it with

6   me, and it was just...

7   Q.  When he's raging and screaming, did he also back it up with

8   physical?

9   A.  Yes.

10  Q.  What would he do?

11  A.  He would slam on the table.  He would -- I could see him

12  clenching his fists.  He would get really jerky and he would

13  point his fingers.  And, you know, they would be moving -- the

14  way he was using his body language, it would move like in the

15  way that he was speaking.  It was like, it was like rhythmic or

16  really forceful.  And it was just, it was just really

17  intolerable.  It was unbearable.  And it was just all the time.

18  Q.  Did it seem to change?  And if so, when?

19  A.  Yes.  Yes, he definitely changed.  I would say he was

20  changing in general throughout our whole marriage, but he

21  changed the most after the Christmas that we went to in 2017.

22  Q.  Okay.  We'll talk about that in a second, but I'm going to

23  move you back for a minute to October 6th, 2017.  Do you

24  remember the incidents on October 6th, 2017?

25  A.  Yeah, I think so.  I know that around that time there

1    was -- I was cooking dinner, and he -- Tavi had left a stool in

2    the kitchen and I didn't see it.  I didn't see the stool, and I

3    tripped over it and I landed really hard of a thud on my knees.

4    And I was in pain and I spilled what was in my hand.  It was

5    broccoli.  I spilled what was in my hand, and it went all over

6    the floor.  And Tavi rushes in and asks me, "Mommy, Mommy, are

7    you okay?  I'm sorry.  Are you okay?"  And then Bogdan comes

8    in.  He storms in.  He looks at me.  He can tell that I'm in

9    pain.  He asks me if I broke my shoulder, and I say no.  He

10   asks me if I broke my leg, and I say no.  And then he just

11   turns and stares at Tavi, and he just starts screaming and

12   yelling and calling Tavi bad names, calling him stupid for

13   leaving the stool out.

14       And...Tavi is cowering.  He has his hands over his ears,

15   he's really pale, and you could tell he's really stiff.  He

16   looked scared.  And then when Bogdan stops yelling, he storms

17   out and he sulks on the couch.  And during that time, Max was

18   in the kitchen with me and he vomited all over.

19       And so as soon as Bogdan left, I consoled my kids.  They

20   we're all crying, so I was trying to console them.  And then I

21   had to change Max's clothes because he had vomit all over.  And

22   then I had to clean up the vomit that was all over his

23   highchair and the floor.  And then I had to clean up after I

24   spilled the broccoli and finish cooking dinner.  Bogdan didn't

25   ask once how I was, and he didn't offer to help us at all.  He

 1   just stayed on the couch.

 2   Q.   During this period from October 2017 'til just before

 3   Christmas of 2017, was Mr. Radu working?

 4   A.   No, he was not.

 5   Q.   Was he taking care of the children if you had to do any of

 6   the house -- like go to the store?

 7   A.   No.   I took the children with me everywhere.   And sometimes

 8   Inge would help and watch the children, usually Tavi.   And I

 9   would take Max with me because I could wear him in the carrier.

10   But, no, he was not, he was not helping with the children.   It

11   would be maybe an hour here or there, but it would be like if I

12   was cooking.   Like I could never completely leave the

13   apartment.   He would never offer to leave -- to watch the kids

14   and let me leave the apartment and be completely off the

15   premises to do something.

16   Q.   So, again, during this period, October, November, December

17   2017, he is not employed.   Right?

18   A.   Mmm-hmm.

19   Q.   Is that a "yes"?

20   A.   Yes, he is not employed.

21   Q.   Who is taking care of the children?

22   A.   I am.   Well, Tavi is in kindergarten during the day, but in

23   general, I am taking care of the children and I am taking care

24   of the house.

25   Q.   Now I am going to move to Christmas 2017.   Did something

DIRECT EXAMINATION - SHON

1    happen in Christmas of 2017?

2    A.  Yes.

3    Q.  What happened?

4    A.  We, we had so many car problems the previous Christmas that

5    we decided to take a transport to Romania from Germany.  When

6    we were in Romania we were car-less.  And when we get there,

7    his parents are really angry and emotional.  And basically the

8    whole time we're there, they are fighting with Bogdan.  So that

9    means they're screaming and they're yelling and they're banging

10   on things and they're crying.  And when Bogdan goes to a

11   different room, they follow him --

12            THE COURT:  Hold on.  There's an objection.

13            MS. McNORTON:  I'm going to object to relevancy of the

14   paternal grandparents' behavior and, again, how that gets to

15   the grave harm.

16            THE COURT:  Sustained.

17            MR. KENNEY:  If I might be heard on that, Judge, for

18   just a second.

19            THE COURT:  Yes.

20            MR. KENNEY:  One of the issues is going to be, if

21   they establish their case, the children would go back to

22   Germany and possibly to Romania.  So I'm about to ask her, do

23   you have concerns about the possibility that your children

24   would not only be in Bogdan Radu's care but also the

25   grandparents' care in Romania; and, if so, why?  That's why I

1    was trying to lay foundation.

2          THE COURT:  The objection is sustained.

3          MR. KENNEY:  Okay.  All right.

4    BY MR. KENNEY:

5    Q.  You've already expressed some concerns about Bogdan Radu,

6    is that correct?

7    A.  Yes.

8    Q.  In this situation, if the Court is to order the children to

9    go back to Germany, do you have any concerns about them

10   likewise going to Romania?

11   A.  Oh, yes.  Definitely.  I fear for their safety.

12   Q.  Why is that?

13         MS. McNORTON:  Objection.  Relevancy.  The issue is

14   returning the children to Germany for Germany to decide the

15   custody case.

16         THE COURT:  Sustained.

17         MR. KENNEY:  I'm sorry?

18         THE COURT:  It's sustained.  The issue is whether the

19   children would be returned back to Germany.  If there is an

20   issue with the children going from Germany to Romania, that's

21   out of my jurisdiction.

22         MR. KENNEY:  That's out of the Court's jurisdiction.

23   I got it.  Is that what the objection was?  I want to be sure I

24   am correct.

25         MS. McNORTON:  It's a relevancy objection.

 1          MR. KENNEY:  I understand, but it was the last part I

 2     didn't catch.

 3          I'm so sorry, Judge.  I need to clear this up.

 4          You object to the fact that it was going from Germany

 5     to Romania?

 6          MS. McNORTON:  Yes, because the legal issue before the

 7     Court is returning the Court [sic] to Germany and the German

 8     jurisdiction.

 9          MR. KENNEY:  I understand the objection.  Thank you,

10     Judge.

11     BY MR. KENNEY:

12     Q.  So what happens in Romania at Christmas 2017?

13     A.  And so I am -- I have to -- I have to try to find safe

14     spaces for the children and I to go.

15          MS. McNORTON:  Objection, Your Honor.  We already -- I

16     already objected to the line of questioning regarding this

17     Christmas of 2017.

18          MR. KENNEY:  Let me clear it up.  That's fair.  If I

19     clear it up by asking...

20     BY MR. KENNEY.

21     Q.  ..was there anything in particular with Bogdan, whether

22     it's in Germany or Romania, that happened that puts you in

23     concern for the safety of the children?

24          Do you understand the question, ma'am?

25     A.  No, I don't understand the question.

DIRECT EXAMINATION - SHON

1  Q.  Okay.  Ma'am, when you're in Romania during Christmas 2017,

2  there were incidents that happened with the family; true?  Was

3  there anything involving Bogdan and the children during

4  Christmas 2017 that gives you concern, and that's why you're

5  here testifying today?

6  A.  Well, he was yelling also.  I mean, he was involved in all

7  the arguing that was happening in the house.

8  Q.  And who was he yelling at?

9  A.  He was yelling at his parents.

10 Q.  How about the kids?  Was he yelling at you and the kids?

11 A.  You know, at that Christmas, no, not really.  At that

12 Christmas, he wasn't.

13 Q.  Did Bogdan's behavior towards you and the children change

14 after that Christmas in Romania in 2017?

15 A.  Yes.

16 Q.  How so?

17 A.  He was worse.  He was even more -- like he couldn't control

18 any of his anger.  And it just, it would just constantly come

19 out all the time that he was just really, really angry, really

20 upset, really stressed out.  And he would just rage over little

21 things.  Like if my son put his shoes on backwards.

22     Like there was one time where we were both taking Tavi to

23 the doctor, and we couldn't find a parking place, and so it

24 was -- Bogdan blamed me because we couldn't find a parking

25 place.  You know, I can't control parking, I can't control

1   that.  And Tavi peed in his car seat at that time, and it

2   became my fault that Tavi peed in his car seat.  And, again, I

3   don't control the bowel movements of my kids, but I do -- I do

4   take them to the bathroom before we go on an outing.

5        I mean, there was another time where we're sitting at --

6   we're eating dinner at a table, and Tavi can't reach the sour

7   cream, and he asks for it, asks for help, and then Bogdan gets

8   mad and mocks him.  And then Bogdan picks up the sour cream and

9   then puts it on his plate.  And then Tavi and I both get mad

10  because Tavi had asked for it first.  And then Bogdan comes

11  over and puts the sour cream, puts a scoop of sour cream on

12  Tavi's plate.  And then Tavi gets mad and starts crying because

13  he wanted to do it himself.  And then Bogdan, he, he says, he

14  looks at Tavi and he says, "Fuck you."  He says, "Fuck you.

15  You don't have to do it yourself."  And then he starts

16  screaming and cussing and calling us all names.  And we're

17  sitting there frozen.  We're scared.  And he just goes -- goes

18  off about everything.  And then he storms out and we just --

19  you know, there are lots of incidents like that, where he

20  just -- you never knew what to expect.

21       It was like we were walking on eggshells all the time

22  because we were -- basically, it was survival.  We had to

23  survive every minute of every hour of every day, and that's how

24  I was living.  I was trying to get through the day, trying to

25  protect my children.  And he was scary.  He was scary.

DIRECT EXAMINATION - SHON

1    Q.  In addition to yelling and screaming, did he do anything,

2    you know, with -- like anything on top of the yelling and

3    screaming?

4    A.  Yes.

5    Q.  What would he do on top of the yelling and screaming?

6    A.  He's hit Tavi before.  He's hit Tavi before.  He's thrown

7    things.  He's thrown chairs.  And he's thrown things that have

8    hit the things that we're currently using.  He's banged on

9    doors, like really hard.  He's, he's banged on tables.  He's

10   assaulted me.  I mean, he's, he's, he's very violent.

11   Q.  Let me talk for a minute about March 25th, 2018.  Do you

12   remember that date and that incident?

13   A.  Yeah, I do.

14   Q.  What happened on March 25th, 2018?

15   A.  Tavi and I and Max are in the bathroom.  And I'm trying to

16   get Tavi -- not Tavi, I'm sorry.  I'm trying to get Max to go

17   poop on the toilet.  We're potty training.  He doesn't want to.

18   He's really upset; he's screaming.  During this time, when I'm

19   working with Max, Tavi is taking a shower.  And then when Tavi

20   is done with the shower, I leave the water running.  And it's,

21   it's like one of those showerheads that you can hold.  And so I

22   put Max in the bathtub, he's still really upset, still

23   screaming, and I try to clean him and bathe him.  And then Tavi

24   is trying to help me and help Max by having the

25   water -- you know, controlling the showerhead and having the

1  water go on Max.  And Max is really upset.  It's making

2  it worse.  It's making it worse that Tavi is helping.  So I

3  asked Tavi to please stop.  But it's just, it's not really

4  working.  It's just complete chaos in the bathroom.

5       So then, all of a sudden, the door opens, like, you know,

6  like someone flung it open.  Bogdan comes in and he slaps Tavi

7  across the face and then starts screaming at us.  You know,

8  telling Max to stop crying, telling Tavi that he was being bad,

9  telling -- screaming, yelling.  You know, it was like daggers

10  in his eyes.  He's like screaming, telling me I'm the worst

11  mother ever, that I can't control my children, telling me that

12  I'm the worst person ever.

13       And then I try to -- I tell Bogdan, I finally convinced

14  Bogdan to leave and then I close the door again.  And then he

15  flings the door open a second time and he comes back screaming

16  and yelling.  And, I mean, he's saying like the worst things.

17  You know, "You fucking bitch."  "You fucking Shons."  And he's

18  also screaming and yelling at Tavi, who did absolutely nothing

19  wrong.  He was just trying to help me.

20  Q.  Ma'am, you said this was in March of 2018 or another --

21  A.  I'm sorry.  That was in May.

22  Q.  Was when?  May?

23  A.  I think it was -- I'm getting the dates confused.

24       Oh, no, that was in May.  I'm sorry.  I'm getting that

25  confused.

DIRECT EXAMINATION - SHON

1   Q.  All right.

2   A.  I think in March, that's when he threw the chair.

3   Q.  March of 2018 he throws a chair?

4   A.  Yeah, I think so.  Yeah, March, I think.  Yeah.  He threw

5   the chair.  He broke his phone, and he was really angry that he

6   broke his phone, and that the front of it, where you see

7   everything, was cracked.  And he's just really angry at

8   himself, but, you know, instead of just -- he just takes out --

9   I think he takes all of that anger out on us.  So just

10  basically everything, everything we do, every move we make, is

11  wrong.  And he is yelling at us about it, screaming at us about

12  it, and cussing and, you know, saying bad words.  And it was

13  just, it just went on all the time.  It was all the time that

14  he was like this.

15  Q.  Did events -- did things get worse after -- obviously in

16  December of 2017?  But did there appear to be an escalation of

17  events; and, if so, when?

18  A.  Yeah, it did get worse.  His unemployment was going to be

19  over, I believe, in June or July of 2018.  And so he didn't

20  have a job and I didn't have a job and we had no money.  I

21  mean, we were living on thin air.  He was, he was looking for a

22  job, but nothing was coming through.  And I was still

23  watching -- I was still watching Max.  It was really rough.  I

24  mean, there were times when we really didn't have a lot of

25  food.  And our car was constantly having issues with it

DIRECT EXAMINATION - SHON

1  breaking down.  Yeah, I mean, I told him I think we should go

2  back, we should go back to the States, because we don't have

3  anything here.  We don't have any food, we don't have any car,

4  we don't have a job.  I mean, we don't have anything to sustain

5  us.

6  Q.  Before we get in the next area, I need to ask you about

7  trips to the United States.  Okay?

8      After you get to Germany, did you ever return from Germany

9  to the United States before June of 2019?

10 A.  Yes.

11 Q.  All right.  When did you come to the United States?

12 A.  It was in 2017, for two months, between -- I think it was

13 March 15th to May 15th.

14 Q.  Very good.

15     And when you flew -- you flew, obviously, right?

16 A.  Yes.

17 Q.  Silly question, got to ask it.

18     So when you left Germany, on or about March 15, 2017, what

19 was different about March 15, 2017 and June the 9th, 2019?

20 A.  Well, Bogdan had bought the -- so, in 2017, Bogdan had

21 bought roundtrip tickets.  And he, he dropped us off and picked

22 us up at the airport, and I was -- we were flying where Max was

23 going to be sitting with me, sitting on me, because he was

24 under two.  So we had just two suitcases.  And at that time,

25 you know, I wasn't ready to give up on our marriage yet.  I was

1    still focused on trying to work on our problems that we had

2    together and, you know, try to make our marriage work.  So I

3    was completely -- you know, I was coming back.

4        And then on June 9th -- I mean, basically in 2019, I mean,

5    everything deteriorated in our marriage.

6        And in March, he, he sexually assaulted me.  And pretty

7    much after that, it just... I mean, he's a monster.  I mean,

8    who assaults their wife?  And so it just...you know, I was...I

9    was...I knew after that assault that I wasn't going to be able

10   to stay with him.

11       So when we left on June 9th, I did have my dad buy an extra

12   suitcase so I could bring four suitcases instead of just three.

13   My friend Erin picked us up from the apartment on June 9th, and

14   we went to her house, and then a transport picked us up from

15   her house.  Bogdan did not take us to the airport at that time.

16   And I was done.

17       I had tried so hard to do all of his demands, to do

18   everything for the kids, for the house, to do all his

19   ultimatums that he constantly gave me all the time.  I tried

20   everything.

21   Q.  I'm going to talk about December 2018.  Okay?  Do you

22   remember December 2018?

23   A.  Yes.

24   Q.  Did anything happen in particular in December of 2018 that

25   you can recall as important for the Court to consider?

DIRECT EXAMINATION - SHON

1  A.  It's the summer of -- okay.  At that time we were getting

2  ready to go on an outing, I believe to like a festival, and so

3  I told the boys to go to the bathroom first before we went in

4  the car.  And we're still potty training Max.  And so I take

5  Max into the bathroom.  And he's crying, he doesn't want to go

6  potty.  So he's crying, he's upset, and I sit there with him

7  and wait it out.  And as soon as I get him to stop crying, all

8  of a sudden, I hear a loud banging on the bathroom door, and

9  it's like his whole arm and his palm, of Bogdan, is slamming

10 against the door and the door is shaking.  Like it is

11 shuttering under the force.  And he is screaming at me like in

12 this really -- like he's screaming in this really high-pitch

13 scream and telling me, "You better get Max to stop crying."

14 "You better get him to go potty."  "You are the worst mother."

15 He is screaming.  And then he tells me I better unlock the door

16 or else he's going to knock the whole door down.  So, of

17 course, Max starts crying again and screaming again.

18      And I wait for Bogdan to move away from the door.  And

19 then I unlock the door and I am holding Max to me.  And I go

20 out of the bathroom, and like the first thing I'm going to do

21 is check where Tavi is, because I know that Tavi was out where

22 Bogdan was.  And I find Tavi is just, you know, in the kitchen

23 where -- you know, the door is always open in the kitchen.  And

24 Tavi is standing there, he's completely frozen and stiff, and

25 he has his hands over his ears, and he looks really pale,

DIRECT EXAMINATION - SHON

1    really scared.  And Bogdan is really menacing, just staring,

2    really menacing and glaring at me and glaring at us.  So I take

3    Tavi's hands, and I'm still holding onto Max...  And I take

4    them into my room and I lock the door.  And then I am crying,

5    too.  And I am basically, you know, trying to comfort them the

6    best I can.  And I can't -- I can't explain why Bogdan is doing

7    that.  So I am comforting them.  And as soon as I feel like

8    they're doing better, they're a little more calm, then I start

9    contacting friends to see if there's somewhere that we can go

10   for them, that we can go, because I don't feel safe in the

11   house.  I don't feel comfortable.  I feel like he was going to

12   knock that door down.  And who's to say that that wouldn't be

13   my face or Tavi's face or one of us?  I have no idea.

14       So after I hear -- it's been a few hours, and I don't hear

15   any noise outside the door, so I decided to unlock the door.

16   And I take the children with me, we're holding hands, and we

17   walk to the kitchen.  And I feed them, I feed them some food.

18   And then I look to see where Bogdan is.  He is -- I believe

19   he's out on the couch.

20       And so then I go to my room, and I start packing my

21   suitcase, because I did find a place that we could go.  And

22   Bogdan comes in, and he looks at me incredulously, you know,

23   like, "Why are you leaving?"  "How can you leave right now?"

24   And I'm looking at him and I say, "I don't feel safe here.  I'm

25   not going to stay here with you.  I'm not going to put my

1    children in jeopardy."  And so he says, "How can you leave at a

2    time like this?  You know, how can you leave when I might

3    commit suicide?"

4    Q.  He threatens to commit suicide?

5    A.  He threatens to commit suicide, yeah.  He says that he

6    could commit suicide because -- well, I don't know why, but he

7    says he's going to commit suicide.  And I said, that's not --

8    you know, "I don't feel safe here.  I don't feel comfortable

9    here.  I cannot stay here, you know, with you at the moment."

10        And so after I finish packing up our suitcase, you know, we

11   put our -- we put our coats on, our shoes, and I take the

12   children, and we leave.  And we're gone for four nights.

13   Q.  What happens when you come back?

14   A.  When I come back, when I come back, I take the kids

15   straight to school, because we came back on like a school day.

16   And then I go to the apartment and I talked to Bogdan about

17   it; and he has no idea what he did.  He has -- he has no memory

18   of what he said or of any of the actions.  He doesn't remember

19   anything.  And I am just super scared, because it just sounds

20   like he completely blacked out into this rage during the whole

21   experience.

22        And then he asked me to do make-up sex.  And I just...I

23   can't... There's no apology or anything.  It's just, you know,

24   that happened, oh, let's have sex.

25   Q.  Again, ma'am, this happened in?

DIRECT EXAMINATION - SHON

 1   A.   December of 2018.

 2   Q.   Okay.  All right.  After December 2018, did anything happen

 3   on Valentine's Day 2019?

 4   A.   Yeah.  We were -- we were talking.  So, you know, a few

 5   months earlier, before February 14th, Inge had told me

 6   specifically that we needed to move out.

 7            MS. McNORTON:  Objection.  Calls for hearsay.

 8            THE COURT:  Sustained.

 9   BY MR. KENNEY:

10   Q.   I'm sorry.  You just said something --

11   A.   Well, I was leading up to the conversation we're having on

12   February 14th.

13       So we were talking about financial issues, Bogdan and I

14   were talking about financial issues.  And, you know, we had it

15   hanging over our head that Inge wanted us to move out, and

16   Bogdan said that we couldn't move out yet because he was

17   waiting to receive some things in the mail.  And so he was

18   waiting to receive like an escrow payment for a land holding

19   that he had in San Antonio, Texas.  And then he was also

20   waiting for a document from the U.S. Army to come to our

21   address.  And so he said that, you know, we couldn't move out

22   until those things came.

23       And then I said, I asked him, "Do you know if the U.S.

24   Army, if the military sent you that document yet?"  And then

25   all of a sudden, instantly, he snapped.  He said -- he yelled

DIRECT EXAMINATION - SHON

1    at me and screamed at me, and, you know, he said, "How dare you

2    ask me this?"  And I thought it was just a very simple -- I

3    thought it was a very simple question.  But, you know, it

4    didn't end with that.  He decided to go into a whole tirade of

5    things where he -- I mean, basically every single aspect of me

6    he yelled and screamed about.  And he called me a "fucking

7    bitch."  And he called me a "feminazi."  I mean, he completely

8    degraded me.

9        And then he started degrading my parents and some of my

10   relatives.  And then he went into how I'm the worst parent and

11   the worst, the worst person, and I don't do anything right and

12   I'm too slow.  I mean, every aspect of me, he just, he just

13   screamed, screamed and yelled to my face.  And I'm scared.  I'm

14   really scared.  He just doesn't, he just doesn't stop.  It just

15   went on and on forever.  And he's saying fuck this and fuck

16   that and bitch, bitch, bitch.  And it's just --

17   Q.  Did this happen in front of the children?

18   A.  I, I don't know.

19   Q.  You don't know.

20   A.  I don't know.

21   Q.  Well, the screaming and yelling, did it happen in front of

22   the children regularly, or what did he do, take you aside?

23   A.  Oh, it was in front of the children regularly.  It was all

24   the time.  But that specific instance that we were talking

25   about, I am not sure.

1  Q.  All right.  Now let's move into -- but before we do, I

2  understand you had to get Tavi's passport renewed, is that

3  correct?

4  A.  Yes, that's correct.

5  Q.  During February of 2019?

6  A.  Yes.

7  Q.  Were there any incidents about the renewal of the passport

8  in February or March of 2019 that may be relevant for this

9  Court to consider?

10        MS. McNORTON:  Your Honor, if I may.  We were told

11  that we would have until 4:30.  We're

12  running...[indiscernible/barely audible]... so I'm going to

13  object to relevancy.  I know this Court has allowed a lot of

14  this kind of testimony, but I would request that we strictly

15  focus on the legal issue here, which is the grave risk of harm.

16  I think --

17        THE COURT:  We are running out of time.  It's 4:20.

18        MR. KENNEY:  I have a few more issues with her for the

19  period of time in Germany with the kids.

20        THE COURT:  If you can stick to anything with just

21  dealing with the kids.  I have allowed quite some leeway, but

22  we have to make sure that we finish up today.

23        MR. KENNEY:  Fair enough.

24  BY MR. KENNEY:

25  Q.  During that period of time, in March of 2019, were there

DIRECT EXAMINATION - SHON

1  any incidents between Bogdan and the children that you recall?

2  A.  Yes, I know there were incidents.

3  Q.  As you sit here today, you just don't have any independent

4  recollection, during February, March, April, March of 2019?

5  A.  March of 2019?

6  Q.  It's okay.  If you don't remember, it's all right.

7  A.  Right now, I don't remember.

8  Q.  All right.  Let's move on.

9  A.  I know that there was stuff that was continuously happening

10 all the time.

11 Q.  You started to tell us about being sexually assaulted in

12 March of 2019.

13 A.  Yes, I was sexually assaulted by Bogdan.

14 Q.  What happened?

15      MS. McNORTON:  Objection.  Relevance.  The issue again

16 is...[indiscernible/barely audible]...the dad and the kids.

17 BY MR. KENNEY:

18 Q.  Did this happen in front of the children?

19 A.  No.  They were at school.

20 Q.  The children were at school when you were sexually

21 assaulted by Bogdan?

22 A.  Yes.

23      MR. KENNEY:  I am asking for some leeway on this,

24 Judge, to establish this man's behaviors.  He sexually assaults

25 his wife --

DIRECT EXAMINATION - SHON

```
 1              THE COURT:  We've already heard testimony about that.
 2    Can you move on.
 3              MR. KENNEY:  Okay.
 4    BY MR. KENNEY:
 5    Q.  Was that the point when you said, "I've had enough"?
 6    A.  Yes.
 7    Q.  Why?
 8              MS. McNORTON:  Objection.  Relevancy.  This is not
 9    with respect to her state of mind.  This is purely a legal
10    conclusion with respect to grave risk of harm, which is
11    where this testimony --
12              THE COURT:  Sustained.
13              MS. McNORTON:  -- to be going.
14              THE COURT:  Sustained.
15    BY MR. KENNEY:
16    Q.  Do you want to tell us what happened after March of 2019
17    with you and Bogdan?
18    A.  Well, in April, he told me that he wanted me to leave
19    because I didn't want him sexually, and then he told me -- so
20    he told me to call my dad and get an airline ticket to return,
21    to go back to Tucson, and that I was going to take
22    the -- that I needed to take the kids with me, and that he
23    wasn't going to pay me a cent, and that he wasn't going to be
24    in their lives at all.
25    Q.  When in April did he tell you this?
```

 1   A.  I want to say it was mid-April.

 2   Q.  Of 2019?

 3   A.  Of 2019.

 4   Q.  All right.  Did he say that a lot to you, that you need to

 5   get your stuff and get the heck out of here?

 6   A.  He did.  He said it almost weekly for two years.  I mean,

 7   he would say it to -- he would tell us that -- he would yell at

 8   us.  And he would tell it the most, I believe, to Tavi, that --

 9   in the argument he would tell Tavi that, "I'm going to send you

10   back home to live with your grandparents where they can

11   discipline you."  Or, you know, "I'm going to send you --" not

12   home.  I meant, "I'm going to send you to the U.S.," or to

13   Tucson.  And he would say it all the time, that he was going to

14   send Tavi back, sometimes by himself, or he was going to send

15   Tavi back to the U.S. with me and Max.  He said it all the time

16   in arguments, that, you know, he wanted us to leave.

17   Q.  So finally at some point in 2019, did you take steps to

18   leave?

19   A.  Yes.

20   Q.  What did you do?

21   A.  I had been in contact with my sister.

22   Q.  What's her name?

23   A.  My sister's name is Melanie Shon Kuhlman.

24   Q.  Okay.  Go on.

25   A.  Because things were just, they were just getting

 1  progressively worse.  I mean, Bogdan and I were -- we did

 2  discuss working on our issues, and then it would switch back to

 3  this isn't working.  And so I talked with my sister about

 4  airline tickets, and then she looked into them, And then I --

 5          THE COURT:  Hold on, ma'am.

 6          MS. McNORTON:  Your Honor, again, I'm going to object

 7  to relevancy.  The issue here is not her state of mind and what

 8  she was thinking, it is when Mr. Radu became aware she was not

 9  returning.  That's a very different issue at hand.

10          MR. KENNEY:  I'm sorry.  I have to back up to hear

11  you again.

12          MS. McNORTON:  It's when Mr. Radu became aware that

13  she did not intend to return, which has been documented by

14  Exhibit 10 of Petitioner's exhibits.

15          MR. KENNEY:  Exactly, Judge.  Getting ready to lay --

16  just having her lay foundation for these exhibits.

17          THE COURT:  Thank you.

18  BY MR. KENNEY:

19  Q.  Did you buy an airline ticket?

20  A.  Yes.

21  Q.  Did you get a roundtrip ticket?

22  A.  No.

23  Q.  Why not?

24  A.  Because we weren't coming back.

25  Q.  Who bought the tickets?

DIRECT EXAMINATION - SHON

1   A.  My dad bought the tickets.

2          MR. KENNEY:  I'm sensing that we need to break or

3   something.

4          THE COURT:  It means we only have the video 'til 5:00

5   o'clock.  So even though I would love to stay longer, it's 4:25

6   right now.

7          MR. KENNEY:  Did I understand Your Honor has a

8   conference also at 4:30 today on another case?

9          THE COURT:  No, I don't.  I don't.

10          Right, Cathy?

11          It's just our video will only go and our calls only go

12   'til 5:00 o'clock.

13          MR. KENNEY:  I understand that.  I'll try to hurry up.

14   BY MR. KENNEY:

15   Q.  I am going to hand you what's been marked as Exhibit 32 and

16   39, and ask if you can identify 32 first, which I know has

17   already been admitted.  Do you recognize Exhibit 32?

18   A.  I do.

19   Q.  What is 32, ma'am?

20   A.  Thirty-two is our itinerary for our flight back to the U.S.

21   Q.  Who purchased the airline tickets?

22   A.  My dad did.

23   Q.  What's the date on those purchase of the airline tickets on

24   the itinerary?

25   A.  The confirmation date is May 28th, 2019.

DIRECT EXAMINATION - SHON

1   Q.  All right.  On May 28th, 2019, you get the itinerary,

2   right?  Is that when you get this itinerary which is marked as

3   32?

4   A.  Yes.

5   Q.  Do you give it to Bogdan on May 28th, 2019?

6   A.  Yes, I email it to him.

7   Q.  You email it to him on what day?

8   A.  I don't remember which day.

9   Q.  Okay.  Was it on or about that date, May 28, 2019?

10  A.  I mean, it was, it might have been a few days after I

11  received this.

12  Q.  What happens when you give him the itinerary?

13  A.  He gets really mad.

14  Q.  Why does he get mad?

15  A.  Because he sees it's a one-way ticket.

16          THE COURT:  Mr. Kenney, does this go to his knowledge

17  of when he believed that the children would be removed from the

18  jurisdiction?  Is this the --

19          MR. KENNEY:  Yes, Your Honor.

20          THE COURT:  -- only evidence you have with regards to

21  your argument that he was outside of the one-year time limit?

22          MR. KENNEY:  Yes, Your Honor.  Also, the email.

23  That's Exhibit 38.  There is a series of emails.

24          THE COURT:  I understand that, but I relied on, in

25  making my ruling, that the children were not actually removed

 1    until June 9th.

 2           MR. KENNEY:  I understand.

 3           THE COURT:  And it's the date on which I based my

 4    ruling, my ruling on.  And just to save everyone some time,

 5    even if she had told him, even if he knew, it wasn't until the

 6    time that she removed the children, and that's what I am basing

 7    my ruling on.

 8           MR. KENNEY:  So I am clear, Your Honor, and forgive

 9    me, I want to make sure I am clear.  What you're saying is when

10    the children were actually removed from Bogdan --

11           THE COURT:  From Germany.

12           MR. KENNEY:  From Germany or from the marital

13    residence?

14           THE COURT:  From Germany.

15           MR. KENNEY:  Because I learned -- she told me in the

16    interim, No, actually, we left the marital residence on June

17    the 9th, 2019.

18           THE COURT:  And it mostly goes to when he -- I don't

19    believe this is enough to show that he knew that the children

20    were not going to be coming back; so that, in conjunction with

21    the removal and the children not returning, is what I am basing

22    the ruling on.

23           MR. KENNEY:  So, to clear this up and make a specific

24    ruling in this area, so is Your Honor taking the position that

25    he didn't know they weren't coming back until later?  Is that

 1    what you're saying?

 2           THE COURT:  Well, that they -- I have not -- that this

 3    is not enough to convince me that he didn't know that the

 4    children were not coming back until later.

 5           MR. KENNEY:  To establish the well-settled defense, is

 6    what you're saying.

 7           THE COURT:  To establish the well-settled defense.

 8           MR. KENNEY:  With that in mind -- well, I am

 9    wondering, for the purposes of making a record, how I have to

10    preserve what the well-settled defense witnesses would say.

11    So, okay.

12           THE COURT:  Well, I think, you know...  I think I

13    have established...I have allowed...I have given a lot of

14    leeway as to the well-established defense.  And as I said

15    earlier, what I am interested in is the --

16           MR. KENNEY:  Grave risk.

17           THE COURT:  -- grave risk of harm.  So let me let you

18    continue, and then we'll see where we are.  We may need to -- I

19    don't know, I'll hear argument in a bit.

20           MS. HARALAMBIE:  Your Honor, if I might, just a

21    reminder that when I was examining Mr. Radu, we all talked

22    about he was not going to be testifying about the grave risk

23    issues until after the respondent's case.  So we would be

24    entitled, and you allowed us to reserve rebuttal on that issue.

25    Although it will be my intention to make a motion at the end of

DIRECT EXAMINATION - SHON

```
 1   her testimony that there isn't enough as a matter of law to
 2   constitute a grave risk.  Just to let you know that, Your
 3   Honor.
 4            MR. KENNEY:  I understand.
 5            THE COURT:  I am wondering if we need to reschedule
 6   this.
 7            MR. KENNEY:  I understand where she is going with
 8   that.  If I may ask one -- I haven't had a chance of asking
 9   Ann --
10            Real quick, Ms. Haralambie, are you doing an oral
11   motion for directed verdict at the close of the respondent's
12   case?  Or will you be filing a written --
13            MS. HARALAMBIE:  Yes.
14            MR. KENNEY:  Will you be filing a written motion?
15            MS. HARALAMBIE:  No.  I was going to do it orally
16   because --
17            MR. KENNEY:  Okay.  Thank you.  I just needed that
18   clarification.
19            MS. HARALAMBIE:  -- cases are supposed to be decided
20   completely within six weeks from the time the petition is
21   filed.  And, you know, we've already had to continue this once,
22   and my understanding is the Court said it is going to finish
23   today, and we just need to preserve, you know, our case --
24            THE COURT:  The problem is, is that we are on video.
25   I would be happy to stay until we get it resolved today.
```

DIRECT EXAMINATION - SHON

1      Cathy, we can only go until 5:00 because of the video?  Or

2  can we stay...

3      Go ahead and proceed, and we'll find out whether we can

4  stay at least another hour or so.

5          MR. KENNEY:  Very good.

6  BY MR. KENNEY:

7  Q.  During that period of time, in March, April and May of

8  2019, were there any further incidents of Bogdan's behavior as

9  directed against the children that you recall as you sit here

10  today?

11  A.  Yes.

12  Q.  All right.  What was it, and when?

13  A.  You said in 2019?

14  Q.  Yes.  March, April and May of 2019.

15  A.  I mean, it was -- it was all the time.  It was all the time

16  that he was --

17          MS. McNORTON:  I object.  This has been asked and

18  answered, and she's testified that she had no independent

19  recollection of any incidents between Bogdan and the children

20  during this time period.

21          MR. KENNEY:  No.

22          THE COURT:  She did.

23          And could you step a little bit closer to the mic or

24  pull the mic closer to you, ma'am?  Thank you.

25          That was her testimony, Mr. Kennedy [sic].  Maybe you

 1  can rephrase your question.

 2          MR. KENNEY:  Okay.

 3  BY MR. KENNEY:

 4  Q.  Clarify, when did you leave Germany?

 5  A.  We left Germany on June 10th of 2019.

 6  Q.  What time did your flight leave on June 10th, 2019?

 7  A.  I don't remember.  I think it was in the afternoon.

 8          MS. McNORTON:  Objection.  Relevancy, Your Honor.

 9  You've already ruled on this issue.

10          THE COURT:  What was that?

11          MS. McNORTON:  Objection to relevancy as to the

12  specific time that she is leaving.  You've already ruled on

13  this issue.

14          THE COURT:  I think he's just trying to make a record.

15          Go ahead as to the time.

16          MR. KENNEY:  That's exactly correct, Judge.  I'm just

17  trying to make a record on the precise time of departure.

18  BY MR. KENNEY:

19  Q.  If you need to look at 32 to refresh your recollection.

20  A.  We left at 1530.

21  Q.  1530 would be 3:30 in the afternoon?

22  A.  Yes.

23  Q.  Okay.  Next question:  Did you -- and I know we haven't yet

24  offered it into evidence, but is 38 the email you sent to

25  Bogdan Radu about the airline tickets?  Please don't take that

1  tab off, that little black thing.  I don't want to lose the

2  order of those exhibits.

3  A.  Yes, it is.

4  Q.  What day is it that you sent him an email about your

5  departure?

6  A.  June 4th.

7  Q.  Of?

8  A.  2019.

9  Q.  And did anything happen on that date when you gave him the

10  itinerary, on June 4, 2019?

11  A.  Yes.

12  Q.  What happened?

13  A.  He got really angry.

14          MS. McNORTON:  Asked and answered, Your Honor.

15  Objection.

16          THE COURT:  Sustained.

17  BY MR. KENNEY:

18  Q.  Did he become physical with you?  Did you two -- did he

19  physically assault you or hit you or anything like that?

20  A.  No, but he was physical with furniture.  He was hitting

21  tables and walls.  And he was, he was, he was doing all this

22  with the children there, too.

23  Q.  Okay.  All right.  Now, after you arrived back in the

24  United States, in Tucson, was there ever a time when you

25  told -- let's strike that.

1    Let's start this:  I take it that you did tell Bogdan you

2  were leaving and you were leaving for good, right?

3  A.   Yes.

4  Q.   Okay.  And that was on or about what date?

5  A.   That was before our flight.

6  Q.   And who picked you up?  Who took you to the airport?

7  A.   My friend, Erin Anderson.  She picked us up from our

8  apartment, and then we spend the night at her house, and then

9  we were picked up by a transport that took us to the Frankfurt

10 airport.

11 Q.   Okay.  Now, I think we talked about the differences between

12 2017, when you had a two-month visit, and 2019.  And I think

13 you've told us the differences were...go ahead.

14 A.   The differences is that I was -- the difference is it was a

15 one-way ticket, I was not planning on coming back.  I packed

16 four suitcases.  I know that there was stuff that I did leave

17 behind, but the stuff that I left behind was not as important.

18 I mean, we rented a furnished apartment, so most of the

19 furniture was not mine, and the few things I did -- left behind

20 were just some photos and some art and --

21         THE COURT:  Ma'am, hold on.  There's an objection.

22         MS. McNORTON:  Your Honor, just to help things move

23 along, I'd just like to reserve a standing objection on the

24 grounds of relevancy.  I understand Mr. Kenney is just trying

25 to set a record.

DIRECT EXAMINATION - SHON

1          MR. KENNEY:  I can establish the connection with

2     relevance.  Their Exhibit 9 is storage receipts.  They're

3     pursuing a claim or saying that somehow this was indicia or

4     evidence of her non-intent to leave, and I'm about to have her

5     explore that subject with further evidence of prior storage

6     that she just walked away from or lost.

7          THE COURT:  Was that -- I don't recall that being one

8     of the arguments.

9          Is that one of the arguments, Ms. McNorton?

10         MS. McNORTON:  Your Honor, there was property and

11    storage, but, again, my argument on the relevancy is because

12    this is related to preserving the record for the motion in

13    limine, is what I understand where Mr. Kenney is going with

14    this line of argument.  And I just don't want to have to raise

15    a relevancy objection every time that --

16         THE COURT:  It's overruled as to relevance if he's

17    discussing the reason for the storage.

18         MR. KENNEY:  Okay.

19         THE COURT:  Thank you.

20    BY MR. KENNEY:

21    Q.  Before moving from South Lake Tahoe, okay, what happened to

22    your personal belongings?

23    A.  They were -- we had -- we had two cars that we basically

24    filled with boxes, and we paid a company that brought a tow

25    truck and then put them in a storage in Long Beach, California,

DIRECT EXAMINATION - SHON

1   and then they were going to be eventually shipped to Germany.

2   Q.  Okay.  So did you ever get those items?

3   A.  No, I did not.

4   Q.  What happened to them?

5   A.  Well, I, I called the company when I visited home in 2017

6   to find out if I could get those items out of storage, and they

7   said, "Your bills weren't paid, and so we have auctioned those

8   cars."  So they no longer had them.

9        MS. McNORTON:  Objection on the lines of relevance, of

10  how this is relevant to the issues pending before this Court.

11       THE COURT:  Thank you.

12       Overruled.

13  BY MR. KENNEY:

14  Q.  Mr. Radu has offered in receipts, which, we stipulated for

15  foundation purposes and admitted the storage receipts which are

16  Exhibit Number 9, for items that were left in Germany.  Okay?

17  Was it your intention to return to Germany to get those items?

18  A.  No.

19  Q.  Do you have any affinity or emotional attachment to those

20  items in Germany?

21  A.  No.  I mean, the only -- there's a few photos and artwork

22  from the children that would be nice to have, but, no.  I mean,

23  I was concerned about their safety, and, you know, that's --

24  no, those things don't matter to me.

25  Q.  Whose safety?  The personal property safety or whose?

DIRECT EXAMINATION - SHON

1  A.  Oh, no.  I was concerned about of the safety children.  It

2  was more important for us to leave Germany than to worry about

3  those things that were left behind.

4  Q.  So you weren't leaving them behind as indicia or an

5  indication that you were going to return.

6  A.  Yeah.  No.  Those things, I don't need those things back.

7  Q.  So, in other words, did you take everything with you that

8  had value when you left June the 9th, 2019?

9  A.  Yes.

10  Q.  Well, what was that?  What did you take?

11  A.  I took the clothes, the clothes that we needed, and I took

12  some --

13       THE COURT:  That's been asked and answered,

14  Mr. Kenney.

15  BY MR. KENNEY:

16  Q.  What about the children?

17  A.  Oh.  Yes.  I took the children.  That was the most

18  important thing, was to protect the children.

19  Q.  Now, did you receive some emails from Mr. Bogdan Radu after

20  August 31, 2019?

21  A.  Yes.

22       MR. KENNEY:  May I approach with the exhibit?

23       THE COURT:  Yes.

24  BY MR. KENNEY:

25  Q.  Take a look at what's marked as Exhibit 38.

 1          MR. KENNEY:  And if I haven't, I'll go ahead and move

 2    for admission of 36, Judge, which I think is the emails that

 3    she identified as what she said to Bogdan on June 2nd --

 4          THE COURT:  Any objection, Ms. McNorton?

 5          MS. McNORTON:  If they're involved as a packet of Rule

 6    38, I have no objections.

 7          THE COURT:  Thank you.

 8    (Attorneys speaking between themselves, away from the

 9    microphones, out of the hearing of the court reporter.)

10    BY MR. KENNEY:

11    Q.  Ms. Shon, 38 is the series of emails that you got from

12    Bogdan Radu, is that correct?  Beginning August 31 of 2019?

13    Are those all of the emails you got from Bogdan Radu from

14    August 31, 2019 through April 30, 2020?

15    A.  Yes.

16    Q.  Okay.  And what happened beginning in August 31, 30, of

17    2019?  What was the tone and tenure of these emails?

18    A.  They're horrible.  They're horrible.  I mean, I felt like I

19    was being abused all over again.  I mean, he was trying to

20    control the situation.  And, I mean, they were just -- I mean,

21    they made me freeze up and just feel like -- it just felt like

22    I was back there in Germany again.  I mean, the tone in them,

23    it's like, it's horrible.  He doesn't say anything about the

24    children.  The only thing he says about the children is that

25    he's willing -- he wants this huge lump sum of money from me,

DIRECT EXAMINATION - SHON

```
 1  and if I can't get it myself, that he wants it from my parents,
 2  I mean, who have nothing to do with this.  And he is willing to
 3  get this huge sum of money for exchange for the children.  And
 4  my children are not worth any money --
 5          MS. McNORTON:  Objection, Your Honor.  Move to strike.
 6  The documents speak for themselves.
 7          THE COURT:  Sustained.
 8  BY MR. KENNEY:
 9  Q.  Ma'am, I have to lay the foundation for this part of the
10  case also.
11      Were the children enrolled in school in April -- or August
12  of 2019?
13  A.  Yes.
14  Q.  Where were they enrolled at?
15  A.  They're enrolled at the International School of Tucson.
16  Q.  Are they attending the International School of Tucson at
17  this time?
18  A.  Yes.
19          MS. McNORTON:  Objection.  Relevancy.
20          THE COURT:  Overruled.  Go ahead.
21  BY MR. KENNEY:
22  Q.  Do the children also attend church here locally?
23  A.  Yes.
24  Q.  Where do they go?
25  A.  We go to the Lutheran Church of the Foothills.
```

DIRECT EXAMINATION - SHON

1   Q.  Very good.

2       And who is the reverend or pastor there?

3   A.  Well, I mean, he recently retired, so there's an interim

4   pastor.  But when we were going before all the COVID-19 stuff

5   that caused the shutdown, it was Pastor John Lillie.

6           MS. McNORTON:  I am going to renew my objection to

7   the...[indiscernible word(s)].

8           MR. KENNEY:  Again, I am just laying foundation for

9   the in limine, Judge.

10          THE COURT:  Yes.  Overruled.

11  BY MR. KENNEY:

12  Q.  Did John Lillie also -- did he write a letter on our behalf

13  in this case?

14  A.  Yes, he did.

15          MR. KENNEY:  I know Your Honor's position on the in

16  limine.

17  BY MR. KENNEY:

18  Q.  Was it this letter, Exhibit 33?

19  A.  Yes, it is.

20          MR. KENNEY:  Your Honor, I will move for admission of

21  Exhibit 33.

22          MS. McNORTON:  Objection.  Hearsay and foundation.

23          THE COURT:  I will admit Exhibit 33 for purposes of

24  appeal, as a proffer and purposes of preserving the testimony

25  for appeal.

1          MR. KENNEY:  And if I am not mistaken, you and -- one

2     moment, Judge.

3     (Attorneys speaking between themselves, away from microphones,

4     and out of the hearing of the court reporter.)

5          MR. KENNEY:  I'm going to offer 59 and 60.

6     BY MR. KENNEY:

7     Q.  See if you can identify 59 and 60 for me.

8     A.  59 is the children's enrollment forms to the International

9     School of Tucson.  It also looks like there's some attendance

10    in here, and their emergency information and health

11    information.

12    Q.  Very good.

13    A.  It's basically their school files.

14    Q.  And Exhibit 59 is for Tavi and 60 is for Max?

15    A.  Oh, I didn't look at that part.  Yeah, 60 is for Tavi and

16    59 is for Max.

17    Q.  And then 37, is this the boys', excuse me, report cards?

18    If I can find what happened to 37.  The boys get report cards

19    from International School?

20    A.  Yes, their teachers send --

21    Q.  How are they doing?

22    A.  It depends on what year they're in, but their teachers do

23    it, and it's quarterly.  So they get four per year, except this

24    past year there were only three because of the shutdown with

25    the virus.

 1  Q.  Is that the boys' report cards for Tavi and Max ending in

 2  March of 2020 at the International School of Tucson?

 3  A.  Yes, it is.

 4          MR. KENNEY:  Very good.

 5      Your Honor, I'll move for admission of 37, 59, and 60, for

 6  purposes of the appeal, if there is to be one.

 7          THE COURT:  Thank you.  Those will be admitted over

 8  objection, but admitted for purposes of a proffer and for

 9  preserving the record for appeal.

10  BY MR. KENNEY:

11  Q.  All right, ma'am.  Now, ma'am, I am going to hand you

12  what's marked as Exhibit 55 and ask, did you prepare a

13  timeline, a summary of events in your marriage, what's called a

14  marriage timeline in this case?

15  A.  Yes, I did.

16  Q.  Because of the time constraints, is 55 the timeline you

17  prepared?

18  A.  Yes, it is.  Yes, it is 55.

19  Q.  Does it set forth the summary of the events between when

20  you started dating Mr. Bogdan Radu up to and through -- what's

21  the last date on the last page?

22  A.  Yes.

23  Q.  What's the date of the last page?

24  A.  The date on the last page is July 2nd, 2020.

25          MR. KENNEY:  Your Honor, I move for admission of 55,

DIRECT EXAMINATION - SHON

1    the marriage timeline.

2            MS. McNORTON:  Your Honor, I object.  It's based on

3    hearsay, and, again, relevancy.

4            THE COURT:  What is the purpose of 55?  We've already

5    heard -- I've heard her testimony.  I don't think I need the

6    summary or the timeline.

7            MR. KENNEY:  There are a lot of other instances that

8    we're not able to cover because of the time constraints, so, to

9    speed things up, we prepared up a summary.

10           THE COURT:  I don't believe there were others that

11   she -- the questions were asked that she did not recall or

12   didn't know about or didn't recall, and that's exactly what I

13   am trying to -- I don't want her to not bring anything up

14   because of the time constraints.  If that's an issue, then we

15   can stay here 'til she brings all of them up.  But if she

16   doesn't recall or remember them, then I don't --

17           THE WITNESS:  I mean, all of these --

18           THE COURT:  Ma'am.

19           MR. KENNEY:  You can't speak.

20           THE WITNESS:  Sorry.

21           THE COURT:  So the objection is sustained as to --

22           MR. KENNEY:  55.

23           THE COURT:  -- Exhibit 55.  And you are free to bring

24   up any other instances which are relevant to the children's

25   grave risk of physical harm.

1          MR. KENNEY:  Thank you, Judge.

2    BY MR. KENNEY:

3    Q.  Ma'am, you filed for dissolution of marriage in this case?

4          THE COURT:  Mr. Kennedy [sic], let's wait until you

5    speak into the microphone.

6          MR. KENNEY:  I'm sorry.

7          THE COURT:  Thank you.

8    BY MR. KENNEY:

9    Q.  Did you file for dissolution of marriage against Bogdan

10   Radu in this case?

11   A.  Yes, I did.

12   Q.  Where did you file your petition for dissolution of

13   marriage?

14   A.  It was here in Pima County.

15   Q.  I am going to hand you what's marked as Exhibit 56, and ask

16   if you can identify that.

17   A.  Yes.  This is our dissolution of marriage.

18   Q.  Those are copies of the pleadings, is that correct?

19   A.  Yes.

20         MR. KENNEY:  I'll move for admission of 56, Your

21   Honor.

22         MS. McNORTON:  Objection, Your Honor.  Hearsay,

23   relevancy.  It is also prepared for litigation purposes.

24         THE COURT:  What is the relevance, Mr. Kenney?

25         MR. KENNEY:  Your Honor, they are going to try to

1   argue that the events surrounding March, April, May 2019 are

2   fabricated, didn't happen, and what that is is a consistent --

3   prior consistent statement.  Those are pleadings where she

4   realleges and states what happened that led to the divorce.  So

5   to defeat the argument on fabrication, recent fabrication, I am

6   offering the exhibits to prove the prior consistent statement.

7           I'm sorry, was it sustained?

8           THE COURT:  No, I...I think there's already been

9   testimony regarding the dissolution of marriage.  So the

10  objection is sustained.

11          MR. KENNEY:  What number was that again?  Could you

12  tell me?

13          THE COURT:  56.

14          MR. KENNEY:  56 was sustained.

15  BY MR. KENNEY:

16  Q.  Ma'am, part of -- I have to preserve this in the record,

17  too.

18      When you first came to Tucson, what did you do before going

19  to see Sherri Mikels-Romero?

20  A.  You mean like right after I came?  Or you mean -- I mean,

21  when we first came to Tucson, we went to Tahoe for a few weeks.

22  And then we came back to Tucson and I was -- I was -- I had

23  looked into schools for the children.  And then in August, I

24  looked into lawyers and hired Shaun and filed for divorce.

25  Q.  By way of treatment is what I am asking for, for therapy.

1    Before going to see Sherri Mikels-Romero, what did you do?

2    A.  Oh.  Yes, I was seeing Sherri.  And then I also went to

3    support groups.  I also contacted Emerge, and I started seeing

4    like a case manager at Emerge that I could talk to about the

5    trauma and services that they had available for me and the

6    children.

7    Q.  We have three exhibits real quick I need to get in because

8    I've got less than three minutes.  Okay?

9        Take a look at 36 first -- I'm sorry, 34 first, Exhibit 34.

10   What is Exhibit 34?

11   A.  34 is a letter of reference from Emerge.

12   Q.  About what?

13   A.  Oh, about the services I used there.

14   Q.  And what's the date of the letter?

15   A.  The date of the letter is July 10th of 2020.

16   Q.  Of 2020?

17   A.  Yes.

18            MR. KENNEY:  Move for admission of 34, Your Honor.

19            MS. McNORTON:  Objection.  Hearsay.

20            THE COURT:  Overruled.

21   BY MR. KENNEY:

22   Q.  And then the other exhibits -- are you currently employed?

23   A.  Yes, I am.

24   Q.  Where do you work?

25   A.  I work at the finance department in Pima County.

```
 1              MS. McNORTON:  Object.  Relevancy.

 2              MR. KENNEY:  I haven't even offered it yet.

 3              THE COURT:  What's the relevance to that exhibit?

 4              MR. KENNEY:  In the Koc versus Koc decision, K-o-c

 5     versus K-o-c, one of the factors the Court can consider is does

 6     Mom have stable employment.  In the well-settled defense there

 7     are six factors, and what the -- what we're about to discuss is

 8     the document showing her payroll stubs from her current

 9     employer.

10              THE COURT:  It will be overruled, and it will be

11     admitted for purposes of a proffer as to the

12     well-established defense.

13              MR. KENNEY:  That would be Exhibit 36.

14     BY MR. KENNEY:

15     Q.  Is that your payroll stubs?

16     A.  Yes, it is.

17     Q.  And then finally we have some photographs there that I've

18     offered to submit.  What is the exhibit there, Exhibit 43?

19     A.  (Nodding head.)

20     Q.  I'm sorry, is that a "yes"?

21     A.  Yes.  Yes, these are photographs.

22     Q.  And Exhibit 43 is --

23     A.  They're photos of my kids with myself and with my parents.

24     Q.  Okay.  There was one more set of photos, too, I remember we

25     talked about, but I don't see it's been admitted yet.
```

DIRECT EXAMINATION - SHON

1    Okay.  44.  This is the last exhibit.

2         THE COURT:  Is that Exhibit 54?

3         MR. KENNEY:  44, Your Honor.

4         THE COURT:  44?  So those are the photos?

5         MR. KENNEY:  The prior one was 43, which is the family

6    photos.  And 44 is International School of Tucson winter market

7    photo.  And she's about to discuss what the rest of those

8    photos are which are part of 44.

9         THE COURT:  So 44, and what was the other exhibit?

10        MR. KENNEY:  43, Your Honor.

11        THE COURT:  44 and 43 will be admitted for purposes of

12   appeal and for the well-established defense.

13   BY MR. KENNEY:

14   Q.  Just to clarify what 44 represents, 44, if you take a look

15   at it real quick, is that you shown on that photo?

16   A.  Yes, it is.

17   Q.  Is the rest of the photos, which is part of 44, including

18   the children?

19   A.  Yes, these are all photos that include the children.

20   Q.  From what?

21   A.  They're from birthday parties.

22   Q.  From where?

23   A.  They're from birthday parties that the kids were invited to

24   from their -- from their friends from school.

25   Q.  In where?

1   A.  In Tucson.  In Tucson, Arizona.

2   Q.  At which school?

3   A.  These are from friends that they went to school with from

4   International School of Tucson.

5   Q.  Okay.  Last question.  Have the children ever gone to any

6   other school here in Tucson, Arizona?

7   A.  No.

8   Q.  They've only gone to the one school, which is the

9   International School of Tucson?

10  A.  Yes.

11        MR. KENNEY:  Okay.  Very good.

12        THE COURT:  Thank you, Mr. Kenney.

13        Ms. McNorton.

14        MS. McNORTON:  Your Honor, I believe Ms. Haralambie

15  wishes to address the Court.

16        THE COURT:  Yes.  Thank you.

17     Ms. Haralambie?

18        MS. HARALAMBIE:  Yes.

19        MR. KENNEY:  Judge, I have to object.

20        MS. HARALAMBIE:  Thank you, Your Honor.  I realize

21  there is no jury --

22        MR. KENNEY:  Excuse me.  The rules are that if you

23  object, you must do the cross.  You can't split and have one

24  lawyer do objection and then someone else do the cross.  It has

25  to be the same lawyer.  That's not permissible.

1           MS. HARALAMBIE:  I'm not doing the cross, Your Honor.

2   I'm making a motion.

3           MR. KENNEY:  Oh, I'm sorry.  Okay.  Sorry.  I thought

4   you were doing a cross-examination.

5           MS. McNORTON:  Yes.  I'm doing cross.

6           MR. KENNEY:  I thought that's what you were --

7           MS. HARALAMBIE:  My only cross is of my client, Your

8   Honor.

9           THE COURT:  Yes, that's what I understood.

10          MS. HARALAMBIE:  I realize --

11          THE COURT:  Hold on.  Are we doing a -- is she doing

12   her motion before you do your cross?  Do you intend to cross

13   Ms. Shon or may she step down?

14          MS. McNORTON:  Our concern, Your Honor, is the time

15   frame.  So I'll defer to Ms. Haralambie.  If she wishes me to

16   do my cross, I'll do my cross, but I want to make sure she has

17   time to do her motion.

18          THE COURT:  Ms. Haralambie, could we address your

19   motion in writing and proceed with the testimony, whatever

20   evidence and testimony we have left today?  I think that would

21   be more efficient use of everyone's time.

22          MS. HARALAMBIE:  Although, Your Honor, if you grant my

23   motion, there is no need for cross, and there's no need for

24   rebuttal.

25          THE COURT:  Thank you.  That might not be -- I am not

1    inclined to do it at this point.  I want to get the testimony

2    in.  Certainly, I am not going to make you -- if you want to

3    proceed, you know, this is a half hour of your time, and we

4    could probably schedule more time if need be, but that would be

5    my preference.  But I'll let you handle it the way you want to

6    handle it.

7              MS. HARALAMBIE:  I am concerned about the time,

8    because, as I said, the goal is to have a final decision made

9    within six weeks of the filing of the petition.

10             THE COURT:  That was my understanding as well, but the

11   parties ended up moving to continue.  And we had the dates set

12   up and it was -- you know, and I don't recall who moved to

13   continue, but, if I remember correctly, it was a stipulation to

14   continue the hearing to this -- you know, further out.

15             MS. HARALAMBIE:  Right.  We didn't finish, and

16   Ms. McNorton's son was graduating from high school, so --

17             MS. McNORTON:  I do thank Mr. Kenney for --

18             MS. HARALAMBIE:  So the stipulation was based on that.

19   But if the Court would not be inclined to rule from the bench

20   on the motion, then I would defer to Ms. McNorton to do her

21   cross-examination and then for us to do our rebuttal --

22             THE COURT:  Thank you.

23             MS. HARALAMBIE:  -- of my client.

24             THE COURT:  Thank you.

25             MR. KENNEY:  Judge, may I just run out real quick?

```
 1  [Indiscernible/speaking away from microphone].

 2          THE COURT:  Yes.  Go ahead.

 3          THE WITNESS:  Can I make a phone call?

 4          THE COURT:  But we're only going to be here until

 5  5:30.

 6          THE WITNESS:  I have to pick them up by 6:00.

 7          THE COURT:  You can step down.

 8          MS. HARALAMBIE:  Your Honor, can I turn off my video?

 9  It's 8:00 o'clock here, I am diabetic, and I need to get

10  something to eat.

11          THE COURT:  Yes.  Absolutely.

12          MS. HARALAMBIE:  A piece of bread or something.

13          THE COURT:  Absolutely, yes.

14          MR. KENNEY:  I'm sorry, Judge.

15          THE COURT:  Go ahead, Ms. McNorton.

16          MS. McNORTON:  Your Honor, I was just wondering about

17  the time constraints.

18          THE COURT:  How much time do you think -- you know, I

19  don't want to keep rushing this.  Let's get through with

20  Ms. Shon and then we'll see where we are.  I want to go until

21  5:30.  I don't want to go past 5:30.  I can't keep everyone

22  here.

23          MS. McNORTON:  That's why I was wondering if it

24  wouldn't be better to hear from Ms. Haralambie and

25  then...[indiscernible word(s)].
```

```
 1              THE COURT:  Go ahead and start with your cross.
 2              MS. McNORTON:  I'll be quick.
 3                        CROSS-EXAMINATION
 4  BY MS. McNORTON:
 5  Q.  You were testifying in response to questions from
 6  Mr. Kenney at the very beginning.  You made a comment when he
 7  was talking about Tavi that Mr. Radu wasn't working but he
 8  refused to watch the kids and you had to take care of them all
 9  the time.  Do you recall that testimony?
10  A.  Yes.
11  Q.  But then you also contradicted that when you said later on
12  that Bogdan did watch the kids for several months when you
13  started working at the end of 2015.  Do you recall that
14  testimony?
15  A.  But it was not several months.
16  Q.  Did there come a time where he was watching the children?
17  A.  Only Tavi.
18  Q.  Now, you also said that when you had the babysitter, he was
19  home all day?
20  A.  Yes.
21  Q.  You weren't home and present in the house, were you?
22  A.  No.  I was working.
23  Q.  So you have no personal independent recollection of his
24  involvement with Tavi during that day time.
25  A.  I don't, but I do know he was there because Cassidy told me
```

1  he was there.

2  Q.  Okay.  I move to strike any hearsay.

3      The question was, you don't know his involvement with Tavi

4  when he was home with him.

5  A.  I do know some of it because Cassidy told me some of it,

6  the babysitter who was watching Tavi.

7  Q.  Let me ask the question.  Do you have personal knowledge?

8  A.  Can you rephrase the question?

9  Q.  You were not present at the house when he was there, is

10 that correct?

11 A.  That is correct.

12 Q.  You were testifying about when your parents came to visit

13 when Max was born, and some issues in how stressed out Mr. Radu

14 was.  Do you recall that testimony?

15 A.  Yes.

16 Q.  During this period you had a new baby born?

17 A.  Yes.

18 Q.  Your parents were staying with you in a small house?

19 A.  For part of it, yes.

20 Q.  Mr. Radu was having to sleep on the couch?

21 A.  Yes.

22 Q.  And Mr. Radu was working outside the home at that time?

23 A.  For part of it.  He had paternity leave.

24 Q.  You were talking about some incidents when you were

25 concerned in June of 2016 regarding the milk sippy cup for Tavi

CROSS-EXAMINATION - SHON

1  and how you allege that Mr. Radu slammed a hand on the table

2  yelling and screaming?

3  A.  Mmm-hmm.

4  Q.  Did you call law enforcement?

5  A.  No, I didn't.

6  Q.  Did you get a protective order?

7  A.  No, I didn't.

8  Q.  Did you engage in any legal remedies?

9  A.  No, I was too scared.

10  Q.  I am just trying to look through to get done quickly here.

11     Okay.  You again said that there was an issue regarding

12  both of you taking one of the children to the doctors, and

13  there was an issue over a parking space, and he got upset, and

14  Tavi peed in his car seat.  Do you recall that testimony?

15  A.  Yes.

16  Q.  Any police reports?

17  A.  No.

18  Q.  Any protective orders?

19  A.  No.

20  Q.  Any court orders preventing Mr. Radu from having any

21  contact with the children?

22  A.  No, I was too scared.  I was too scared to report anything.

23  I didn't know what he would do to me.

24  Q.  In 2018, you left for several weeks to return to the U.S.

25  for the summer to see your parents?

1   A.  It wasn't during the summer.

2   Q.  I'm sorry.  When was it?

3   A.  It was in the spring.

4   Q.  In the spring.  Okay.

5       While you were in the U.S., did you seek to avail yourself

6   of any legal remedies?

7   A.  No, I didn't.

8   Q.  You voluntarily returned to Germany, didn't you?

9   A.  I did.

10  Q.  You say that Mr. Radu slapped Tavi in the bathtub?

11  A.  Yes.

12  Q.  Did you report that to anybody?

13  A.  No, I didn't.

14  Q.  Did you get a protective order for your son?

15  A.  No, I didn't.

16  Q.  Did you seek any kind of medical treatment for him?

17  A.  No, I didn't.

18  Q.  Again, you allege -- this doesn't involve the children, but

19  you alleged a sexual against you in March of 2019?

20  A.  Yes.

21  Q.  Did you call the police?

22  A.  No, I didn't.  I should have.

23  Q.  Did you seek any kind of medical attention for yourself?

24  A.  No, I didn't.

25  Q.  Did you obtain any kind of protective order?

1    A.  I didn't know how that would work in Germany.

2    Q.  What is Mr. Radu's involvement with the U.S. military?

3    A.  When we moved to Germany, he was in the Army Reserve.  And,

4    actually, before -- he was in the Army Reserve when we met, and

5    he was in the Army Reserve all the way through when we met and

6    got married and lived in Tahoe through part of the Germany.

7    Q.  When was he no longer affiliated with the U.S. Army?

8    A.  I believe that was in February of 2018, but he was planning

9    on getting back in the Reserves on a different program through

10   the Air Force.

11   Q.  At any time did you go report his alleged behavior to any

12   of his superior officers?

13   A.  I'm sorry.  Can you repeat that.

14   Q.  At any time did you report any of his alleged behavior to

15   his superior officers?

16   A.  No, because I didn't know them.  He never went to Reserve

17   training even though he was in the Reserve.  He was -- he never

18   went --

19           MS. McNORTON:  Objection.  Move to strike.

20           THE COURT:  Ma'am, you need to wait for the next

21   question.

22   BY MS. McNORTON:

23   Q.  So you left Europe -- you left Germany to come to the U.S.

24   in spring of 2018 after your --

25   A.  No, it wasn't 2018.

CROSS-EXAMINATION - SHON

1  Q.  For vacation.  In spring of 2018, you came to the U.S. for

2  a vacation.

3  A.  I didn't.  It was in 2017.

4  Q.  I'm sorry.  2017.  It was 2017?

5      Okay.  And you're testifying that was after Bogdan had

6  engaged in some behaviors that you found concerning, but,

7  again, you voluntarily went back to Germany.

8      After this alleged sexual assault, you stayed in Germany

9  for another three months with your husband, didn't you?

10  A.  I did.

11  Q.  You made -- you said something about sometime, I believe it

12  was December 2018, that you said you left.  I didn't catch your

13  answer.  How long were you gone for?

14  A.  We were gone for four -- four nights.

15  Q.  Four nights.  Did you call law enforcement?

16  A.  No.  I should have.

17  Q.  Did you take any affirmative actions whatsoever?  For

18  example, calling law enforcement, getting a restraining order,

19  getting legal assistance?

20  A.  No, I didn't, but I should have.

21  Q.  At any time during your marriage, as a result of any of

22  these alleged incidents, have you made a report to any

23  authority?

24  A.  No.  No, I haven't.

25  Q.  You made a comment that Mr. Radu threatened to commit

1  suicide one time when you said you were leaving.

2  A.  Yes.

3  Q.  Did you seek some immediate help for him with respect to

4  what was clearly his mental health problem?

5  A.  No, because I was more concerned about the children.  I was

6  more concerned about getting the children out of the house away

7  from him, because I didn't know what he was going to do.

8  Q.  But you left and then came back.

9  A.  Four days later.

10  Q.  You also testified that for two years he would weekly tell

11  you to leave and, "I'm going to send you to the U.S."

12  A.  Yes.

13  Q.  Is it your testimony that, based upon that, he should have

14  known in June that you intended to not come back?

15  A.  No.  That would not...  No, that would not be it.

16  Q.  Prior to Tavi meeting with Ms. Romero, have you ever had

17  the children engaged in any kind of counseling?

18  A.  No, because I couldn't afford it.

19  Q.  Who pays for the children's counseling now?

20  A.  I am.

21  Q.  Your father paid for your return ticket, though, to the

22  house?

23  A.  Yes.

24  Q.  You testified with respect to some emails that Mr. Radu

25  sent you shortly after he found out you didn't intend to return

CROSS-EXAMINATION - SHON

 1  home, isn't that correct?

 2  A.  Well, he knew I was going to return home before those

 3  emails.

 4          MS. McNORTON:  Objection.  Move to strike.

 5          THE COURT:  Sustained.

 6  BY MS. McNORTON:

 7  Q.  Those emails he sent you, he admitted he said things he

 8  shouldn't have said, didn't he?

 9          MR. KENNEY:  I'm sorry, I didn't hear that.

10  BY MS. McNORTON:

11  Q.  He admitted in his testimony he said things he probably

12  shouldn't have said?

13          MR. KENNEY:  I'm going to object.  This calls for the

14  witness...[indiscernible word(s)].

15          THE COURT:  Sustained.

16  BY MS. McNORTON:

17  Q.  Those emails, the vast majority of them, relate to him

18  asking about what's going to happen in the event of a divorce,

19  isn't that true?

20  A.  But those emails were threats.

21  Q.  But they indicate options for divorce --

22  A.  But those options were threats.

23  Q.  -- after August of 2019.

24  A.  Those were threats.

25  Q.  Were the emails referencing potential divorce commencing

REDIRECT EXAMINATION - SHON

1  the end of August 2019?

2  A.  I'm sorry.  Can you rephrase again?

3          MS. McNORTON:  I'll withdraw the question, Your Honor.

4  I don't believe I have any other questions of this witness.

5          THE COURT:  Thank you.

6          MR. KENNEY:  I'll be quick, Judge.

7          THE COURT:  Yes, go ahead.

8                      REDIRECT EXAMINATION

9  BY MR. KENNEY:

10 Q.  Ma'am, you were just asked a series of questions by counsel

11 about not reporting to police any of the incidents we've

12 discussed today.  Why did you not report any incidents that

13 happened to the police?

14 A.  Because I was terrified of Bogdan.  I feared retaliation

15 from him.  I feared that he would hurt me, he would try to rape

16 me, that he would assault -- that he would hurt the children.

17 I also don't speak any German, and so I felt that was a huge

18 barrier.  And we didn't have any base access, so I didn't --

19 you know, I couldn't go and get services on an American base.

20 All the services that were open were in German.  I mean, the

21 main reason was I was scared.  I was scared, and, I mean, at

22 the time, I was living every -- every second to survive.  It

23 wasn't what was going to happen long term, like where I am now.

24 It was just getting through that second.

25 Q.  Very quickly, I want to hear, did you, in fact, seek

1    counseling for Mr. Bogdan Radu at any point after or before the

2    assault in March of 2018?

3    A.  Yes, I did.  Yes.

4    Q.  She just asked you some questions about that.  Did you

5    pursue any kind of counseling through any -- on the base, or in

6    Germany, or anywhere like that?

7    A.  Yes.

8    Q.  Where?

9    A.  I went through a friend who had some experience with

10   different organizations that provided counseling.

11   Q.  Where, though?  Was it in Germany or here?

12   A.  They were all online.  So, as far as I know, they were here

13   in the U.S.

14   Q.  At any time during 2018 or 2019, did Mr. Bogdan Radu admit

15   to you he's got mental health issues?

16   A.  Yes.

17   Q.  Before we go there, the suicidal, the threat of suicide,

18   okay, did that cause you concern that he has some mental health

19   issues?

20   A.  Yes.

21   Q.  Had he ever said, "I'm going to kill myself if you leave,"

22   before that night in December of 2018?

23   A.  I don't know.

24   Q.  You don't.  As you sit here today, you don't recall.

25   A.  I don't recall.  I don't know.

1  Q.  Did he admit to you he has mental health problems, and, if

2  so, when?

3  A.  Yes.  Well, I remember that in -- I believe it was the

4  summer of 2016, that we both saw some anger management courses,

5  and he was thinking about doing those.  And then I do remember

6  in 2018, when he became more violent and was throwing furniture

7  and he hit Tavi -- and, you know, this is when he was -- you

8  know, we were having like a regular conversation the way you

9  and I are talking right now, that he admitted that he doesn't

10  remember most of what he does, and he thinks that he has PTSD

11  from some experiences that he had with the U.S. military when

12  he was on active duty.

13  Q.  Did he put the burden on you to do anything about that?

14  A.  I mean, he -- he -- I -- I tried multiple times to try to

15  let him know that he needed to seek professional help.  He

16  needed to -- he needed to see a therapist or a counselor or

17  even a support group.

18  Q.  And what did he say?

19  A.  He told me it was my job, it was my job to find counseling

20  for him.

21  Q.  Do you remember when he told you that?  When was that?

22  A.  I mean, he refused to do anything, any type of mental

23  health help.  It wasn't until -- it was sometime in the spring

24  of 2019 that he -- when we were starting to work more on our

25  issues that he finally said, you know, "If you --" "If you find

 1    a service for me, I will go, but it has to be free."

 2    Q.  When in 2019?  Before or after you were assaulted?

 3    A.  I think it was after the assault.

 4    Q.  So if you were assaulted, you believe, in March of 2019,

 5    when would this conversation --

 6    A.  I think it might have been in April.

 7    Q.  Of 2019.

 8    A.  Of 2019.

 9              MR. KENNEY:  That's all I have, Judge.

10              THE COURT:  Thank you.

11              May the witness step down?

12              MR. KENNEY:  Yes, Your Honor.

13              THE COURT:  You may step down.

14              MR. KENNEY:  We had some other witnesses.  We've

15    already talked about the fact that they were well-settled

16    defense witnesses that were prepared to testify, to lay

17    foundation, if necessary, for those items, but that would be

18    all the witnesses that we have at this time, Judge.

19              THE COURT:  Thank you.

20              MR. KENNEY:  The respondent rests their case.

21              THE COURT:  Thank you.

22              Any rebuttal?

23              MS. McNORTON:  Ms. Haralambie?

24              MS. HARALAMBIE:  Yes, Your Honor.  But I -- is my mic

25    on?  Sorry.  Is my mic on?

```
 1            THE COURT:  Yes, it is.  Thank you.
 2            MS. HARALAMBIE:  It just wasn't in front of my mouth.
 3            Yes, I'd call Mr. Radu.  And I would ask to reopen for
 4   the purpose of updating the Court as to him currently being
 5   back in Germany with his business since he got through the
 6   COVID restrictions.
 7            THE COURT:  Thank you.
 8            MR. RADU:  Yes, Your Honor.  I am officially back in
 9   Germany.  And I have registered officially through my new
10   apartment and my new city...[indiscernible/garbled word]...
11   residence here.  And I have an official certificate signed,
12   sealed, by the mayor's office that I am actually a resident of
13   the new place.  All this paperwork has been submitted as
14   of middle of July --
15            THE COURT:  Mr. Radu?  Mr. Radu?  We're having a hard
16   time, we are having a hard time hearing you.  Are you on
17   speaker phone?
18            MR. RADU:  Yes.  I am going to get off speaker, Your
19   Honor.  Hold on.
20            Okay.  Can you hear me better now?
21            MS. HARALAMBIE:  Did you want him to be re-sworn in?
22            THE COURT:  We are trying to ascertain whether we can
23   hear him.
24            Go ahead, Mr. Radu.
25            MR. RADU:  Yes.  Yes, Your Honor.  As I was telling
```

1  you, I basically officially registered, my new residence, my

2  new apartment, as of middle of July.  I have an official

3  statement from the mayor's office...[indiscernible word(s)]...

4  about -- that I have a new apartment, residence here in

5  Germany.

6          THE COURT:  Thank you.  Mr. Radu, you are still under

7  oath.

8          **BOGDAN RADU**, WITNESS, PREVIOUSLY SWORN

9          THE COURT:  You may proceed, Ms. Haralambie.

10         MR. RADU:  Yes, I am aware of that.

11         MS. HARALAMBIE:  Thank you.

12                 REBUTTAL EXAMINATION

13  BY MS. HARALAMBIE:

14  Q.  Mr. Radu, do you have business in Ramstein, Germany?

15  A.  Yes.  Because, because I am considered like a small type of

16  self-employed contractor, like a...[indiscernible/garbled

17  word]...I can function from my house, from my permanent

18  residence here.  And a lot of my activities have been funneled

19  through the new location that basically registered me as a

20  business and my operations on the other side of western

21  Romania.  I can subincorporate any point of work anywhere in

22  the EU, including Germany.

23  Q.  Is there a difference in what you pay truckers if they are

24  based in Romania versus if they are based in Germany?

25  A.  Yes.  There are significant differences in employment or

REBUTTAL EXAMINATION - RADU

1    labor practices.  For example, if I have Romanian truck drivers

2    that work for me, they can choose to be either in the German

3    system of labor or the Romanian system of labor.  The

4    advantages on the Romanian system of labor, any goods and

5    services that I produce through my employees are taxed at a

6    lower rate vis-a-vis with Germany.

7        On the German side, I have a lower taxation rate as a newly

8    formed business vis-a-vis with Romania.  So kind of like it

9    evens out with both locations in the end.

10   Q.  And I believe you testified last time that you had ordered

11   some trucks in Germany?

12   A.  That is correct.

13   Q.  Have those arrived yet?

14   A.  Yes.  They are on a bi-lo-stack [phonetic spelling].  They

15   are on a purchase stack [phonetic] invoice order.  And I have

16   registered, and I just have to like put them in the German

17   system so they can be registered for this particular

18   location...[indiscernible/garbled word(s)].

19   Q.  Will they be used in Germany or Romania?

20   A.  They will be used vice versa on the routes of N3 A6 -- A62

21   [phonetic spelling].  This corridor is basically my line of

22   operation that goes from southern Germany to the western part

23   of Romania, where I have my other point of work.

24   Q.  Just because I am a little bit geographically challenged,

25   and we need to make a record, is your base of where you do most

1   of your work a hub around Ramstein that is in Germany?

2   A.   That is correct.

3          MS. HARALAMBIE:   Your Honor, based on the

4   not-very-good audio, I would just prefer at this point to argue

5   my motion.   I don't know if Mr. Kenney has any

6   cross-examination on that.   I can ask him, you know, in more

7   detail about the grave risk, but I think that as a matter of

8   law, the respondent has not raised sufficient factual basis for

9   that.

10         So it looks like I have three minutes, is that

11  correct?

12         THE COURT:   Well, hold on.   I'm trying -- I need to

13  hear testimony from Mr. Radu as to the grave risk issue of

14  psychological harm.

15         MS. HARALAMBIE:   I don't know if it would be better if

16  he calls in.   I don't know if he is on a video and we just

17  don't see his video.   I'm having a real hard time

18  understanding.

19         THE COURT:   Hold on just a second.   I'm trying to find

20  a date when we can...or a time.   I think what we need is

21  Mr. Radu's testimony, rebuttal testimony, and then the -- you

22  can argue your motion at some time.

23      Cathy, can we use the courtroom tomorrow at 1:00?

24         MR. KENNEY:   Your Honor, I am scheduled for a hearing

25  at 1:30 that's been set for a couple of weeks, months now, on a

1   custody case.  In fact, it was actually set in March, got moved

2   to April because of the pandemic, moved to May, and it's just

3   been moved.  And so --

4            THE COURT:  Can you do 11:30?

5            MR. KENNEY:  Tomorrow?

6            MS. HARALAMBIE:  I can.

7            MR. KENNEY:  It's the 27th.  Is that correct, Your

8   Honor?

9            THE COURT:  Yes.

10           MR. KENNEY:  Can we -- is it possible to do 11:00?

11           THE COURT:  We can do 11:00.  I have an involved

12  hearing at 10:30 that's actually scheduled for an hour and a

13  half, and I was thinking of cutting that one somewhat short and

14  then we could from --

15           Tracy, we're off the record.

16                (Off the record at 5:33 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, A. TRACY JAMIESON, do hereby certify that I am

4   duly appointed and qualified to act as an Official Court

5   Reporter for the United States District Court for the District

6   of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true and accurate transcript of the proceedings

9   contained herein, held in the above-entitled cause on the date

10  specified therein, and that said transcript was prepared by me.

11         Signed in Tucson, Arizona, on the 30th of

12  September, 2020.

13

14

15                              s/A. Tracy Jamieson

16                              A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25