```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF ARIZONA

 3    Bogdan Radu,                )  4:20-cv-00246-RM
                                  )
 4              Petitioner,       )
                                  )
 5    vs.                         )
                                  )  Tucson, Arizona
 6    Persephone Johnson Shon,    )  August 27, 2020
                                  )
 7              Respondent.       )
      _____)
 8

 9      Before the Honorable Rosemary Márquez, District Judge

10      Transcript of Proceedings - Evidentiary Hearing Day 3

11   APPEARANCES:

12   For the Petitioner:

13       Ann Nicholson Haralambie Attorneys, PC
         Ann Haralambie, Esq.  (Appearing via VTC and speakerphone)
14       3661 N. Campbell Avenue, Suite 130
         Tucson, AZ 85719-1527
15       (520) 327-6287

16       McNorton Fox, PLLC
         Lisa C. McNorton, Esq.
17       4400 E. Broadway Blvd, Suite 602
         Tucson, AZ 85711
18

19   For the Respondent:

20       The Kenney Law Firm, PLC
         Shaun P. Kenny, Esq.
21       485 S. Main Avenue, Bldg. 3
         Tucson, AZ 85701
22       (520) 884-7575

     Proceedings reported and transcript prepared by:
23       A. Tracy Jamieson, RDR, CRR - Official Court Reporter
         Evo A. DeConcini U.S. Courthouse
24       405 West Congress, Suite 1500
         Tucson, Arizona 85701   (520) 205-4266
25   Proceedings reported by court reporter using steno machine
     shorthand; transcript prepared with court reporting software.
```

1                    INDEX OF COURT PROCEEDINGS

2
                                                        PAGE
3
     Motion as to Grave Risk................................   3
4

5                      INDEX OF EXAMINATIONS

6

7
 WITNESSES:                                             PAGE
8

9   **BOGDAN RADU**

10       Rebuttal Examination By Ms. Haralambie...............   23

11       Rebuttal Cross-Examination  By Mr. Kenney............   32

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (On the record at 11:42 a.m., as follows:)

2          THE CLERK:  In civil matter 2020-246, Bogdan Radu

3    versus Persephone Johnson Shon, on for a further hearing,

4    evidentiary hearing.  Counsel, please state your appearance.

5          MS. HARALAMBIE:  Ann Haralambie for the petitioner,

6    who is present telephonically.

7          MS. McNORTON:  Good afternoon, Your Honor.  Lisa

8    McNorton co-counsel for the petitioner, who is present

9    telephonically.

10          MR. KENNEY:  Good morning, Your Honor.  Shaun Kenney

11   with The Kenney Law Firm, appearing on behalf of Respondent,

12   Persephone Johnson Shon, who is present, seated to my left.

13          THE COURT:  Good afternoon, everyone.  This is the

14   continuation of the hearing.

15      Ms. Haralambie, would you like to make your motion?

16          MS. HARALAMBIE:  Yes, Your Honor.

17          I believe that even if you took as true all of the

18   allegations that Ms. Johnson made, they don't at all constitute

19   a grave risk.  It's important to realize that even if, you

20   know, first of all, all of the authorities that are listed on

21   the list I gave you, and pretty much everyplace else, indicate

22   that Article 13 defenses are to be very narrowly construed.

23   Also, the risk is said to be grave and not merely even serious.

24          One of the cases I did not list for you, *Da Silva v.*

25   *De Aredes*, *953 F.3d 67*, is a 2020 First Circuit case, but it

1  pointed out that the physical -- at page 74 -- that the

2  physical abuse that had been alleged in that case never

3  resulted in any hospital visits by De Aredes' police complaints

4  or arrests.  And here, even though we have had at least two

5  mandated reporters, Sherri Mikels-Romero and Dr. Shon, who were

6  mandated reporters, they never felt that whatever it was that

7  they had against Mr. Radu rose to the level of requiring even a

8  mandated report.  And that has to be made by mandated reporters

9  for suspected abuse.  So if it doesn't even rise to that level,

10  it certainly isn't grave risk.

11          You know, we don't even have any allegations that

12  there were red marks or bruises.  Most of the testimony went to

13  Mr. Radu was not a very good husband and was not a very good

14  father, but that's not the test.

15          THE COURT:  I don't think there was -- Ms. Haralambie,

16  there wasn't any physical abuse.  I don't think that's their

17  allegation, I think it's mostly the psychological abuse.

18          MS. HARALAMBIE:  And --

19          THE COURT:  Go ahead.

20          MS. HARALAMBIE:  And I don't really think that you

21  have evidence of psychological abuse of the children.

22  Certainly not enough to rise to the level of grave risk.

23      And it's important, and I'm looking at *Gaudin v. Remis*,

24  which is on the list of citations I gave you, a Ninth Circuit,

25  2005 case, that also talked about the grave risk has to be

1   something, you know, more than even just serious.  That Court

2   found that even if such risk existed, there, the District Court

3   had erred in failing to consider alternative remedies by means

4   of which -- and I'm reading now from pages 1035 to 1036, of 415

5   F.3d.  The Court failed to consider alternative remedies by

6   means of which the children could be transferred back to

7   Canada, without risking psychological harm.

8          THE COURT:  I read that as well, and what are you

9   suggesting?  What are the alternatives, alternative remedies?

10         MS. HARALAMBIE:  Well, the Hague Convention does not

11   require or contemplate that the Court has to return children to

12   the petitioning parent.  It's not a custody decision.  All of

13   the cases are very clear that it's not a custody decision.

14   It's returning them to a country.  And only if there is some

15   reason to believe that the courts in that country are unable to

16   provide adequate protection for the children, you know, then

17   maybe the Court can consider that there is no reasonable

18   alternative.

19         There is nothing stopping Ms. Johnson from traveling

20   with the children to Germany, to filing something there,

21   requesting custody, and all of the things that we heard

22   yesterday, which were basically custody testimony, could be

23   presented to the Germany court.  There is absolutely no reason

24   to believe that the family courts in Germany are unable to hear

25   and take into account the testimony of the parties; just one

1  party can't basically forum shop by taking the children

2  unilaterally or retaining them unilaterally in the United

3  States, and then say, well, you know, the children don't want

4  to be with their father.

5      And Tavi, according to Sherri Mikels-Romero, Tavi said that

6  sometimes his father was mean and sometimes his father was --

7  you know, was nice and played with him.  You know, that's

8  certainly not evidence that this child is, you know, going to

9  be subject to some kind of extreme psychological trauma

10  certainly not being in the same country as his father.

11      And I would point out, as Ms. Mikels-Romero had to agree,

12  that this is a child who has been solely in the custody and

13  influence of the mother and the maternal grandparents, who

14  clearly do not have fond views towards the father.  So there

15  was nothing -- she said nothing she saw warranted a diagnosis.

16  She did not get Mr. Radu's permission to see Tavi, nor did she

17  get his side of the story or anything else.  She did

18  acknowledge that Ms. Johnson gave a history of childhood drama,

19  excuse me, childhood trauma from her family of origin, but she

20  didn't explore that because that was not the presenting issue.

21      Now, we know that Ms. Johnson went to see Mr. Kenney for

22  the purposes of filing for divorce and then went to see

23  Ms. Mikels-Romero.  She didn't write a report, she wrote a

24  letter to Ms. Johnson's divorce attorney.  She said that she

25  knew Ms. Johnson was going through some anxiety because of the

1   divorce; but, again, that doesn't say anything about the

2   children being subject to any kind of trauma, any kind of

3   psychological abuse.

4       The kinds of cases that I have seen -- and it would take me

5   a minute, I could find if you want me to -- where the

6   psychological risk was evident was one where the children had

7   been sexually molested in the house and in the town where they

8   were being asked to return, and being in the same environment

9   where there had been sexual abuse; and I think it may have been

10   only one of the siblings, I don't recall, would trigger them

11   into the same -- reliving the trauma of the sexually abuse.  So

12   the psychological abuse was tied to sexual abuse.  Here,

13   Mr. Radu lives 25 miles away from the apartment that he had

14   lived in with the children.

15       And, again, the Court can order that the children be

16   returned.  If Ms. Johnson wants to go with them and take them

17   back, you know, that's fine, the parties can figure out where

18   they're going to live pending a long-term decision at that

19   point; but it certainly, to begin with, does not rise to the

20   level of grave risk.

21       Mr. Radu would certainly be willing to come to the United

22   States and pick the children up if Ms. Johnson is unwilling or

23   unable to do that, he doesn't care, he can meet them at an

24   airport somewhere.  There could be a third party do the

25   hand-off.  But it's not psychological issues related to

1   Ms. Johnson doesn't want to be with him or doesn't want to see

2   him, it's the children.  And they simply, as a matter of law,

3   have not made that case, under the very strict requirements of

4   the Hague Convention and ICARA and the cases that have

5   construed it.

6       There is also, from the *Gaudin* case, the Court says the

7   question is simply -- excuse me, I am reading from page 1036.

8   The question is simply whether any reasonable remedy can be

9   forged that will permit the children to be returned to their

10  home jurisdiction for a custody determination while avoiding

11  the grave risk of psychological harm that would result from

12  living with their mother.  And that was referring the Court to

13  the *Blondin* case, which we have previously talked about.

14      But I don't think there's even the basis that -- there is

15  enough evidence to show by clear and convincing evidence, which

16  is her burden to prove, that the children would be at grave

17  risk of any kind of abuse, physical or psychological.

18          THE COURT:  If I did find that there was grave risk,

19  what would be the alternative remedy available, other than --

20  similar to the *Gaudin* case?  And I don't know if I read the

21  whole -- what they decided in that case, but I don't see how in

22  this case the children would be able to be returned.  And I

23  guess Ms. Johnson can take them.  But what's to prevent, once

24  she arrives, I guess she would have to address it with the

25  court there as to -- I mean, what would be the alternative

1  remedy in order to avoid grave risk of psychological harm from

2  the father?

3        MS. HARALAMBIE:  Well, if the Court finds that there

4  would be psychological harm, I think there could be

5  undertakings.  For example, there are several friends that

6  Ms. Johnson has there.  She mentioned one that she went to for

7  four days.  She mentioned another one who was -- where she

8  stayed, and I can't remember if it was the same person, when

9  she last left from the airport, and she went over there and

10  then the air transport picked her up there.  There are people

11  that she knows from the kindergarten class, that, you know, she

12  may be able to make arrangements for the children to stay there

13  temporarily until a court could issue a temporary order.

14        THE COURT:  But the problem with that is that the

15  father would still have custody in that country, so what's to

16  say that if -- I mean, I can't issue an order saying the

17  children are going to live with her and -- until there is a

18  custodial hearing or a custody hearing in that court.

19        MS. HARALAMBIE:  Well, I think if you find the grave

20  risk, assuming arguendo that you find there is a grave risk, I

21  think that you can reserve jurisdiction, order the children to

22  be returned with Mr. Radu, not to assume physical custody of

23  the children.  You could also make a referral or the mother to

24  make a referral to their child protective services, I can't

25  remember what the name of the German agency is, and have

1    undertakings that that would -- that that referral would be

2    made prior to the children actually returning.  You could order

3    Ms. Johnson to file with the German court for temporary custody

4    within X number of days, and that would give her time to obtain

5    some kind of temporary order.

6          But the one thing I don't think you can do is say that

7    basically the kids are going to stay here and it's going to be

8    up to an American court to make those decisions.

9          THE COURT:  Sure.  Thank you.  Was there anything

10   else, Ms. Haralambie, with regards to the argument?

11         MS. HARALAMBIE:  Not with respect to the motion, Your

12   Honor.  You already ruled on the well-settled.

13         THE COURT:  Yes.

14         MS. HARALAMBIE:  I'm just arguing on the grave risk.

15         THE COURT:  Thank you.

16         Response, Mr. Kenney?

17         MR. KENNEY:  Yes, Your Honor.  Thank you.  Just give

18   me one second to find my case law here.

19         THE COURT:  Sure.

20         MR. KENNEY:  I believe what opposing counsel was

21   referencing about the sexual abuse was the *Blondin* case itself.

22   I think that's the case where the children were from France

23   originally, *Blondin v. Dubois*.  We cited that in our response

24   to the motion in limine.

25         MS. HARALAMBIE:  Yes.

1       MR. KENNEY:  In that particular case there was

2  allegations and proof of serious sexual assault against the

3  minor child, who I believe was a young girl, approximately

4  eight or nine years of age, that was subjected to pornographic

5  actions there in her village; so there is no question, in that

6  situation, that's truly a grave risk.

7       In our situation we have, like the Court has seen and

8  heard, with the psychological evidence that was presented by

9  Sherri Mikels-Romero, there is no question there is some

10  psychological trauma going on here.  And you see the effect of

11  it not only with my client, but she's starting to see the

12  effect of it on Tavi, the eldest.  She's met with him four

13  times since July.  I didn't ask her to do it, she thought it

14  was probably best to do so.

15    They want to make a big deal about they are mandatory

16  reporters.  Mandatory reporters to report the abuse as to

17  where?  Bogdan Radu is in Romania.  He left Germany, November

18  the 19th, 2019, and went to Romania to take care of his

19  parents, and didn't return from Germany until sometime this

20  week when he got his lease and we were provided pictures of the

21  apartment complex.  So where exactly was it they were supposed

22  to call?  That's the question.

23    So if it was a situation where Mr. Bogdan Radu is here, in

24  the United States, that would be different, but when you're

25  dealing with a situation where he is overseas in an Eastern

1    Bloc country like Romania, who are they supposed to call?  I

2    have no idea, and I'm not sure they do either.

3        Nevertheless, we have the evidence that we presented that

4    shows there is a serious and grave risk of harm for these

5    children -- and not just serious, but severe risk of harm --

6    for these children to go back to the father -- and I use that

7    word lightly -- who is, more or less, just a donor, who tells

8    his wife "you take care of the kids, you feed them, and you do

9    everything for them, I am not going to change their diapers, I

10   am not going to do anything for them, and, if you make a

11   mistake, I'm going to come down on you like a ton of bricks,"

12   which is what he did nonstop throughout the --

13        THE COURT:  Yeah, and I don't -- so let me tell you

14   where I am going so maybe it will direct you so that you can

15   help me try to figure this case out.

16        My concern was not so much his attitude towards her;

17   and that's not my concern.  It's not my concern how their

18   relationship was or how they interacted.

19        My concern is her -- I did find her description of his

20   behavior towards the children to be credible.  And so now I am

21   finding myself -- and I've been thinking about this case since

22   it landed on my desk, about, well, how -- and since I started

23   to hear the testimony -- does it amount to grave risk of

24   psychological harm to the children.

25        I have taken into consideration, well, she should have

1    reported it when she was there, she should have taken actions

2    while she was there, in Germany, with the authorities there, if

3    she felt that the children were in that position of -- in risk

4    of psychological harm.

5            Now that she is here, at some point she still needs

6    to -- you know, I am not -- the proper authorities need to

7    review this to see how they can avoid the psychological harm or

8    continued psychological harm, and I am trying to balance this

9    out with the reality that it's something that that particular

10   jurisdiction has to deal with.

11           I have struggled with, I think it was the *Gaudin* case,

12   with the alternative remedies, you know, whether she travels

13   with the children back there, whether we -- what would be

14   alternative remedies that I would have jurisdiction over or

15   have supervisory powers over once the children go back.  And I

16   guess that's where I am.

17           MR. KENNEY:  Yes, I understand.

18           THE COURT:  Again, her testimony as to things that

19   happened between her and Mr. Radu and the issues that they were

20   having, although, you know, it appears that she has

21   psychological issues of her own and issues which I am trying to

22   really separate from the children, because it doesn't

23   necessarily -- it doesn't go to the grave risk of the children.

24   You know, I understand many times, yes, it does, but in this

25   case I don't think that was the situation.

 1          But I guess that's where I am on my thoughts on this

 2     case.

 3          MR. KENNEY:  I understand, Your Honor.

 4          First of all, let me say this about *Gaudin*:  That is

 5     an absolutely fascinating case.  It went up to the Ninth

 6     Circuit Court of Appeals three times.  And as I read the facts

 7     in that particular case, both parents were from Canada and

 8     relocated to the state of Hawaii.  And then the issue, for the

 9     first time, and I believe the second time in the case, was does

10     Hague Convention even apply.

11        So that third time, third time's a charm, the matter gets

12     back before the Court on the grave risk defense, and then what

13     are the alternatives, well, they don't really answer --

14          THE COURT:  Right.

15          MR. KENNEY:  -- what to do in a situation like that.

16     Which is why I presented the well-settled elements for the

17     Court's consideration as well.  Because I do take the position,

18     even -- opposing counsel and I will have a differing opinion

19     about this, that that is a factor under *Blondin,* and as noted

20     in *Gaudin* as well, that you kind of have to consider, is are

21     the children well-settled here, and, if so, what investigative

22     type work and protective work can be done here to address that.

23          Well, we have mechanisms in place for that.  To do

24     parent evals.  They can even do parent evals, I've done

25     interstate parent evaluations.  I haven't done an international

1    one, but I can honestly tell you, we can start with the process

2    of the parenting eval to be done, and then the German authority

3    will do it and we will do it here.

4          THE COURT:  But that has to be under the jurisdiction

5    of the German court.

6          MR. KENNEY:  That's true, too.  If you find that the

7    grave risk exception applies, but you still have to find some

8    exception for its application, I would agree it would either be

9    the German court that would order a parent eval to be done,

10   which I presume they can do, I don't personally know about

11   German law in that area, but I presume they can just as well do

12   an eval in Germany and then ask us here in the United States

13   please do an eval and use the following factors, as we do.

14          But I want to talk on that for a second about the

15   choice, the German.  You're talking about two people whose

16   connections to Germany are very tenuous.  He's a United States

17   citizen.  She's a United States citizen.  The only person that

18   has any actual connection to Germany would be Max, he was born

19   there.  So I think, you know, this concept of "we've got to go

20   back to Germany" is just so tenuous because neither one of the

21   parties are citizens of Germany.  They just happened to have

22   been there for about four years before she left and returned

23   here to the Tucson metropolitan area.  I just think it's crazy

24   that we have to do that, but if the Hague Convention says they

25   have to go back to Germany, that's crazy.

1          THE COURT:  But you're not disputing that that's what

2     the Hague Convention says, that they have to go back to

3     Germany.  I mean, that this is a German -- that Germany is the

4     place where -- if that's where the father is living, if that's

5     where they were living, that that's the place where this has to

6     be decided.

7          MR. KENNEY:  If I may touch on that, Judge, that's

8     where father is living again.  He left November 19th.  He had

9     plenty of time to reestablish himself.  He's back as of August

10    25.  He's got an apartment there, and he notified with the

11    local authorities that he's there.  So he just came back.

12          Now, talk about forum shopping, that's a classic right

13    there.  I mean, he was gone up until a week ago.

14    And I know Your Honor struggled with this.  In the

15    beginning you made it a point to ask him, "where are you?" and

16    he is in Romania, and he just decides now is the time to do

17    this.  He's had plenty of opportunity to reestablish himself.

18    So, if there's forum shopping going on here, under the Hague

19    Convention, it's back to Germany.

20    But I did want to answer one question that was posed by

21    opposing counsel, Your Honor, and for the Court's

22    consideration.  Logistically, how would you do this?  I mean,

23    put them on a plane with my client, who, by the way, Mr. Radu

24    reminded her, "you better get a job," and she did finally get a

25    job, a very well-paying job, she's doing well, but she'll lose

1  it if she has to go back to Germany.

2      Erin Anderson, who was referenced as a potential witness,

3  is no longer in Germany.  She returned to the United States the

4  end of July.  She is now living in Kentucky.  She and her

5  husband were I guess called "TDY," if that's not mistaken.  Is

6  that what they call it?  They were returned back to the United

7  States.  So they're no longer there.

8      The other lady that was mentioned, a Linda or Leslie, now

9  resides in Chicago.  The only person that's there is Inge

10  Frick-Wilden, who testified yesterday.  That's all the

11  connections she's got, is Inge.  And that doesn't strike me as

12  being the best alternative in this type of situation.

13      But, Judge, I think...  Forgive me for a minute.

14      As I was leaving last night, I was going home and I was

15  listening to the RNC.  And I'm sitting here, listening to all

16  this, and I'm going, am I in an alternative universe?  I'm

17  listening to Vice President Mike Pence make his acceptance

18  speech, and I am hearing all this and I'm going, are we in an

19  alternate universe?  This doesn't seem to be making sense to me

20  at all.  And this is one of those areas where I think the Hague

21  Convention doesn't make sense.

22      I understand that he's in Germany now, and the only

23  alternative is to go back to Germany; it doesn't make sense to

24  me, because he is not a citizen of Germany.  He's just there.

25  He's a Romanian who happens to have a United States

1    citizenship.  She's a United States citizen.  It seems like, to

2    me, it would be differentiate if he was a German citizen,

3    residing in Germany, and then she up and leaves and takes the

4    kids.  I think that's the basis of the Hague Convention, is to

5    prevent the forum shopping to be done when you've got one

6    parent that resides there in the State of habitual residence

7    like Germany.

8         You've got a parent who is Romanian who comes back to

9    Germany literally a week ago.  And that's forum shopping, that

10   I see it.  That is, clearly, forum shopping.

11        If he had stayed in Romania, I don't know that there would

12   be much question, because the issue would then be, well,

13   really, I mean, you're in Romania, is it going to be Romanian

14   law that applies under the Hague Convention?

15        So our position is that under *Blondin v. Dubois*, and even a

16   fascinating series of cases under *Gaudin v. Remis*, the courts,

17   if it finds the grave risk of psychological harm in this

18   situation, the exception for returning to the abducted-to

19   country, the only other alternative is to have them remain

20   here.  If he wishes to initiate a German custody case, which I

21   suspect he's already started, or will start soon, the German

22   government order a parent eval to be done here, and during the

23   course of the parent eval, the German government makes the

24   determination as to whether or not the children should be

25   returned to their father.  And that makes the most sense to me:

1   They remain here until he initiates his German lawsuit, and

2   then begins the process on the custody eval, if there is such

3   one, in Germany, which I presume there is.  I don't know

4   that -- opposing counsel may have checked with the German

5   counsel.

6           THE COURT:  So as a logistical, logistically, then,

7   they order, then, yes, the child has to come back, then we end

8   up doing this all over again.

9           MR. KENNEY:  No.  Because then the German government,

10  the German court, if you rule that the German court is the one

11  that has the jurisdiction under the Hague Convention, then the

12  German court will be the ones that make that determination.

13          THE COURT:  Right.  So if they say, yes, you have to

14  bring the children back, or the children have to go to the

15  father, then we end up here again.

16          MR. KENNEY:  No, I don't believe the process requires

17  us to return to Your Honor.

18          THE COURT:  Well, it would require Ms. Johnson to

19  either take the children back, and, if she refuses, then we end

20  up here again.

21          MR. KENNEY:  Oh, I see your point, yes, if she refuses

22  to comply with the court, or challenges somehow challenges the

23  German's court jurisdiction on that.  I cannot speak to her

24  ability in that area at this point.

25          THE COURT:  Anything else with regards to the

1    alternative remedies?

2         MR. KENNEY:  I think we have proven our elements on

3    the well-settled issue.  I'd just like to call to the attention

4    of the Court the Koc versus Koc case, K-o-c-h versus -- I'm

5    sorry, k-o-c versus K-o-c case.  In that case, the Court did

6    look at elements on well-settled, even though there was the

7    argument of grave danger.  That Koc case is cited at -- I have

8    a copy for Your Honor.

9         THE COURT:  Thank you.  I can pull it.  Thank you.

10        MR. KENNEY:  It's *In Re Koc*, 187, I'm sorry, *181 F.*

11   *Supp. 2d 136*, Eastern District of New York.  It's cited often

12   in these ICARA cases for guidance on what the Court should

13   consider, you know, whether it has an alternative possibly

14   keeping them here.

15       I think we've proven our case in that area that this would

16   be the best alternative, is to keep them here, and let's

17   proceed, if you want, let him proceed with his German divorce

18   and then let's address the custody issues with the German

19   court.

20        THE COURT:  Thank you.

21        I am not prepared, Ms. Haralambie, to rule on your

22   motion for directed verdict, and I can either take it under

23   advisement or deny it with leave for you to renew at the end of

24   your rebuttal.

25        MS. HARALAMBIE:  May I respond to Mr. Kenney?

1            THE COURT:  Yes.

2            MS. HARALAMBIE:  Okay.  A couple of things.  First of

3    all --

4            THE COURT:  But I do want to give you time to present

5    a rebuttal.  I'm just letting you know.

6            MS. HARALAMBIE:  Yes.

7            The parties were all in Tahoe, in the State of

8    California, for three years with Tavi, and certainly a mandated

9    report could have been made, and was not made, during those

10   three years that everyone was here.  I am a Certified Child

11   Welfare Law Specialist, I've been doing CPS work for 43 years,

12   and it is often the case that abuse of a child is done

13   somewhere else, in another state, another country.  The report

14   is made to CPS here, they make a report to the other country.

15   You know, there a variety of district court level cases where

16   that is done under the Hague.  So, to say there was nobody to

17   make a report to doesn't really, doesn't really cut it.

18           But to the extent that Mr. Radu was not in Germany for

19   a period of time, there was a COVID pandemic that started in

20   January, he went to visit his ailing parents over the holidays,

21   and, as EU citizens, people can travel anywhere they want.  He

22   left his stuff in Germany, he came back for it, he signed a

23   lease in July, he ordered trucks for his business in Germany.

24           But the fact is the Hague Convention does not talk

25   about domicile, it doesn't talk about citizenship.  And the

1   Perez-Vera Explanatory Report to the Convention is very clear,

2   whether Mr. Kenney thinks it's crazy or not, the Convention is

3   what it is, and it makes certain very clear boundaries.  It

4   says a year, not 366 days, it's not a year if it's a leap year

5   if you're in a different time zone.  It says state of habitual

6   residence.  They conceded that Germany was the state of

7   habitual residence.  So that is no reason.

8        But I would just again say that even if the Court finds the

9   testimony of the mother as to Mr. Radu's treatment toward the

10  children, and that's the area that I would focus on in

11  rebuttal, it does not reach clear and convincing evidence of

12  grave risk of harm to the children if they are returned to the

13  country of Germany.  And unless you make a finding that there

14  would be a grave risk of harm to the children if they are

15  returned to Germany, you don't get into any of those other

16  alternative ways to do things.

17       And the cases make it very clear that parents should not be

18  rewarded for abducting their children or retaining their

19  children in another country and then making evaluations or

20  things go on either here or in the state of habitual residence.

21  The children are to be returned.  There are lots of cases where

22  children are returned to the foster care system, the child

23  protective service system of that country.  But before you even

24  get to any of that, you would have to find clear and convincing

25  evidence of grave risk.

1        That's it.

2              THE COURT:  I will take the motion under advisement.

3        We have about 45 minutes, would you like to present any

4    rebuttal?

5              MS. HARALAMBIE:  Yes.  Mr. Radu, who I think is still

6    under oath.

7              THE COURT:  Mr. Radu, you are still under oath.  Are

8    you able to hear us?

9              MR. RADU:  Yes, Your Honor.

10             THE COURT:  Please speak into the telephone rather

11   than a headset.  And speak slowly.

12             MR. RADU:  I am speaking in the video app.  I don't

13   have video feed, but I can hear you very well.

14             THE COURT:  Thank you.

15             You may proceed.  You may proceed.

16        Go ahead, Ms. Haralambie.

17             MS. HARALAMBIE:  Thank you.

18                  **BOGDAN RADU**, WITNESS, PREVIOUSLY SWORN

19                       REBUTTAL EXAMINATION

20   BY MS. HARALAMBIE:

21   Q.  Mr. Radu, you were present remotely for all of Ms. Shon's,

22   excuse me, Ms. Johnson's testimony yesterday.  Is that correct?

23   A.  That is correct.

24   Q.  I want to ask you a few things.  Can you remember any

25   incident where you hit either of your children?

REBUTTAL EXAMINATION - RADU                          24

1  A.   The only incident I remember, we were visiting a pumpkin

2  farm and my two sons got in a brotherly, rowdy kind of fight.

3  The oldest one threw some hay in my youngest one's face, he got

4  a bunch of sand and dirt in his face.  He cried a little bit.

5  So I gently nudged him on the back of his foot, I told him not

6  to do it anymore, because the youngest one was very upset.  I

7  made him to apologize, and in the end everybody was happy and

8  we continued to have our day as a family time.  And that

9  happened probably around October 2018, if I recall the time.

10 Q.   Did you ever observe either of the children cowering in

11 fright around you?

12 A.   Not, not to my recollection, no.

13 Q.   Did you ever do anything that would have resulted in red

14 marks or bruises on your children?

15 A.   No.  I have never done that.

16 Q.   Your wife testified yesterday that she didn't speak German,

17 and so, you know, didn't make any police reports or CPS

18 reports.  Did she have any friends in Germany who spoke German?

19 A.   Yes, she did.  As a matter of fact, one of her mom's

20 friends from the kindergarten in Merzalben, Ms. Andrea

21 Zwilling, she spoke fluent German and English as well.  Also,

22 the teacher of our two children, Ms. Kyra, she was speaking

23 fluent German and English, and they were very close as well.

24 So she did have plenty of contacts, locally actually, in the

25 place we were living, that she could have used German language

1   services if the need were to be.

2   Q.  And did you ever harm your wife in front of the children or

3   when the children were there?

4   A.  No.  No, I have not.

5   Q.  Let me ask you this:  Does Germany have some kind of child

6   protective services agency?

7   A.  Yes, they do.  It's called Jugendamt, like youth authority,

8   and they have locations between like newborns, after the age of

9   18.

10  Q.  And, in Germany, are kindergarten teachers mandated

11  reporters, who, if they feel that the children are being

12  abused, they're required to make reports to that agency?

13          MR. KENNEY:  I'm going to have to object to that.  I

14  think --

15  A.  Yes, they are.

16          MR. KENNEY:  I think that calls for speculation by

17  this witness.

18          THE COURT:  Sustained.

19          MR. KENNEY:  Also lack of foundation.

20          THE COURT:  Sustained.

21          That was sustained, lack of foundation.

22          MS. HARALAMBIE:  Yes.

23  BY MS. HARALAMBIE:

24  Q.  How do you know that there is such an agency?  What's the

25  basis of your knowledge?

REBUTTAL EXAMINATION - RADU

1   A.  Because I have received an official paperwork from them,

2   and they specifically asked me what is the status of my

3   children's health records during the summer of 2019.  And the

4   Jugendamt office is located in Permasens, and they've sent me

5   two official letters, one for Octavian and one for Maximilian.

6   Q.  And other than those letters in the summer of 2019,

7   regarding their medical, medical records, did you ever receive

8   any communications, either by letter or somebody coming to see

9   you, or leave a business card at your door, or anything like

10  that, that indicated that they had received any kind of report

11  that you had abused your children either physically or

12  psychologically?

13  A.  No, I have not received such letter from any of the German

14  authorities that I have abused my children.

15  Q.  And did any of the teachers that saw your children talk to

16  you about mistreating your children in any way?

17  A.  No.  None of the teachers at the kindergarten have ever

18  approached me with such an issue.

19  Q.  Now, let me ask you whether there were ever times that you

20  yelled at the children or yelled when the children were in the

21  room or in the area where they could hear you?

22  A.  Yes, there were occasionally times when I raised my voice

23  pitch.  And as any hectic parent can tell you, sometimes you

24  raise your voice, sometimes you lower it.  I come from a

25  military background, where everybody talks louder by default,

REBUTTAL EXAMINATION - RADU

27

1  so it kind of permeates, up to 20-something years of being in a

2  government service, that I do actually talk louder.  And

3  because of our, because of my background, Romanians, inherently

4  we do talk in a loud-pitched voice.  So there is a combination

5  of both.

6  Q.  Did you ever call your children any names that you thought

7  were inappropriate, like calling them "stupid" or things like

8  that?

9  A.  Probably in the heat of the passion, I may have called them

10  a couple of times.  But I didn't call them in intention to like

11  put them down totally.  It's just like sometimes you drop the

12  "F" word because you're all riled up.  So I do regret it,

13  looking in perspective right now.  Maybe I should have used a

14  different tone voice or a different type of -- better approach

15  in managing my children.  But I am not a perfect parent, I

16  never claimed I was.  But I do recognize I do have some

17  shortcomings, as far as communications are concerned, even with

18  my children...[voice trailing off/indiscernible word].

19  Q.  Have you been affectionate with your children?

20  A.  Yes, I have.  I think I have been a good parent and a

21  loving parent.  I am not, again, I am not a perfect parent,

22  nobody is, but I don't expect -- I never expected, I don't know

23  if anyone expects their households to become a monastery of

24  quietness.  You know, it's two boys, one that was three, and

25  the other one was five and a half.  There were always issues

REBUTTAL EXAMINATION - RADU

1  that, sometimes they're small and they turn out to be big, or

2  they're big and they actually turn out to be small.  And I

3  tried --

4  Q.  On the occasions when you were affectionate with your

5  children, how did they respond?  Were they affectionate back or

6  did they recoil from you?  Or can you describe what their

7  reaction to you would be?

8  A.  They were very affectionate.  They're my children.  I love

9  them.  Especially I love to play with them in the house, and go

10  outside to the dinosaur park, which is like a theme park on the

11  east side of Kaiserslautern, doing activities, to the best of

12  my ability, in a time wise.  So I wasn't like a total ice block

13  type parent.  That couldn't be further from the truth.

14  Q.  Did the children ever say anything or do anything to you

15  that made you feel that you were somehow, even though you

16  didn't mean to be doing it, but that you were somehow

17  emotionally abusing them?

18  A.  Like any other child, sometimes they express their ways in

19  child talk, and we, as parents, even I as a parent, sometimes I

20  overreacted to things, which is a normal reaction for any

21  parent that doesn't know.  And I'm, I could say I've learned a

22  lot and I'm still learning, but at any given time -- and I've

23  been trying to be as affectionate as I can be with my children,

24  both of them.

25  Q.  Do you believe that the children would be at any kind of

risk of emotional abuse or psychological harm if they returned

to Germany?

        MR. KENNEY:  Your Honor, I'm going to have to object

to that question because that is --

A.  [Indiscernible].

        THE COURT:  Hold on, Mr. Radu.

        MR. KENNEY:  Your Honor, I believe that calls for a

legal conclusion and is within the province of the fact finder

and the Court in this case.  That's a legal determination.

    So I am going to object on the grounds of foundation.

Also, that's a question that this Court decides, not Mr. Bogdan

Radu.

        THE COURT:  Overruled.  You may answer, Mr. Radu.

BY MS. HARALAMBIE:

Q.  Do you remember the question?

A.  Yes, I was about to -- can you repeat the question back?

Q.  Yes.  Do you believe that the children, even if you weren't

intending to do it, would be at any kind of risk of emotional

or psychological harm if they returned to Germany?

A.  The children would never be in any kind of emotional risk

if they were to return to Germany.  As a matter of fact, I miss

them a lot.  I haven't seen them in 14 months.  So what parent

would, like, harm psychologically his children after 14 months?

I would never do that.

Q.  I am not saying this is going to happen, but if the judge

1    made a decision that she was not comfortable with the children

2    returning immediately to live with you, and if she put some

3    kind of restrictions that the children would have to stay

4    somewhere else until a German court made a final ruling, would

5    you obey the restrictions the Court put on you?

6    A.  I would.  And I believe Germany is a very modern society,

7    and they can find a balanced solution, if the need were to be.

8    Q.  Are there people in Germany that the children know and are

9    familiar with who you think would be able and willing to have

10   the children stay with them until a German court made a ruling?

11   A.  I believe there are.

12   Q.  Do you have names that you could give us?

13   A.  Yes, I do.

14   Q.  Okay.  Go ahead.

15   A.  As I mentioned before, Persephone's best friend, Andrea

16   Zwilling, she was very close to her.  I believe, in a

17   heartbeat, she would take our children if the need was to be

18   provided with an environment that would be without any doubts.

19   Q.  And you would feel comfortable with them being with her?

20   A.  Absolutely.

21   Q.  Anybody else?

22   A.  Probably some of Persephone's friends that are still in

23   Germany.  I don't know how many are there.  There are local

24   civilians who have interacted with Persephone, and some of

25   them, they are still local, and I believe even they, as

 1   Americans, they could provide this type of environment if the

 2   need were to be.

 3             MS. HARALAMBIE:  In the interest of time, Your Honor,

 4   and to give Mr. Kenney an opportunity, that's all I'll ask on

 5   that.

 6       I had reserved my time to question him regarding my ICARA

 7   request for attorneys fees and costs.  Do you want that done by

 8   testimony or just for me to submit an affidavit of what the

 9   fees and costs are?

10             THE COURT:  Just an affidavit, please.

11             MS. HARALAMBIE:  Okay.

12             THE COURT:  Thank you.

13   BY MS. HARALAMBIE:

14   Q.  And, Mr. Radu, would you be able to come to the United

15   States to get the children if your wife is unwilling or unable

16   to bring them back?

17   A.  Yes, I would be able to travel to the United States to pick

18   up the children.

19   Q.  And with their EU ID cards, would they be allowed to

20   repatriate even, even though there are some European

21   restrictions on people from the United States going there?

22   A.  That is correct.  Because their EU ID cards are issued

23   based on the EU-son relationship they have with me as an EU

24   citizen.  So they can return any time.

25             THE COURT:  All right.  That's all, Your Honor.

1              REBUTTAL CROSS-EXAMINATION

2    BY MR. KENNEY:

3    Q.  Good evening.  Mr. Radu, can you hear me okay?

4    A.  Yes, I can hear.

5    Q.  Very good.

6        I understand, were you having some technical difficulties

7    the last time you and I had the ability to speak?

8    A.  Yes.  Unfortunately, I have an old device that doesn't have

9    a video feed, so I was able to only hear the conversation

10   clearly.  And some of these -- application that I got directed

11   to install, the Citrix [phonetic] app, consumes a lot of my

12   phone power and sometimes my phone dies off on it.  But I can

13   hear very well.

14   Q.  Okay, sir.

15   A.  Although I can't see you.

16   Q.  I'll try to lean into the microphone so can you hear me

17   well.

18       You were asked the question by your attorney about do you

19   remember striking or hitting any of the children, and your

20   response was:  The only incident I remember involved the one on

21   October 28th, 2018 at a pumpkin patch.  Is that your testimony

22   to the Court today?

23   A.  That's the one that I recall the most exactly, that's

24   correct.

25   Q.  And your attorney also asked you the question:  Did you

REBUTTAL CROSS-EXAMINATION - RADU

1  ever observe your children cowering or acting afraid of you?

2  And your response was:  Not to my recollection.  Is that your

3  testimony to the Court today?

4  A.  That is correct.

5  Q.  Okay.  All right.  You were also asked the question about

6  whether you harmed your wife in front of the children, and I

7  believe your response was, no, you never harmed your wife in

8  front of the children.  Now, is that your response today?

9  A.  That is correct.  I never hurt [phonetic] Persephone in

10  front of the children.

11  Q.  Now, what is your definition of "harm," Mr. Bogdan Radu?

12  What do you mean by "harm"?  You mean physical harm, sir?

13  A.  Physical harm can be one of them.

14  Q.  I'm sorry, sir, I can't hear you.  What did you say?

15  A.  Physical harm can be one of them.

16  Q.  What about psychological harm, yelling at your wife and the

17  kids, do you believe that causes psychological harm, sir?

18  A.  Well, sometimes in the heat of the passion, the argument,

19  parties talk louder, they don't hear each other out, they say

20  half sentences and the other party's interrupting.  I believe

21  this can create like a very, very emotional atmosphere, and

22  this could be considered psychological harm for both parties,

23  not just for one party.

24  Q.  So your testimony is that yelling and screaming at children

25  and your wife, and her yelling and screaming at you, would

REBUTTAL CROSS-EXAMINATION - RADU

1  constitute psychological harm.  Isn't that correct?

2  A.  It's part of normal family life.  It all depends how you

3  take it inside.  That's the way I see it.

4  Q.  Let's talk about that for a second.

5       You were asked the question by your attorney about yelling

6  and speaking in a loud voice.  And you testified that

7  occasionally there were times that you would raise your voice,

8  and that's because you had 20 years of service, government

9  service, and also I think you testified it was because of your

10  Romanian cultural upbringing.  Is that what you said, sir?

11  A.  We do talk louder, in the military, everybody in the

12  military I worked with for two [phonetic] years, we did talk

13  loud.  It comes with the natural, the natural business of the

14  job, because you --

15            THE COURT:  Mr. Radu?

16  A.  [Indiscernible].

17            THE COURT:  Mr. Radu?

18  A.  [Indiscernible].

19            THE COURT:  Mr. Radu?  Hello, Mr. Radu?

20  A.  [Indiscernible].

21            THE COURT:  You need to slow down a little bit, slow

22  down.  And get a little bit closer to the mic, to the

23  telephone, please, or the microphone.

24            THE WITNESS:  Yes.  Yes, Your Honor.

25            THE COURT:  Thank you.

1    BY MR. KENNEY:

2    Q.   So the answer to my question is, yes; that is, those were

3    the occasional times you would raise your voice, and it's only

4    because of the 20 years in the government service and the

5    cultural difference being from Romania.  Isn't that correct,

6    sir?

7    A.   It's a combination of both.

8    Q.   Okay.  All right.  I understand.

9         And you did say, you admitted, you're not a perfect parent.

10   I agree, children don't come with operating instructions, I

11   have three of my own, and it is a process.  But are you telling

12   us that you have changed now and you've matured over the last

13   15 months and that you would not subject your children to the

14   risk of emotional and psychological harm, having changed over

15   the last 15 months?

16   A.   Well, think about what I have been going through.  I

17   haven't seen my children in 14 months.  If you wouldn't get

18   this to be like a life-altering experience, I don't know what

19   else is.  So the answer is, yes, I have changed a lot.

20   Q.   So the answer is, yes, you have changed.  And there were

21   occasions your counsel asked you about when you were being

22   affectionate, and then she asked you the question about risk of

23   emotional or physical harm -- psychological harm.  Excuse me.

24   Strike that.  -- risk of emotional or psychological harm, and

25   your response was, quote, "I would never do that after 15

1    months."  Isn't that what you just said?

2        Is that a yes, sir?

3    A.   Probably so.

4    Q.   Didn't you just say to the question that was asked by your

5    lawyer, "Are you going to subject these children to the risk of

6    emotional or psychological harm if they come back to you?" and

7    your response was, quote, "I would never do that after 15

8    months"?  Isn't that what you just said?

9    A.   What I said is that I would never subject my children -- I

10   have not subjected them before that, to the degree that was

11   alleged that I have done things to them, nor that I would do

12   that right now, after going 15 months that I haven't seen them,

13   I haven't talked to them on the phone.  I've only seen two

14   grainy videos and two grainy pictures of them.

15   Q.   All right.  Mr. Radu, I am going to talk about a specific

16   incident.  December 15, 2018.

17       You're getting ready to go on a family outing.  Remember

18   that day, sir?  December 15, 2018.

19   A.   I mean, it's been three years, two years.  So probably we

20   went on a family outing, I don't exactly remember what we did.

21   Q.   Your wife Persephone is upstairs in the bathroom.  Max

22   doesn't want to use the restroom, he's crying.  She's been

23   working on him going to the bathroom.  She finally gets Max to

24   calm down.  You come banging on the door and you start

25   screaming, "You better get that boy under control."  Do you

remember saying that?

A.  Probably, I did.

Q.  Yes.  You keep banging on the door with your arm, or your
fist, and you scream at the top of your lungs that she better
get Max to stop crying and to unlock the door.  Do you remember
that, sir?

A.  Probably, I did.

Q.  You try to open the door.  You're screaming and cussing how
she's the worst mother ever and she's doing a horrible job
raising your children.  Right?  You said that.

A.  Probably, I did.

Q.  Yeah.  You also said she better unlock that door or else
you're going to knock the door down.  Do you remember saying
that?

A.  I may have said that in a modified version.  It's been two
years, so, probably so.

Q.  We're going to get to that.  We're going to talk a little
bit about that.

     She eventually -- she waits for you to move away from the
door, she unlocks the door, clutching Max to her, she goes
downstairs.  Tavi wasn't in the bathroom with her, was
she [sic]?  Was he?

A.  I don't remember where Tavi is at that time.  He could be
in his bed.  He could have been in his bed.  He could be
somewhere else.

1    Q.  She takes Max and Tavi to the bedroom, your bedroom, locks

2    the door, calms them down.  Remember doing that?  Remember

3    hearing her do that?

4    A.  I'm going to tell Persephone several other times she has to

5    go by herself to calm the children.  So this wouldn't be any

6    different incident than she operate any other times when the

7    children were under distress for whatever reason.

8    Q.  You mean there were other instances where --

9    A.  As a matter of fact, sometimes I got kicked out.

10   Q.  I want to be fair, sir, and give you an opportunity to

11   finish your question, or your answer.

12        So your answer is, to my question, there were other

13   opportunities where she had to, quote, "calm the children down"

14   in the bedroom?

15   A.  Well, you know, sometimes I wasn't in the house but I could

16   hear them from the stairwell.  They were like, nothing was

17   happening in the house, but everybody, the three of them, they

18   were like, either like fighting together or playing roughly,

19   and obviously Persephone was together with them to calm them

20   down.  It's normal, natural to do it.

21   Q.  Right.

22   A.  So it wouldn't be any different reaction that she would

23   probably have done it in at any other time or any other --

24   Q.  Mr. Radu, I am talking about December 15, 2018, a specific

25   date.  A few hours after she calms down the children, she

1    starts packing a suitcase, you see her packing the suitcase and

2    you act confused like, "Hey, what's going on?" "Why are you

3    leaving?"  Remember that?

4    A.  Vaguely, I remember it.

5    Q.  I am sorry, sir?

6    A.  Vaguely, I remember it.

7    Q.  Vaguely, you remember it.  Isn't this the same night where

8    you complain and say to Persephone, "If you leave me right now,

9    then I am going to commit suicide."  Remember that?

10   A.  You know what, sometimes people say things, they're not

11   really meaning it.  And I can tell you for a fact that many

12   other people, you hear them down the street say it.  That

13   doesn't mean they're going to do it, it's just a way to vent

14   their frustration.

15   Q.  So the answer to my question is, yes, you did say that that

16   night, "If you leave me right now, I am going to commit

17   suicide."  Remember that?

18   A.  I may have said that, but it was anger of the moment, vent

19   of the moment that I was trying to express my feeling.

20   Q.  She ignores you.  She leaves for four nights and doesn't

21   come back 'til December 19th, 2019.  And when she comes back,

22   she and you are talking in the bedroom, and you don't even

23   remember what you did or said that night, do you, sir?

24   A.  If you have a lot of information to process sometimes,

25   sometimes you forget details.  But I can tell you for a fact

REBUTTAL CROSS-EXAMINATION - RADU

1  that Persephone left other times to go two, three nights in a
2  row, so it wasn't something that I was totally miffed about it.
3  Q.  So there were other opportunities when she would leave --
4  A.  As a matter of fact...[indiscernible] --
5  Q.  -- with the bags packed and walk out with the kids.  Is
6  that your testimony to the court, sir?
7  A.  Many, many other times Persephone was overnighting for play
8  dates with Ms. Erin Anderson, and obviously she was packing a
9  suitcase for two or three days, because she couldn't go with
10  just a backpack because stuff wasn't fitting in there.  So it
11  could have been another occasion that she was going to stay
12  longer --
13  Q.  Thank you.
14  A.  -- to wherever she was going.
15  Q.  But my question is more specific, sir:  You don't even
16  remember what you said or did the four nights prior to the
17  return on December 15, 2018.  You don't remember, do you?  You
18  didn't remember.
19         MS. HARALAMBIE:  Objection.  Asked and answered
20  multiple times.
21         THE COURT:  Sustained.
22         MR. KENNEY:  All right.
23  BY MR. KENNEY:
24  Q.  Mr. Radu, you were in the military, you've just told us,
25  for 20 years, in the military service.  And it's my

1  understanding that you were shot at in a different -- in a

2  country while serving either the United States military or the

3  Romanian military, and as a result --

4          MS. HARALAMBIE:  Objection to relevance.

5  BY MR. KENNEY:

6  Q.  -- you suffer from PTSD.  Is that correct, sir?

7          MS. HARALAMBIE:  Objection.  Relevance.

8          THE COURT:  Overruled.

9          MS. HARALAMBIE:  Objection.  Relevance.

10          THE COURT:  Overruled.

11          Go ahead, Mr. Radu.

12  A.  I can tell you, out of the millions of people that have

13  served in the ranks, the probability that's someone having any

14  type of PTSD, adjustment disorder, however you want to call it,

15  it's highly likely.  And I have actually worked as a VA rating

16  specialist, and I have rated thousands of soldiers and service

17  members with PTSD symptoms.  And I have been a government

18  employee.  And I am not ashamed to say that, due to my service,

19  I have experienced some flackbacks, some symptoms of

20  withdrawals.  And that's okay, at least I learned how to cope

21  with them.  It took me some time because I came from active

22  duty in the Iraq wars.  But I think I'm okay at this point.

23  Q.  Okay.  Because I'm about to ask you about April 16, 2019.

24  Do you remember telling Persephone on the evening of April 16,

25  2019, that you're finally ready to talk to someone about your

1   anger and PTSD problems?  Remember that?

2   A.  And I remember that -- I am going to give you the

3   background on that, too, since you actually asked the question.

4   Because on that date, actually I had left the service.  The VA

5   does not offer PTSD counseling in Germany to civilian veterans.

6   So whatever she has found for me wasn't approved by the VA by

7   the regulations for specific treatment.

8   Q.  Very good.  So --

9          THE COURT:  Hold on, Mister -- I want to hear the rest

10  of this.

11      Go ahead, Mr. Radu.

12  A.  So I asked her, find me something that's actually approved

13  and that the government can pay for it, not someone from the

14  local economy that is not familiar with the --

15  Q.  That was specific --

16  A.  -- [indiscernible/garbled word(s)]...for the past 20 years.

17  Q.  Are you done, sir, with the question?  Are you done with

18  your answer?

19  A.  Yes, I am.

20  Q.  Because the second part of my question was that evening you

21  told her you're finally ready to talk to someone, but it needs

22  to be a free service, if possible.  Do you remember telling her

23  that?  April 16, 2019?

24  A.  I didn't say it has to be a free service.  I am telling

25  you, from my own experience as a government employee, how the

1   government outsources specific types of care overseas for

2   military and veteran families.  It has to be approved by a

3   government type of provider that is familiar with these types

4   of issues.  It can't be free from someone that lives down the

5   street that says "I have a plaque that I can treat you for

6   that."  It doesn't mean it's approved by the government

7   standards in order to provide proper care to whomever those

8   individuals are.  It doesn't matter if they're active duty,

9   dependents, or retirees.

10  Q.  Thank you.  So the answer to my question is, yes, you did

11  say that to Persephone on April 16, 2019, that you're finally

12  ready to talk to someone about your PTSD and anger issues, but

13  it needs to be a free service, if possible.  True?

14          MS. HARALAMBIE:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16  BY MR. KENNEY:

17  Q.  Sir, I want to talk to you for a minute about your current

18  lease and your house, Exhibit 10.  I am looking at your lease,

19  and it doesn't state a term of period, like six months to a

20  year, and it looks like you've got the right to leave with a

21  minimum of 30 days' written notice.  Am I correct about that,

22  sir?

23          MS. HARALAMBIE:  Objection to relevance.

24          THE COURT:  Overruled.  Go ahead.

25  BY MR. KENNEY:

REBUTTAL CROSS-EXAMINATION - RADU

```
1    Q.  Is that correct, sir?
2    A.  This is a lease that caters specifically to the military
3    contractor and veteran or retiree communities.  So there are
4    laws that are built as such into the leasing agreements and
5    presented to the potential term.
6    Q.  So the answer to my question is, yes, that is correct,
7    there is no term on the lease, just 30 days' notice and you can
8    leave.  Right?
9    A.  That is built because a lot of military communities, they
10   move every, like, 18 months --
11   Q.  Thank you.
12   A.  -- every two years.  So you don't know when people are
13   going to leave.
14            MR. KENNEY:  I'm going to move to strike.  It's a
15   "yes" or "no" response.  It's a "yes," correct?
16            THE COURT:  I think he answered yes.
17   BY MR. KENNEY:
18   Q.  Finally, I want to talk about these alternative people that
19   you recommend, before I ask my last question.
20      Andrea Schilling [phonetic] was one of them.  Andrea Markus
21   Schilling was an individual you gave the name of, is that
22   correct?
23   A.  Andrea and Markus Zwilling, that's correct.
24   Q.  She has MS.  Isn't that correct, sir?  She has health
25   issues.
```

1  A.  She's a medical professional, so she's very qualified to

2  take care of children.

3  Q.  Nevertheless, she has MS.  Yes?

4  A.  I don't know.  I've never talked to her about her medical

5  condition, so I do not know that.

6  Q.  In all the time that Tavi was there in Germany before

7  returning to the United States, did you ever speak to any of

8  his teachers?

9        MS. HARALAMBIE:  Objection.  Irrelevance.

10        THE COURT:  Overruled.

11        MR. KENNEY:  He testified on direct.

12        THE COURT:  Go ahead.  You may answer, Mr. Radu.

13        THE WITNESS:  Yes, Your Honor.

14  A.  I have actually spoken to the teachers.  I have spoken to

15  the headmaster of the school in Merzalben.  I have spoken to

16  Kyra, who is the teacher of both Maximilian and both Octavian.

17  Every time I picked them up, I'd probably spoken with their

18  teacher, both in English and in my broken German.  So I was a

19  very involved parent with my children every time I picked them

20  up at school.

21  Q.  Final question, sir:  Do you feel any remorse on how you

22  treated your wife and children before they returned to the

23  United States on June 10th, 2019?

24  A.  In retrospect, looking back, yes.  I feel remorse.

25        MR. KENNEY:  That's all the questions I have.

1          THE COURT:  Mr. Radu, I have a couple of questions.

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  In the last 14 months, have you traveled

4     to the United States to see the children?

5          THE WITNESS:  No, I have not traveled, because I did

6     know where exactly the children were and what was their status

7     and if I was allowed to see them.

8          THE COURT:  But you knew they were with the

9     grandparents in Tucson, correct?

10         THE WITNESS:  I had a general idea they were in the

11    Tucson area, but not necessarily.  No, they could have been in

12    Tahoe, they could have been in southern California.

13         THE COURT:  I'm sorry, what was that last part?  They

14    could have been in Tahoe, is that what you said?

15         THE WITNESS:  Yes, Your Honor.  They could have been

16    South Lake Tahoe, they could have been in southern California.

17    Persephone has a very large family, so for about five, six

18    months, I really couldn't tell exactly where they were until I

19    actually talked with their school in October/early November

20    2019, and finally kind of figured out they were actually in

21    Tucson.

22         THE COURT:  So you spoke to the school in October, is

23    that what you said?

24         THE WITNESS:  I spoke with the IST, the International

25    School of Tucson, around 10th to 17th of October of 2019, I

1    believe.

2            THE COURT:  Are you -- have you been under any -- you

3    talked about the VA and posttraumatic stress symptoms, PTSD

4    diagnosis, have you had any counseling, let me ask first, in

5    the last 15 months?

6            THE WITNESS:  No, not in the last 15 months.

7            THE COURT:  Have you had counseling prior to that?  Or

8    at any time.

9            THE WITNESS:  Yes.  Actually every time I went for my

10   VA appointments while I was stateside, there's a PTSD

11   questionnaire that gets administered automatically to every

12   single patient that comes through the VA facility.

13           THE COURT:  And how often did you go to the facility?

14           THE WITNESS:  Usually I went for my annual checkup,

15   like on my anniversary, birthdays, or if I had any recurrent

16   appointments.

17           THE COURT:  And there's a questionnaire that you fill

18   out, is that what you said?

19           THE WITNESS:  Yes, Your Honor.  That is correct.

20           THE COURT:  But you've never been in therapy or under

21   the care of a therapist.

22           THE WITNESS:  I have never been in therapy.

23           THE COURT:  You're doing contract work now, is that

24   correct?  Contract with the U.S. Military?

25           THE WITNESS:  Yes.  I have a piece of contract with

1  the U.S. Military, and some operation on the western side,

2  southern Germany routes, passenger transfers.

3       THE COURT:  Do you have access to their base or their

4  services, the U.S. Military base?

5       THE WITNESS:  Yes, I do.  Based on my veterans ID

6  card, I have full access to the base facilities anywhere around

7  Germany.  The NDAA Act of 2020 has even full exchange

8  privileges, commissary, and morale and welfare facilities to

9  the betterments.

10       THE COURT:  Thank you.  I have no other questions.

11    Ms. Haralambie, did you have any other questions?

12       MS. HARALAMBIE:  I don't believe so, Your Honor.

13    I think we've got three minutes left, is that right?

14       THE COURT:  Yes.  Was there anything further we needed

15  to address in the next three minutes?

16       MS. HARALAMBIE:  No.  I think the argument that I made

17  on my motion is pretty much the same argument that I would make

18  again.

19       THE COURT:  Thank you.  Mr. Kennedy, anything else?

20       MR. KENNEY:  Well, I don't know if it's going to be

21  closing argument time.  Do you want us to submit written?

22       THE COURT:  I don't think I need closing arguments I

23  have heard the testimony and I will review everything.

24       MR. KENNEY:  I would just point out, Your Honor, one

25  thing he just testified to that was absolutely a hundred

1    percent incorrect.  And that's Exhibit 7, their own exhibit, he

2    files a police report with the Tucson Police Department on

3    September 15, 2019, 10:46 p.m.  In Exhibit 7, he lists the

4    address where the children are, which is at 5900 North Camino

5    del Conde, Tucson, Arizona, 85718.  So his testimony that he

6    didn't know where the children were is an absolute lie.

7        Which is also something I think the Court should note in

8    his application, he puts down that he was in Merzalben,

9    Germany, January 15, 2020, when he filed that application with

10   the Hague Convention.  It's clear from his testimony he was

11   not.  And that's a statement he had to provide under oath.

12       My contention is this man is not being truthful to this

13   Court, and I would ask Your Honor to find that.

14            THE COURT:  Thank you.  If there is nothing further,

15   you are excused.  I am going to take the matter under

16   advisement and issue an order.

17       Was there anything further?

18            MS. HARALAMBIE:  Thank you, Your Honor.

19            THE COURT:  Thank you.

20            MR. KENNEY:  Nothing further.  Thank you for your

21   time.

22            MS. McNORTON:  Thank you, Your Honor.

23            MS. HARALAMBIE:  I'm assuming the Court did not want

24   me to file an affidavit on attorneys fees and costs before you

25   rule, is that correct?

1             THE COURT:  That's correct.

2             MR. KENNEY:  Will I be able to respond to the

3     affidavit?

4             THE COURT:  Yes.

5                   (Off the record at 12:59 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, A. TRACY JAMIESON, do hereby certify that I am

4   duly appointed and qualified to act as an Official Court

5   Reporter for the United States District Court for the District

6   of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true and accurate transcript of the proceedings

9   contained herein, held in the above-entitled cause on the date

10  specified therein, and that said transcript was prepared by me.

11         Signed in Tucson, Arizona, on the 1st of

12  October, 2020.

13

14

15                              s/A. Tracy Jamieson

16                              A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25