**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bogdan Radu, | No. CV-20-00246-TUC-RM |
| Petitioner, | **ORDER** |
| v. | |
| Persephone Johnson Shon, | |
| Respondent. | |

On June 8, 2020, Petitioner Bogdan Radu ("Radu") filed a Petition for Return of Children to Germany ("Petition") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001, *et seq.* (Doc. 1.) The Court held a three-day evidentiary hearing on July 29, 2020 and August 26-27, 2020. (Docs. 15, 21-22.) On September 17, 2020, the Court issued an Order granting the Petition and ordering the return of minor children O.S.R. and M.S.R. to Germany. (Doc. 26.) The Court found, under Article 13(b) of the Convention, that the children would be at grave risk of psychological harm if returned to Germany in the custody of Radu, but it further found that such harm could be mitigated by ordering that the children be returned in the temporary custody of Respondent Persephone Johnson Shon ("Shon"). (*Id.* at 5-6.)

On August 31, 2021, the Ninth Circuit held that this Court's September 17, 2020 Order "is permissible under the Convention," but it vacated and remanded for this Court

"to reasonably ensure compliance with its alternative remedy in Germany." *Radu v. Shon*, 11 F.4th 1080, 1084 (9th Cir. 2021). This Court held a further evidentiary hearing on November 3, 2021 and November 9, 2021. (Docs. 63, 67.) The Court also contacted the United States Department of State for assistance.

**I.    Evidentiary Hearing**

At the evidentiary hearing on November 3, 2021, Shon called Dr. Andreas Hanke, Ph.D., as an expert witness. At the continued evidentiary hearing on November 9, 2021, the Court heard testimony from Shon and Radu. Radu filed pro se pleadings related to the hearing. (Doc. 58 (duplicated at Doc. 65-1 to 65-6); Doc. 64.)[1] Shon introduced a number of exhibits into evidence at the hearing, filed a Notice of Case of Interest (Doc 60), and filed a Notice of Authority Relied Upon in Closing Argument and Supplemental Authority (Doc. 70).

Dr. Hanke is an attorney licensed in Germany who testified as Shon's expert in German family law and in comparative law relating to Germany's treatment of United States Hague orders. Dr. Hanke testified that, although a United States custody order would be enforced in Germany, a Hague return order is not eligible for recognition or enforcement in Germany. Dr. Hanke further testified that the concept of alternative remedies (a.k.a., undertakings or ameliorative measures) is unknown in Germany, and therefore the temporary custody ruling in this Court's September 17, 2020 Order would be unenforceable in Germany. In addition, Dr. Hanke testified that, even though Germany was the place of habitual residence of O.S.R. and M.S.R. within the meaning of the Convention at the time Shon removed them to the United States, a German court would nonetheless consider the children to be habitually resident in the United States.[2] Dr. Hanke opined that a German court would likely require the children to live in Germany for a significant amount of time—up to six months—before the court would

---

[1] Radu also filed a Motion to Allow Electronic Filing (Doc. 57), which this Court granted (Doc. 59). He later filed a duplicate of the Motion. (Doc. 65.) The duplicate Motion will be denied as moot.

[2] In support of this testimony, Shon introduced as Exhibit 65 an order of a German family law court that denied in July 2020 a petition filed by Radu regarding custody of O.S.R. and M.S.R. Radu disputes Shon's characterization of that order. (*See* Doc. 64 at 1-2.)

make a custody determination, but he also testified that the court would have discretion in determining when it was competent to make the custody determination. Dr. Hanke confirmed that, under German law, Radu and Shon currently have joint custody of O.S.R. and M.S.R. Finally, Dr Hanke testified that, because O.S.R. and M.S.R. are not German citizens, Shon would be unable to initiate German custody proceedings, or obtain protective measures in Germany, from abroad.

Shon testified that, as an American citizen, she would be able to travel to Germany as a tourist for 90 days but would be unable to work in Germany or to stay there long-term. She also testified that she lost approximately $55,000 to scammers and, as a result, she currently has only $700 in savings. She testified that she would be unable to afford plane tickets to Germany or rent in Germany. However, she also conceded that her parents, who are both retired medical doctors, have provided her and her children with financial support, including paying for their plane tickets from Germany to the United States and helping to pay for Shon's attorneys in this matter. Shon further testified that she currently lives in a house worth approximately $420,000 which was purchased by a business her parents own, and that she affords approximately $19,000 in annual private school tuition for her children. Shon is currently employed by Pima County and would be eligible for humanitarian leave for six months if she returned to Germany. Shon testified that she is frightened that she will get arrested if she returns to Germany, but she also testified that she is not sure if there are any legal matters pending against her in Germany and that she has not attempted to contact any German authorities to determine whether there is an arrest warrant or any proceedings against her.

Radu testified that he is prepared to pay for the airfare for the return of his children to Germany, as well as the cost of housing in Germany for Shon and the children until he can litigate custody in the German family court system. He avowed that he would maintain a separate household in Germany until he was able to have a hearing before a German family court. He testified that he has not attempted to speak to his children since November 2019 because Shon cut him off and indicated she wanted nothing to do with

him. Despite his acrimonious relationship with Shon, Radu testified that he believes that he and Shon can cooperate in order to settle their legal custody situation in Germany. He stated that he filed a missing children's report in Germany and his children's school may also have initiated legal proceedings related to the children's failure to return to school. He is not sure if any of those proceedings are active. If Shon is arrested in Germany, Radu's understanding is that the German equivalent of Child Protective Services would ascertain the safety of O.S.R. and M.S.R. Finally, Radu testified that his children are American and Romanian citizens, and that he is not sure whether M.S.R. could obtain German citizenship as a result of having been born in Germany.

In his pro se briefs, Radu avers that German courts have knowledgeable English-speaking judges, staff, and attorneys to properly resolve any matters brought before them; that Germany has child and family support services equivalent to Child Protective Services; and that this Court can request a record of the status of any criminal charges or investigations against Shon. (Doc. 58 at 1-3.)[3] He argues that his children should be returned to Germany in his temporary full and sole custody until a German court makes a final custody determination. (*Id.* at 14.)

In addition to holding an evidentiary hearing, the Court contacted the United States Department of State Office of Children Issues' country officer for Germany, who in turn contacted the German Central Authority on the Court's behalf. Alena Kukuk ("Kukuk") of the German Central Authority responded that no binding statement could be made regarding how long a German court would need to make a custody determination, but she directed the Court to Section 155 of the Act on Proceedings in Family Matters and Matters of Non-Contentious Jurisdiction, which states that "[p]arent and child matters concerning the place of residence of a child, the right of contact, or the surrender of the child, as well as proceedings based upon endangerment to the best interests of the child, shall have priority" and "shall be handled in an expedited manner."

---

[3] Radu asks the Court to seal certain evidence in this case (Doc. 58 at 10-11), but he does not specify which docket and page numbers he believes should be sealed. His request to seal evidence will be denied without prejudice to his ability to file a Motion to Seal that specifically identifies the docket and page numbers that he is requesting be sealed.

- 4 -

Kukuk stated that the youth welfare offices in Germany are responsible for monitoring and ensuring the welfare of children and can conduct home visits, apply to a court for restriction of custody rights of parents and transfer to a guardian, and, in urgent matters, take a child into custody before applying to the court. Neither the United States Department of State nor the German Central Authority were able to inform the Court whether there are criminal matters pending against Shon in Germany.

## II.     Applicable Law

If a child has been wrongfully removed or retained within the meaning of the Convention and less than one year has elapsed from the date of the wrongful removal or retention and the commencement of Hague proceedings, the court must promptly order the child's return unless an exception applies. Convention Art. 12; 22 U.S.C. § 9001(a)(4). One such exception is contained in Article 13(b) of the Convention, which provides that the court is not required to order the return of the child if there is a "grave risk" that the child's "return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." In evaluating the grave-risk exception, the Court may not speculate on where the child would be happiest, *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005), or who is a better parent, *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999). Furthermore, the Court must consider only whether a living situation is likely to cause grave psychological harm "during the period necessary to obtain a custody determination," not whether it would be capable of doing so "over the full course of a child's development." *Gaudin*, 415 F.3d at 1037. The respondent bears the burden of establishing the grave-risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

"[B]efore denying the return of a child because of a grave risk of harm, a court must consider alternative remedies" that would allow the child's return while protecting the child from harm. *Gaudin*, 415 F.3d at 1035. The alternative remedy evaluation "must consider whether the return remedy is more likely than not to reduce the short-term risk of harm accompanying repatriation." *Radu*, 11 F.4th at 1087. In evaluating

alternative remedies, the court "cannot weigh matters or apply measures treading on the ultimate custody determination." *Id.* Furthermore, the alternative remedy should not "incorporate any long-term considerations or conditions that conflict with the Convention and ICARA." *Id.*

In evaluating whether an alternative remedy mitigates a grave risk of harm, the district court should consider the enforceability of its alternative remedy "in the foreign jurisdiction based on the availability of legal measures to mitigate the child's risk of harm, reliability of testimony indicating compliance with any court orders or legal measures," and the "history of the parent's relationship, cooperation, and interpersonal communications." *Radu*, 11 F.4th at 1087-88. If the severity of the risk of harm to the children is low, and "depending on the parties' pattern of behavior," voluntary commitments or agreements from one parent to obey court orders may be sufficient. *Id.* at 1088.

The alternative remedies inquiry "is inseparably bound up with the question whether a grave risk of psychological harm exists in the first place," and both the existence of a grave risk of harm and the effect of remedies must be considered in light of circumstances as they exist in the present." *Gaudin*, 415 F.3d at 1036.

### III. Discussion

Dr. Hanke testified that a United States custody order would be enforced in Germany but that a Hague return order would not be eligible for recognition or enforcement. The Court finds that, if a German court were to construe the temporary custody provision of this Court's September 17, 2020 Order as a custody order, the provision may be enforceable; otherwise, the provision would likely be unenforceable. Regardless, the Court finds that the provision is not necessary to mitigate a grave risk of psychological harm to O.S.R. and M.S.R. in light of all testimony and evidence in the record.

As the Ninth Circuit observed, this is "a borderline case whether an Article 13(b) finding is warranted." *Radu*, 11 F.4th at 1089. The Court's prior Article 13(b) finding

1 was based on the risk of psychological harm to O.S.R. and M.S.R. if the children were
2 returned to Germany in the sole custody of Radu.  (*See* Doc. 26 at 5.)  Furthermore,
3 without the benefit of testimony establishing how long it would take for a German court
4 to make a custody determination, this Court considered the risk of psychological harm
5 over too lengthy of a time period.

6 The testimony at the post-remand evidentiary hearing, as well as the information
7 obtained by the Court from the German Central Authority, establishes that, under German
8 law, Shon and Radu currently have joint custody rights, and a German court would be
9 able to make a custody determination within six months of the return of O.S.R. and
10 M.S.R., with the court having discretion to make such a determination earlier, and with
11 custody matters receiving priority for expedited processing.  At a minimum, Shon is able
12 to return to Germany for three months as a tourist.  Furthermore, it is likely Shon's
13 parents would be willing to travel to Germany as tourists to assist as necessary with the
14 caregiving of O.S.R. and M.S.R., given their history of consistently providing as-needed
15 support to Shon and the children.  Accordingly, Shon—followed by her parents if
16 necessary—would be capable of staying in Germany until a custody determination can be
17 made by a German court of competent jurisdiction.  Even if a German court declines to
18 make a custody determination until O.S.R. and M.S.R. have resided in Germany for six
19 months, and even if Shon's parents decline to travel to Germany, Shon's ability to stay
20 with the children in Germany with joint custody rights for the first three months will help
21 the children transition back to German society and to the care of their father.  Although
22 Radu and Shon have a history of poor, antagonistic communication, both have an interest
23 in obtaining an expedient custody determination; based on that mutual interest, the Court
24 finds that they could cooperate sufficiently until a German court makes a custody
25 determination.  If problems arise, Germany has child protection agencies to ensure the
26 wellbeing of the children.

27 Shon's testimony concerning her limited financial means was not entirely credible,
28 given Shon's employment, lifestyle, and ability to obtain financial support as needed to

fund her lifestyle. Furthermore, if Shon is unable to pay for airfare or rent in Germany, Radu has committed to paying for the airfare of O.S.R. and M.S.R., as well as rent for a separate residence for Shon and the children until a custody determination can be made in Germany. Although there is some possibility of criminal proceedings pending against Shon in Germany, Germany's child protection agencies would ensure the safety and wellbeing of O.S.R. and M.S.R. in the event of Shon's arrest. Furthermore, the Court questions why Shon has not attempted to ascertain whether any criminal proceedings are pending against her in Germany if she is concerned about that possibility—particularly since she hired a German lawyer for other purposes during the course of these proceedings.

Given the above, the Court finds that ordering Shon to return with O.S.R. and M.S.R. to Germany—where she and Radu have joint custody rights—is sufficient to ameliorative any risk of psychological harm to the children.

The parties may request a further hearing if they need assistance regarding the logistics of returning O.S.R. and M.S.R. to Germany.

**IT IS ORDERED** that the Petition (Doc. 1) is **granted**. Respondent Persephone Johnson Shon shall return O.S.R. and M.S.R. to Germany within **thirty (30) days** of the date this Order is filed.

**IT IS FURTHER ORDERED** that Radu's duplicate Motion to Allow Electronic Filing (Doc. 65) is **denied as moot**.

Dated this 30th day of December, 2021.

_____
Honorable Rosemary Márquez
United States District Judge